# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.B., by and through his guardians ad litem, ADAM BILLIET and CORRIE BILLIET, | CASE NO.: 1:19-cv-00858-NONE-EPG |
| Plaintiff and Counter-Defendant, | FINDINGS AND RECOMMENDATIONS RECOMMENDING THAT THE DECISION OF THE CALIFORNIA OFFICE OF ADMINISTRATIVE HEARINGS BE AFFIRMED IN PART AND REVERSED IN PART |
| v. | |
| TUOLUMNE COUNTY SUPERINTENDENT OF SCHOOLS, et al., | (ECF Nos. 37, 40) |
| Defendants and Counter-Claimants. | ORDER GRANTING MOTION TO SUPPLEMENT THE RECORD |
| | (ECF No. 32) |
| | ORDER GRANTING UNOPPOSED REQUESTS FOR JUDICIAL NOTICE |
| | (ECF Nos. 38, 42) |
| | **FOURTEEN DAY DEADLINE** |

J.B., a minor, by and through his guardians ad litem, Adam Billiet and Corrie Billiet (collectively "Parents"), appeals from an education due process hearing and decision under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* J.B. contends that the decision of the California Office of Administrative Hearings ("OAH"), issued by Administrative Law Judge Tiffany Gilmartin ("ALJ"), erred in several ways and should be overturned in part. The Tuolumne County Superintendent of Schools ("TCSS") and Curtis Creek Elementary School District ("District") have filed a cross-appeal, also contending that the

decision issued by the ALJ erred in several ways and should be overturned in part.[1] The Court recommends that the ALJ's decision be affirmed in part and reversed in part.

Also before the Court are the unopposed requests of TCSS and District (collectively, local education agencies or "LEAs") for judicial notice (ECF Nos. 38, 42), and J.B.'s motion to supplement the record (ECF No. 32). The Court will grant the unopposed requests for judicial notice and will also grant J.B.'s motion to supplement the record.

## I.      FACTUAL BACKGROUND

The following factual background is taken from the ALJ's findings of fact, except as otherwise specifically noted.

J.B. is a minor child who is eligible for special education and related services under the primary category of emotional disturbance, and the secondary category of specific learning disability. J.B.'s family moved to Tuolumne County and began residing within LEAs' boundaries in 2015, when J.B. was in first grade. At the time of the hearing before the ALJ, J.B. was eleven years old and in fifth grade. He is now twelve years old and has completed his sixth grade year.

J.B. has had emotional and behavioral struggles from an early age, including extreme and sudden violent behaviors since age five. (AR 1820-34, 1835.) J.B. has exhibited significant behavioral issues at both home and school and Parents have taken J.B. to see various mental health professionals over the years. J.B. has been treated by a psychiatrist since 2013 for behavior that includes eloping from both home and school, hallucinating that he is a spy or a detective, making weapons out of available objects, seeing goblins, and hearing voices that cause him to smear feces on walls. (AR 3153, 3157, 3172, 2173, 3178, 3186, 3411-15, 5308-10, 5318-22, 5682-83; 5689, 5834.) J.B. has been "5150'd"[2] for dangerous, aggressive, and/or self-harming

---

[1] The parties' cross-motions for summary judgment are before the Court on referral from now-retired Chief Judge Lawrence J. O'Neill (ECF No. 29).

[2] Being 5150'd refers to being taken into custody under California Welfare. & Institutional Code § 5150, which provides:

> When a person, as a result of a mental health disorder, is a danger to others, or to himself or herself . . . , a peace officer [or designated professional] may, upon probable cause, take, or cause to be taken, the person into custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention, or placement for evaluation and treatment in a facility designated by the county for evaluation and treatment and approved by the State Department of Health Care Services.

1  behavior[3] at least fourteen times, with the most recent in January 2019. (AR 3153, 3157, 3164,

2  3172, 3173, 3178, 3186, 3411-15, 3842-46, 3848-50, 5308-5310, 5318, 5585-86, 5682, 5683,

3  5689, 5690, 5834-36.).

4  **A.** **Fall 2016 Semester**

5      Prior to the start of the 2016-17 school year, J.B. ran away from Parent, and Parent

6  contacted law enforcement, who took J.B. into custody in restraints and to the hospital for a

7  psychiatric evaluation. J.B. was hospitalized for one week. Once released, J.B. was enrolled at

8  Curtis Creek Elementary, a comprehensive elementary school within the District. At the end of

9  the first day of school, when J.B.'s mother came to pick him up, he refused to get into the car and

10  instead eloped from the school site with his mother and the principal in pursuit. J.B. attacked the

11  principal with a stick and bit him. Following this attack, Parents were informed that J.B.'s

12  behavior was not suitable for a comprehensive elementary school and J.B. was placed at the

13  Nexus program. The Nexus program is a structured behavioral support program intended to help

14  students with behaviors that interfere with their learning. The program provides students with

15  behavior and social emotional supports in a specialized classroom on a general education campus.

16      On December 2, 2016, J.B. had a behavior incident on the school bus during which he

17  required numerous prompts for redirection, spit at another student, and was banging the seat belts

18  together. Parents received a warning letter from the transportation coordinator. J.B. was also

19  suspended on December 15, 2016, for jumping on another student, knocking the student over,

20  throwing a rock at staff, and running away.

21      An individualized education plan ("IEP") team meeting was held on December 2, 2016.

22  J.B. was found to qualify for mental health services and the IEP team offered 180 minutes

23  monthly of individual counseling to support positive peer interactions and emotional regulation.

24  _____

25  Cal. Welf. & Inst. Code § 5150(a).

    [3] J.B.'s self-harming behavior includes suicidal conduct from a very early age. At six years old, J.B.

26  attempted suicide "by tying a string around his throat, pulling a bookshelf down on himself, and sticking a pencil in his ear to poke out his brain." (AR 3758, 3785, 4005.) At seven years old, J.B. threatened to kill himself and everyone

27  around him, cut his arms with an arrowhead-like stick, and attempted to cut anyone who came into contact with him. (AR 3365, 3842.) Also at seven years old, J.B. drank hand sanitizer and put his tongue in an electric socket. (AR 3843, 4284.) At nine years old, J.B. threatened to jump off a ledge, but his father was able to stop him. (AR 3320.) At

28  ten years old, J.B. threatened suicide by jumping out of second story window. (AR 3481, 3846.)

1  Parent consented to this IEP offer on December 12, 2016.

2  **B.   <u>Spring 2017 Semester</u>**

3       J.B.'s annual IEP meeting was convened on January 4, 2017. The meeting was continued to

4  January 31, 2017. The team reviewed assessment data from J.B.'s psychoeducational assessment.

5  J.B.'s verbal comprehension and visual spatial were in the average range, J.B.'s fluid reasoning

6  was below average, and he had deficits in his working memory and processing speed. J.B. was

7  identified as clinically significant in all areas of executive functioning. J.B.'s academic

8  assessment also revealed math deficits in calculation. Both raters on his Behavior Assessment

9  System for Children-3rd Edition identified J.B. as clinically significant in hyperactivity,

10  aggression, conduct problems, depression, typicality, and withdrawal. Parent provided private

11  assessment results ruling out Autism as a diagnosis for J.B.

12       The IEP team identified writing, math, fine-motor skills, bilateral coordination, and social

13  skills as areas of need. J.B.'s executive function deficits were an unaddressed area of need. LEAs

14  knew of J.B.'s need for redirection, aggressive outbursts, and frequent prompting by the

15  classroom aide to complete his work but failed to provide any goals in this area. The IEP team

16  developed an executive function goal of keeping J.B.'s work space orderly but did not develop

17  goals to address his other areas of executive functioning need.

18       The occupational therapist reviewed J.B.'s three occupational therapy goals and found that

19  J.B. met both fine motor goals but did not meet his bilateral coordination goal of being able to

20  shoot a basketball through a standard height hoop 50 percent of the time. The school district team

21  recommended discontinuing occupational therapy. J.B. continued to have fine and gross motor

22  needs.

23       The IEP team also determined J.B. did not need assistive technology services. However, on

24  February 24, 2017, the IEP team agreed J.B. needed the assistance of an educational tablet that

25  Parents were required to provide. Despite this, no assistive technology assessment was

26  recommended for J.B.

27       J.B.'s previous IEP contained a total of seven goals. By the January 31, 2017 IEP, J.B. met

28  only three goals: the two fine motor goals and a goal in respecting personal space. The IEP team

4

found that J.B.'s behavior impeded his learning and that of others. Parent raised a concern about J.B. being restrained on the bus due to his behavior. The IEP team determined J.B.'s behavior could be managed through classroom reinforcement systems and mental health support and developed two new behavior goals to address positive peer interactions and managing anger, stress, and frustration. Both goals were set in a counseling setting, not the classroom, and would be addressed by the mental health clinician.

J.B.'s school-based mental health needs and goals were serviced by his mental health clinician Jordan Reiser. Ms. Reiser obtained her master's degree in psychology with an emphasis in marriage and family therapy in 2009. Ms. Reiser completed the requisite 3000 practicum hours to obtain a license as a marriage and family therapist in 2011. Ms. Reiser referred to herself as a mental health associate. Ms. Reiser was familiar with J.B. She was aware of J.B.'s behavior challenges and his active imaginary world. She wrote J.B.'s behavior goals without any assistance from other staff or team members. She admitted that she was not the best at writing goals, and that she wrote J.B.'s goals to be addressed/achieved in a counseling setting and not in a classroom setting.[4] (AR 4325.)

The IEP team offered J.B. placement in the Nexus program. The team developed 12 goals for J.B. to work on over the next 12 months. One behavior goal addressed positive peer interactions such as introductions, sharing, and starting a conversation with a 70 percent success rate in two out of three trials in a counseling setting. Another goal addressed J.B.'s need to regulate his emotions. This goal provided that J.B., in a counseling setting, would identify five strategies for managing his own anger, stress, frustration, and anxiety 70 percent of the time in two out of three trials as measured by the mental health clinician. Other goals included a number sense goal, which required J.B. to add and subtract double digits up to 50 with 80 percent accuracy, and a spelling goal of 80 percent accuracy from a fourth-grade sight list.

The IEP also offered services, supplementary aides, accommodations, and supports in the classroom. The services offered included 120 minutes monthly of individual mental health

_____

[4] Ms. Reiser testified at the hearing before the ALJ. The ALJ found that Ms. Reiser was familiar with J.B. and his needs. The ALJ gave her testimony significant weight.

counseling, which was a 60 minute per month reduction from the services J.B. was offered in December 2016, and 204 minutes daily of specialized academic instruction. The supplementary aids, accommodations, and classroom supports included collaboration between staff and parents; a daily behavior chart to track behaviors; chunking of assignments; comprehension checks; pairing verbal instruction with visual cues or schedules; providing J.B. with breaks; limiting distractions in J.B.'s work area; the use of a token reward system; speaking to J.B. away from peers in a calm voice; escorting J.B. to the bathroom and checking the bathroom facility prior to and after use; and staff maintaining line of sight control over J.B. when on the track and staying within arm's reach when J.B. was on the blacktop area.

Parents consented to the January 31, 2017 IEP offer and did not request different or additional goals, placement, services, or supports.

Within days after the January 31, 2017 IEP, J.B. had two behavioral incidents that resulted in him being suspended from school. The first incident occurred when J.B. hit two other students and the bus driver while riding the bus. He also hit his teacher and broke the classroom window on the same day. This resulted in a one-day suspension.

The second incident occurred when J.B. returned from his first suspension. J.B. was playing tag with other students when he hit three students and ran away from the playground. He threw a rock at staff and ran away from staff while he continued to throw rocks. As staff attempted to escort him off the playground, he attempted to bite staff and throw rocks at them. Staff was able to get J.B. back into the classroom where he was contained in a sitting wall restraint until he calmed down. J.B. was suspended for one day for this second incident.

An IEP meeting was held on February 24, 2017, where the two behavior incidents were reviewed. The IEP team agreed J.B. would use Leapfrog, an educational tablet provided by Parents, as a behavior support on his bus rides. No assistive technology assessment was proposed. However, the IEP team presented an assessment plan to conduct a functional behavior assessment on J.B. Specifically, the team wanted to explore the function of his aggressive behaviors, review school and bus behavior, and explore additional aide support. Parent consented to the functional behavior assessment ("FBA").

1   A FBA is a formal assessment conducted by a behaviorist. The behaviorist collects data

2   during multiple observations at different times concerning maladaptive behaviors. The purpose of

3   the assessment is to determine what events or circumstances trigger maladaptive behaviors and

4   determine the true purpose behind each behavior. A plan is then developed to decrease the

5   frequency of the targeted behavior, determine one or more appropriate replacement behaviors, and

6   develop reinforcement strategies to encourage replacement behaviors. The referring behaviors for

7   J.B.'s assessment plan were: (1) negative interactions with peers, defined as making threats and

8   negative comments towards peers; and (2) aggression towards adults and peers, defined as hitting,

9   kicking, and pushing.

10   Victoria Murphy, a board-certified behavior analyst, conducted the FBA in March and

11   April 2017. Ms. Murphy's area of expertise was Autism. Prior to J.B., she had never conducted a

12   functional behavior assessment for a student with emotional disturbance. In conducting the FBA,

13   Ms. Murphy interviewed Parent and learned there were also concerning behaviors occurring in the

14   home. Ms. Murphy also visited J.B.'s Nexus classroom, his mainstream class, the honor room,

15   and the art room, and observed J.B.'s transitions between classrooms. She made five observation

16   visits during the assessment period. During the observation visits, there were no documented

17   instances of maladaptive behaviors.

18   The IEP team met on May 30, 2017, to review Ms. Murphy's FBA. The IEP team

19   developed four new behavior goals for J.B. Two of the behavior goals required J.B. to engage in

20   positive peer interactions and identify five strategies for self-management of stress, anger, and

21   frustration. Both goals called for J.B. to be measured in a counseling setting by the mental health

22   clinician. The remaining two behavior goals involved J.B. utilizing a self-management tool to

23   identify stress triggers and learn to choose an appropriate behavior prior to engaging in

24   maladaptive behaviors and using a graphic organizer to help him select better behavior choices.

25   The IEP team generated a checklist of behaviors and interventions to be addressed:

26   (1) J.B.'s oppositional behavior and defiance towards teachers, adults, and authority figures;

27   (2) J.B.'s tendency to argue and bicker with adults and other students; (3) J.B.'s failure to admit

28   responsibility, frequently blaming others for his failures; (4) J.B.'s failure to follow through with

1   directives; and (5) J.B.'s tendency to not comply with school and class rules, routines, and

2   procedures.

3          Parent signed as present on the IEP team meeting amendment page on May 30, 2017.

4   Parent did not, however, initial that she consented to the IEP.

5   **C.   <u>Fall 2017 Semester</u>**

6          **1.     *October 18, 2017 IEP Amendment***

7          Following the conclusion of the FBA and prior to the start of the 2017-18 school year,

8   Ms. Murphy developed a behavior intervention plan ("BIP") for J.B. Ms. Murphy identified

9   positive behavior strategies employed by J.B.'s Nexus classroom teacher, Shea Morgan, and

10  included recommendations based on those strategies. Because, as noted previously, none of J.B.'s

11  targeted behaviors occurred during the assessment period, the BIP did not address when J.B.'s

12  maladaptive behaviors were more likely to occur. The BIP thus included recommended

13  preventative strategies to address J.B.'s reported, but not observed, behaviors. The recommended

14  strategies consisted of speaking in a neutral and emotionally flat manner; stating directions in a

15  clear and concise manner, then walking away to avoid power struggles; and focusing on J.B.'s

16  effort rather than his accuracy or his grade. The BIP also recommended listening to J.B. to

17  validate his feelings and, when possible and appropriate, to ignore J.B.'s disruptive behavior.

18         The IEP team met again on October 18, 2017, to review the BIP generated by Ms. Murphy,

19  and generate additional behavior goals. The IEP team presented a new plan of behavior

20  intervention that differed from the one the team had introduced in May 2017. This plan identified

21  two target behaviors: negative interactions and aggression towards adults. The plan did not,

22  however, address the frequency of the behaviors. The IEP team indicated that J.B.'s maladaptive

23  behaviors occurred to express frustration with difficult tasks; to protest, postpone, or avoid non-

24  preferred tasks; and to express anger toward an unwanted peer or adult in an effort to remove that

25  unwanted peer or adult.

26         The IEP team included strategies to prevent problematic behavior. These strategies

27  included having J.B. meet with his teachers and have an opportunity to ask questions and receive

28  clarification on expectations for the intervention plan; having J.B. meet with Ms. Reiser to review

1 the intervention plan and establish skills needed to comply with the plan; and providing J.B. with

2 the opportunity to review the visual tools and understand the uses and procedures to access

3 supports. The IEP team also included replacement behaviors for J.B. To encourage these

4 replacement behaviors, the plan included verbal praise for on-task behavior, participation in a

5 token economy to allow J.B. to access preferred activities, and a preferred staff member or food

6 as part of his reinforcement.

7      Four additional goals were developed for J.B. A self-soothing goal asked J.B. to

8 independently move to a safe area away from conflict in four out of five situations. An emotional

9 control goal required J.B. to not engage in threats and negative comments towards other students,

10 and to avoid aggression towards adults as defined by making physical contact with them through

11 hitting, kicking, and pushing 85 percent of the school days he attended. Another goal required

12 J.B. to independently seek help when engaged in a difficult or non-preferred task. Yet another

13 goal asked J.B. to calmly and effectively communicate his emotions and needs in four out of five

14 trials.

15      ***2.   J.B.'s Behavioral Emergencies***

16      After the October 18, 2017 IEP team meeting, and before the end of the 2017-18 school

17 year, J.B. engaged in eight maladaptive incidents that resulted in him being suspended from

18 school. The behaviors included punching other students yelling obscenities at a teacher, throwing

19 rocks at other students and staff, bringing a pocket knife to school, and striking a teacher with a

20 fire extinguisher. Three of these maladaptive behavior incidents occurred between October 18,

21 2017, and January 29, 2018. These incidents included eloping from campus, striking Mr. Morgan

22 with a fire extinguisher, and striking staff with rocks.

23      J.B.'s teachers and support staff tried to navigate J.B.'s changing behaviors. Mr. Morgan

24 developed home-communication logs to share news of J.B.'s behavior with Parents. Mr. Morgan

25 also developed a points system that would evaluate J.B. daily on his behaviors. If J.B. behaved

26 appropriately, he could earn snacks or a video at the end of the day.

27      Mr. Morgan's behavior emphasis was to encourage J.B. to end the day well. Thus, if J.B.

28 engaged in maladaptive behaviors at some point in the day, but recovered his behavior,

1   Mr. Morgan sought to encourage that recovery. Mr. Morgan utilized suspensions to support
2   appropriate behaviors for J.B. Mr. Morgan also utilized in-house suspensions in an effort to
3   determine which consequences J.B. least preferred and support positive outcomes.

4        Mr. Morgan and his aide staff were frequently the adults who remained within arm's length
5   of J.B. during the day to best redirect his maladaptive behaviors. Mr. Morgan and his aide staff
6   were also frequently the target of J.B.'s anger and dislike of authority figures. J.B. threw rocks at
7   Mr. Morgan and struck him with a fire extinguisher and sticks. Mr. Morgan was familiar with J.B.
8   and his needs.[5]

9        J.B. was also privately seeing therapist Susan Swaffar, a licensed marriage and family
10  therapist.[6] Ms. Swaffar saw J.B. after school and spent much of their counseling sessions working
11  on getting J.B. to be emotionally regulated so he could go home from school. Ms. Swaffar found
12  Nexus to be a great program for J.B. at first and did not believe J.B. initially required residential
13  treatment. This was consistent with Parents' desire to keep J.B. in the family unit, which was a
14  preferred outcome. Ms. Swaffar identified J.B.'s tendency to cycle through his maladaptive
15  behaviors. She called this tendency "slippery" because it was exceptionally difficult for J.B.'s
16  caregivers and teachers to predict when the maladaptive behaviors would return. J.B. often
17  returned to similar themes during therapy sessions: being a spy, his need for a weapons cache, and
18  his anger with people who didn't understand that he was a spy.[7]

19       Parents also hired a private behavior modification practitioner, Susan Knopf. Ms. Knopf
20  retired out of Tuolumne County Behavior Health service in 2018. She holds a master's degree in
21  social and behavioral sciences. Ms. Knopf has developed a program she calls cognitive behavior
22  skills that helps parents work through the maladaptive behavior of their children. Ms. Knopf was
23  familiar with the Nexus program from other clients who participated in the program prior to J.B.'s
24  case.

25

26       [5] Mr. Morgan testified at the hearing and the ALJ gave Mr. Morgan's testimony significant weight.
         [6] After Ms. Swaffar began working with J.B. in 2015, she provided Parents with a referral to a psychiatrist,
27  Dr. Randall Roxas. Ms. Swaffar explained that she and Dr. Roxas communicated after the initial referral regarding
    J.B.'s treatment plan but that she had not communicated with Dr. Roxas in more than two years.
28       [7] Ms. Swaffar testified at the hearing. The ALJ stated that she found Ms. Swaffar's testimony and knowledge
    of J.B. to be persuasive and that she gave it great weight.

Ms. Knopf provided extensive assistance to J.B.'s family outside the school setting. When Ms. Knopf first started working with J.B. and Parents, Parents contacted her almost daily, and sometimes multiple times a day. As J.B. became familiar with the program, the frequency of contact with Parents decreased. However, as J.B.'s maladaptive behaviors resurged, Parents' frequency of contact increased again. As part of her on-boarding process, Ms. Knopf worked with Parents for three to four weeks implementing skills. During this process, she observed one instance of J.B.'s maladaptive behavior and how it was influenced by his sibling.

Ms. Knopf became a member of J.B.'s emergency phone-tree contacts for when J.B.'s behaviors became unsuitable and he was not able to remain at school. Ms. Knopf would pick J.B. up from school if Parents were unable to do so. Ms. Knopf would also meet Parents at the emergency room when necessary. Ms. Knopf became a trusted member of J.B.'s private support team.[8]

**D.      Spring 2018 Semester**

  *1.      January 29, 2018 IEP*

J.B.'s annual IEP team meeting convened on January 29, 2018. The IEP team offered J.B. continued placement at the Nexus program, specialized academic instruction for 1080 minutes per week, and individual counseling for 120 minutes monthly.

Of the twelve goals that had been previously set for J.B., only four of them were met, two of which were behavior goals. However, J.B. did not meet any of the behavior goals that had been introduced through the October 17, 2017 IEP amendment, which added the behavior intervention plan ("BIP").

Parent provided the IEP team with a letter from Dr. Roxas, J.B.'s psychiatrist. This letter identified J.B.'s current psychiatric diagnoses and any conditions that were still under consideration. The letter informed the IEP team that Dr. Roxas had diagnosed J.B. with bi-polar disorder and attention deficit hyperactivity disorder.

---

[8] Ms. Knopf testified at the hearing before the ALJ. The ALJ noted that during her testimony, Ms. Knopf expressed her belief that J.B. was intellectually disabled. The ALJ found that Ms. Knopf did this without any evidence to support her claim. The ALJ found Ms. Knopf's credibility to be impacted by this unsupported statement.

1    The IEP team identified J.B.'s areas of need as English language arts, math, social skills,
2    counseling, and behaviors. J.B. also continued to display the need for occupational therapy
3    services, executive functioning, and assistive technology. No goals or services were offered
4    regarding occupational therapy, executive functioning, or assistive technology.

5    The IEP team introduced new goals in multiplication, subtraction, and reading fluency,
6    along with a counseling-setting behavior scenario goal, and two new behavior goals to address
7    negative peer interactions and aggression. Goals from the 2017 IEP that J.B did not meet were
8    continued. An aggressive behavior goal called for J.B. to refrain from pushing, kicking, or hitting
9    staff 100 percent of the school days he was present. His previous goal had called for him to avoid
10   the target behavior 85 percent of the time. He had four instances of physical contact since a
11   previous October 2017 incident, for a 93 percent success rate on avoiding those behaviors.

12   J.B. also received a bus behavior plan. The plan was devised in an effort to maintain J.B.'s
13   safety on the bus. Ms. Swaffar provided a letter in support of the bus behavior plan. She noted
14   that J.B. had made some progress in therapy. She believed he needed some assistance in order to
15   be successful in riding the bus. Ms. Swaffar identified triggers that made J.B. reactive.

16   As part of the bus behavior plan, J.B. would be given an iPad and headphones to use while
17   riding the bus. He would also be provided an aide to ride with him. At the time, J.B. was only
18   riding the bus in the mornings. Once J.B. could ride the bus without issue for one week, the team
19   would increase his ridership to afternoons with aide and technology support. No assistive
20   technology assessment was offered. Parent consented to the IEP on January 29, 2018.

21       *2.    May 10, 2018 IEP*

22    Following the January 29, 2018 IEP meeting, J.B.'s behavior deteriorated. Between
23   February 20, 2018, and July 5, 2018, J.B. was suspended a total of eight days. This was a
24   substantial increase in J.B.'s maladaptive behavior. This maladaptive behavior included J.B.
25   punching a kindergartner, hitting his teacher in the head with rocks and chasing him with a stick,
26   bringing a pocket knife to school, and spouting obscenities at his aide on the bus.

27    On May 10, 2018, an IEP team meeting was held to add searches of J.B.'s pockets and
28   socks in the morning and afternoon to prevent J.B. from hiding contraband that he could use as a

1  weapon. By this time, J.B. had been suspended nine days during the 2017-18 school year. His

2  behavior also required that he be transported to and from school in an individual vehicle.

3       The IEP team agreed to reintroduce J.B. to the bus the last week of the regular school year.

4  During this week, J.B. would take the bus in the morning with an aide. Starting with the extended

5  school year, J.B. would take the bus in the morning and the afternoon. Parent consented to the IEP

6  amendment.

7  **E.**    **Summer 2018 and Fall 2018**

8       The IEP team met again on June 25, 2018, to discuss J.B.'s transportation. J.B.'s treating

9  psychiatrist, Dr. Roxas, provided a medical update of current diagnoses for J.B., medical

10 protocols, and an opinion on the level of care J.B. needed. The team agreed J.B. required an aide

11 to ride the bus. An aide in the afternoon was currently available and they were searching for a

12 morning aide.

13      In August 2018, J.B. was suspended for one day for using school computers to access

14 inappropriate sites, including pornography. On September 6, 2018, J.B. threatened two staff

15 members on his bus ride home. He also kicked and spit on his aide and threatened additional

16 violence if his behavior was reported. Kylee Luchetti, the special education coordinator for

17 Tuolumne County,[9] informed Parents of J.B.'s suspension the evening of September 6, 2018.

18      As noted previously, J.B. also had a fantasy life as a spy. His fantasy life was becoming

19 more disturbing, his drawings more violent, and his desire to create escape routes and weapons

20 caches more immediate.

21      ***1.     Manifestation Determination Review Meeting***

22      A manifestation determination review meeting was held on September 11, 2018. During

23 this meeting, the manifestation determination review team concluded that J.B.'s behavior was a

24

25      [9] Ms. Luchetti joined the Tuolumne County Superintendent of Schools in July 2018 as the special education
coordinator. Tuolumne County supports 11 school districts with a regionalized special education program, and the

26 superintendent of schools provides all service clinicians to area schools. Ms. Luchetti supports special education
providers with training, supervision, and scheduling. Ms. Luchetti also handles special education discipline that rises
to suspension levels.

27      Ms. Luchetti met J.B. on the first day of school in August 2018 as part of her welcome back to school tour of
programs. Ms. Luchetti testified at the hearing before the ALJ. The ALJ found Ms. Luchetti's testimony to be

28 persuasive.

1  manifestation of his disability. Parents signed in agreement with the team's determination that

2  J.B.'s behavior was a manifestation of his disability.

3       Judy Simon, a board-certified behavior analyst for Tuolumne County, recommended to the

4  team that a new functional behavior assessment be conducted. At the time of the manifestation

5  determination review, Ms. Simon had 18 years of experience as a behavior specialist in a school

6  setting. She was working for Tuolumne County as an independent contractor during school year

7  2018-19. Ms. Simon had reviewed the original FBA conducted by Ms. Murphy and recommended

8  it be redone. Ms. Simon noted there were issues with getting the staff to record behavior data

9  correctly and lacked confidence the staff had correctly identified the behavior function. Ms.

10  Simon expressed a need for the behavior assessment to identify precursor information in order to

11  interrupt behaviors before they escalated.[10]

12       The manifestation determination review team adopted the recommendation that a new FBA

13  be conducted and a new BIP be developed. Jeanine Wilkinson,[11] a board-certified behavior

14  analyst with her own company, Building Connections Behavioral Health, also reviewed the FBA

15  and BIP developed by Ms. Murphy. She found both to be lacking in several areas and, consistent

16  with Ms. Simon and the manifestation review team, recommended that a new FBA be conducted

17  and a new BIP developed.

18       **2.  *Request for Residential Placement and Exploration of Residential Placement Options***

19       During the manifestation determination review, Parents indicated they wanted to pursue

20  residential placement for J.B. In support, Parent produced a letter from Ms. Swaffar outlining

21  J.B.'s counseling care and documenting Ms. Swaffar's belief that J.B. required a higher level of

22  care.

23       On September 17, 2018, shortly after the manifestation determination review, Ms. Luchetti

24

25      [10] Ms. Simon testified at the hearing. The ALJ stated: "Ms. Simon's knowledge of the case and thoughtful presentation was given significant weight."

26      [11] Ms. Wilkinson testified at the hearing. The ALJ found Ms. Wilkinson's opinions on the quality of Ms. Murphy's FBA and BIP to be impacted by straying from her area of expertise in behavior. The ALJ noted that Ms. Wilkinson consistently testified about J.B.'s "psychosis" issues, yet J.B. has a diagnosis of Bi-Polar disorder

27  and no medical provider had been called to testify to any "psychosis." Further, the ALJ found Ms. Wilkinson refused to answer the questions she was asked and that she instead insisted on providing the answers she wanted to

28  give. The ALJ found that these factors impacted Ms. Wilkinson's credibility.

provided parental consent forms for Parents to sign allowing LEAs to communicate with two residential treatment programs under consideration: Change Academy at the Lake of Ozarks and Devereux Advanced Behavioral Health. The same day, Ms. Luchetti reached out to Devereux via telephone. Because she did not yet have a signed parental consent, she was only able to inquire in generalities of Devereux's availability.

On September 29, 2018, J.B. was taken to the emergency room for suicidal behavior. During a manic incident, J.B. tried to harm himself with a knife, including attempting to stab his testicles. He was restrained by Parents and later by law enforcement. As J.B. was unable to re-regulate himself, he remained on a psychiatric hold until September 30, 2018.

Parent returned the signed consent for Devereux on October 1, 2018. The same day, Ms. Luchetti learned from Parent that J.B.'s application was rejected by the Change Academy because his behavior was too acute. On October 16, 2018, Ms. Luchetti provided Devereux with documents required to determine whether J.B. qualified for admission. Two days later, Ms. Luchetti learned from Devereux that J.B. had already been conditionally accepted from the documents provided to Devereux by Parents.

At this point, Parents were almost exclusively focused on finding a residential placement for J.B. LEAs were aware between October and December 2018, Parents were considering Devereux as a possible placement for J.B.

In the meantime, J.B. had been rejected from several other facilities. Edgewood Center for Children and Families determined it could not meet J.B.'s needs. Among the factors Edgewood identified as areas of need they would be unable to meet were J.B.'s self-harm, aggression, and tendency to make weapons.[12]

On November 28, 2018, Parent provided a signed release for LEAs to communicate with Perimeter Health, also known as Madison Oaks Behavioral Acute and Residential Services ("Madison Oaks"). This program was Parents' preferred program. The Madison Oaks team reviewed J.B.'s file, determined it could meet J.B.'s therapeutic and educational needs, and made

---

[12] Michael Clumeck, the director of admissions for Edgewood, testified at the hearing.

a decision on November 26, 2018, to admit J.B.[13] The Madison Oaks Behavioral Program is co-located with an acute care facility in Jackson, Tennessee. The facility has a child-adolescent and a geriatric unit. The program focuses on children who have behavioral or psychiatric issues that have made them a threat to themselves or their community. J.B. would be able to receive academic, behavioral, psychiatric, and emotional support through Madison Oaks' program. The daily rate for the program is $495 which covers room and board, therapeutic services, and education.

Parents hired Shayna Abraham, a therapeutic educational consultant with her own company, Prepare to Bloom, as a consultant. Ms. Abraham has a master's degree in counseling psychology. She has no special education teaching experience. As a consultant, she specializes in locating residential treatment facilities for children. Ms. Abraham reviewed all of J.B.'s records and spoke with Parents, but not to anyone from LEAs. At Parents' request and without any knowledge of LEAs, Ms. Abraham visited both Devereux and Madison Oaks. Ms. Abraham visited Devereux for approximately two and one-half hours and spent half a day at Madison Oaks. She noted that Madison Oaks offers a trauma-infused therapy program and has an on-site psychiatrist and staff therapists to serve J.B.'s therapeutic needs.

### 3. December 18, 2018 IEP amendment offer

On December 18, 2018, Ms. Luchetti, believing there was a consensus on both the need for residential treatment and location, provided Parents with a proposed IEP amendment offering J.B. placement at Devereux. Parents refused to consent to this placement because Devereux was no longer their preferred program. Ms. Luchetti was surprised by Parent's refusal.

No IEP team meeting was scheduled immediately following Parent's refusal to consent to the amendment. The next IEP team meeting was not held until February 1, 2019.

On December 28, 2018, following the District's offer of Devereux, and Parents' rejection

---

[13] The ALJ's decision states that Madison Oaks received certification by the California Department of Education ("CDE") in December 2018. As discussed below in more detail, this is inaccurate, as the evidence demonstrates that Madison Oaks received certification in March 2019. However, the evidence also demonstrates that as of December 2018, Madison Oaks had California students placed in it through the IEP process, and had certification pending that was expected to be approved by CDE any day. In light of this evidence, and state law providing for retroactive certification, *see* Cal. Ed. Code § 56366.1(e), (f), it was reasonable to conclude that Madison Oaks' certification was effective retroactive to December 2018.

of that offer, Parents revoked consent for LEAs to speak to any third parties about J.B. Following

Parents' revocation of consent, LEAs were unable to communicate with any prospective

residential placements for J.B. LEAs were also denied updated information about J.B.'s on-going

mental health issues and hospitalizations.

**F.**   **Spring 2019**

    **1.**   ***Dr. Solomon's Psychoeducational Assessment of J.B.***

    In early February 2019, Parents contracted with Dr. Paula Solomon for a

psychoeducational assessment of J.B. Dr. Solomon has a doctorate in psychology. She worked as

a clinical director for TLC learning centers for 23 years. Starting in 1996, she simultaneously

maintained a private practice where she specialized in psychological assessments of students, and

throughout her career has performed more than 300 assessments. She also was a lecturer at the

Institute of Imaginal Studies, where she taught psychology to graduate students in assessment

techniques and neuropsychological screenings.

    Dr. Solomon attended J.B.'s February 1, 2019 IEP team meeting. She then assessed J.B.

over three days in February and March 2019. Her assessment consisted of a review of J.B.'s

records; observations of J.B. at school; standardized testing of J.B.; and interviews with Parents,

J.B., Ms. Reiser, Ms. Luchetti, Ms. Swaffar, and Dr. Roxas' nurse. Records reviewed by Dr.

Solomon include LEAs' assessments, IEP team meeting documents, suspension reports, school-

home communications, and J.B.'s mental health and hospitalization records, some of which were

not shared with LEAs.

    Dr. Solomon administered the Wechsler Intelligence Scale for Children, Fifth Edition. This

standardized test measures cognitive ability and problem-solving processes in children. This

results of this test showed that J.B.'s full-scale intelligence quotient was in the low average range;

and that his working memory and processing speeds were areas of specific weakness. J.B.

performed strongly on the verbal comprehension.

    Dr. Solomon observed J.B. in his classroom on February 12, 2019. During the observation,

J.B. was easily frustrated and off-task. He was given credit for work he partially completed. J.B.

was described as doing as little as possible. J.B. also engaged in maladaptive behaviors like

1  attempting to access inappropriate material on the computer. J.B. tended to struggle between
2  11:30 and 1:00 which was thought to be the result of adjustments in J.B.'s morning medication
3  time.

4          On the same day she observed J.B. in the classroom, Dr. Solomon met with Ms. Luchetti
5  and Ms. Reiser. Dr. Solomon also received input from Parents and Elijah Elder-Rosen[14] through
6  interviews with them and their completion of the rating scales for the Behavior Assessment Scales
7  for Children, Third Edition. Parent's index scores were in the clinically significant range for
8  externalizing problems, internalizing problems, and on the behavior systems index. Parent's
9  content scores noted concerns in the areas of anger control, bullying, developmental social
10 disorders, emotional self-control, executive functioning, and resiliency.

11         None of Mr. Elder-Rosen's scores identified J.B. in the clinically significant area. His
12 scores rated J.B. as at-risk in externalizing and behavioral symptoms; with aggression, atypicality,
13 and withdrawal being his highest scores. Mr. Elder-Rosen's content scores showed J.B. as
14 clinically significant in bullying and at risk for developmental social disorders.

15         To assess J.B.'s adaptive skills, Dr. Solomon administered the Adaptive Behavior
16 Assessment—Second Edition. The test consists of rating scales, which Dr. Solomon asked Parents
17 and Mr. Elder-Rosen to complete. Parents rated J.B. in the first through third percentile for youth
18 his age. He was rated highest by Parents in community use and lowest in self-care, but all scores
19 were significantly below average. Mr. Elder-Rosen's ratings were also below average, with J.B.'s
20 highest score in the 13th percentile in conceptual domain; though all Mr. Elder-Rosen's scores
21 were also significantly below average.

22         To assess J.B. in the area of emotional disturbance, Dr. Solomon administered the
23 Emotional Disturbance Decision Tree. The test measures a child's inability to build or maintain
24 relationships; inappropriate behaviors or feelings; pervasive mood or depression; and physical
25 symptoms and fears. Dr. Solomon also received input from Parents and Mr. Elder-Rosen in

---

26     [14] Mr. Elder-Rosen was J.B.'s Nexus teacher at the time. Mr. Elder-Rosen reported to the manifestation
27 review team that J.B. was one of his best. However, Mr. Elder-Rosen, who taught on a provisional internship permit,
   had no specialized training in special education.
28         Mr. Elder-Rosen testified at the hearing. The ALJ found Mr. Elder-Rosen to be surly, evasive, and at times
   nonresponsive during testimony and thus the ALJ gave his testimony no weight.

completing the Emotional Disturbance Decision Tree. Parents rated J.B. to be very high clinical in all categories. Mr. Elder-Rosen's rating sheets rated J.B. moderate clinical in inability to build or maintain relationships, physical symptoms or fears; and high clinical in inappropriate behaviors or feelings and pervasive mood/depression.

Dr. Solomon received input from J.B. and Parents on the Children's Depression Inventory-2. The Children's Depression Inventory-2 is a multi-rater assessment to aid in the identification of depressive symptoms, and diagnoses of depression and related disorders. J.B. described himself as significant in negative mood, negative self-esteem, and interpersonal problems. Parent's responses also placed J.B. at elevated levels for aspects of depression and total depression.

Dr. Solomon also received input from J.B. and his father on the Multidimensional Anxiety Scale for Children. This measurement estimates the likelihood of experiencing anxiety disorders. Father rated J.B. very elevated in physical symptoms, tense and restless; slightly elevated in social anxiety, performance fears; high average on humiliation and rejection, panic, and obsessions and compulsions; and low on harm avoidance. J.B. self-reported slight elevation in social anxiety, humiliation and rejection, performance and fears, and panic; high average on physical symptoms and harm avoidance; and average on obsessions and compulsions and tense and restless.

Dr. Solomon asked J.B. to participate in the Roberts Apperception Test for Children. In this assessment, J.B. is asked to tell stories from a series of pencil sketches on children and families in normal situations. Each story will have an implied problem or emotional stress. J.B.'s stories were concerning to Dr. Solomon. J.B. was unable to accurately identify interpersonal dynamics and his problem solving gave bizarre and wishful outcomes.

Dr. Solomon also asked J.B. to perform the Draw-A-Person task where the individual is allowed to express their inner view of themselves. J.B. was given three opportunities to draw a person. His first effort was a non-descript person. The second effort was a very detailed lantern he had studied on-line, and the third time, he drew a corpse. The corpse was in graphic detail including beard stubble and an empty eye socket.

The final test Dr. Solomon asked J.B. to complete was the Incomplete Sentence Test. J.B. was slow and thoughtful in his responses. Dr. Solomon followed up with some of J.B.'s responses

19

1   in her interview with him.

2        Dr. Solomon's assessment report recommended J.B. be placed in a residential program that

3   specializes in children with serious mood disorders and significant learning disorders. She found

4   that J.B. was not accessing his education due to his mental instability. Dr. Solomon also

5   recommended a one-to-one aide for J.B. She believed the facility should also specialize in trauma-

6   informed therapy, and recommended J.B. receive daily therapy to allow him to work on his

7   emotions and coping skills. Dr. Solomon believed that J.B. required a residential placement as of

8   late 2015,[15] and that residential placement is currently required due to J.B.'s past inappropriate

9   placement. As part of her recommendation for remediation, Dr. Solomon recommended a

10  residential treatment program capable of providing family therapy, and that the family members

11  receive two years of family therapy and individual therapy.[16]

12       **2.    *Ms. Tjenderson's Educational Assessment***

13       In March 2019, Parents contracted with Priya Tjenderson for an educational evaluation of

14  J.B. Ms. Tjenderson is an educational specialist consultant with the Morrissey-Compton

15  Educational Center. In her role at Morrissey-Compton, Ms. Tjenderson performs educational

16  assessments to determine specific learning differences. Since 2016, she has also served as the lead

17  education specialist with the North Bridge Academy. She holds a master's degree in special

18  education.

19       In conducting the educational assessment, Ms. Tjenderson reviewed J.B.'s work samples,

20  report cards, and past IEPs. Ms. Tjenderson spoke with Parent but did not speak with any of J.B.'s

21  teachers. Ms. Tjenderson administered standardized assessments including the Woodcock-

22  Johnson; Berry-Buktenica Test of Visual Motor Integration; Test of Orthographic Competence,

23  Ages 8-12; and the Kaufman Test of Academic Achievement, 3rd edition, form B.

24       On the Woodcock-Johnson test, J.B. obtained scores in the average range for letter word

25  identification. He performed below average in sentence reading fluency, passage comprehension,

---

26  [15] The ALJ found Dr. Solomon's opinion that J.B. required residential treatment as of late 2015 to be
     unreliable.

27  [16] The ALJ found the recommendations regarding family and individual therapy for family members to be
     unpersuasive based on the expansiveness of the recommendation versus the limited knowledge Dr. Solomon had of

28  the family's needs.

broad reading, and oral reading. He performed below average in spelling, sentence writing fluency, writing samples, and broad language. His math scores indicated significant weakness in calculation, math facts fluency, applied problems, and broad mathematics.

On the Test of Orthographic Competence, Ages 8-12, J.B. scored in the first and second percentile for letter choice, word scramble, and sight spelling. J.B. scored in the 95th percentile in homophone choice. On the Berry-Buktenia Test of Visual Motor Integration, J.B. demonstrated below average deficits on his visual motor skills at both the perceptual and motoric planning levels. On the Kaufman Test of Academic Achievement, 3rd edition, Form B, phonological processing, J.B. scored a standard score of 71, putting him in the 3rd percentile and indicating that he had deficits in separating sounds of words.

Ms. Tjenderson noted that J.B. worked diligently throughout the testing but demonstrated distractibility and needed directions repeated in order to continue working. Near the end of his testing session, J.B. was restless and sang songs with violent or sexual connotations. Ms. Tjenderson believed the testing results were an accurate reflection of his academic achievement.

Based upon her testing, discussions with Parent and J.B., and her review of J.B.'s records, Ms. Tjenderson concluded that J.B. meets the criteria for a Specific Learning Disability in Reading and a Specific Learning Disability in Written Expression, which she described as dysgraphia. She also concluded J.B. warranted a further diagnosis in Specific Learning Disorder in Mathematics, which she described as dyscalculia. Ms. Tjenderson's recommendation indicated that J.B.'s mental health issues impacted his learning abilities. She recommended a series of accommodations for J.B., along with a program of educational therapy and assistive technology. Ms. Tjenderson's report was signed by herself and Dr. John T. Brentar, a licensed psychologist at Morrissey-Compton. Ms. Tjenderson found all of J.B.'s IEP goals to be inadequate.[17]

## II.    PROCEDURAL BACKGROUND

J.B. filed a request for a due process hearing with the OAH on January 3, 2019, naming

---

[17] Ms. Tjenderson testified at the hearing. The ALJ questioned Ms. Tjenderson's objectivity, stating: "Ms. Tjenderson found all of Student's IEP goals to be inadequate. Ms. Tjenderson's wholesale discounting of Student's goals was conclusory. Tjenderson never observed Student at school or spoke to his teachers. Ms. Tjenderson's testimony raised significant questions about her objectivity." (AR 3880.)

1   LEAs, and LEAs filed a request for a due process hearing on February 6, 2019, naming J.B. On

2   February 11, 2019, the cases were consolidated.

3       A consolidated due process hearing was held before the ALJ on March 19, 20, 21, 25, 26,

4   27, and 28, 2019, and April 3, 4, and 5, 2019. During the prehearing conference, the ALJ noted

5   that LEAs had withdrawn their issue number 1—whether District's February 1, 2019 IEP offer of

6   placement at Devereux constituted a free, appropriate, public education ("FAPE") in the least

7   restrictive environment. (AR 3976-77.) The ALJ identified the following as LEAs' remaining

8   issues for the hearing:

9       1.   Are LEAs entitled to a release of information signed by the parents authorizing

10          LEAs to communicate with student's medical providers and with Devereux?

11      2.   May District conduct a new FBA of student, pursuant to a February 6, 2019

12          assessment plan?

13      The remedies sought by LEAs were an order stating that LEAs are entitled to a release of

14  information to communicate with J.B.'s medical providers; and an order that District may conduct

15  a new functional behavior assessment of J.B.

16      The ALJ identified the following as J.B.'s issues for the hearing:

17      1.   Beginning January 4, 2017, did LEAs deny J.B. a FAPE during the 2016-17 school

18          year by:

19          a.   Not offering a more restrictive placement based on J.B.'s history of

20               frequent, intense, and dangerous behaviors;

21          b.   Failing to continue his occupational therapy goals;

22          c.   Failing to offer clear and measurable annual goals reasonably calculated to

23               meet J.B.'s unique needs with clear, accurate baselines;

24          d.   Failing to develop sufficient goals to meet J.B.'s needs in the area of

25               executive functioning;

26          e.   Discontinuing J.B.'s occupational therapy services;

27          f.   Reducing J.B.'s educationally related mental health counseling services; and

28          g.   Failing to offer appropriate and timely behavioral intervention services,

specifically an appropriate functional behavior assessment, functional behavior intervention plan, and a one-to-one aide support.

2. During the 2017-18 school year, did LEAs deny J.B. a FAPE by:

    a.    Not offering a more restrictive placement based on J.B.'s history of frequent, intense, and dangerous behaviors;

    b.    Failing to offer occupational therapy goals;

    c.    Failing to offer clear and measurable annual goals reasonably calculated to meet J.B.'s unique needs with clear, accurate baselines;

    d.    Failing to develop sufficient goals to meet J.B.'s needs in the area of executive functioning;

    e.    Failing to offer occupational therapy services;

    f.    Failing to offer sufficient educationally related mental health counseling services;

    g.    Failing to offer appropriate behavioral intervention services and instead relying on an inadequate functional behavior assessment and functional behavior intervention plan;

    h.    Failing to offer and provide a one-to-one aide in a timely manner; and

    i.    Failing to conduct an assistive technology assessment across all academic settings.

3. During the 2018-19 school year, did LEAs deny J.B. a FAPE by:

    a.    Failing to offer and provide a more restrictive placement based on J.B.'s history of frequent and intense behaviors;

    b.    Offering to change placement outside the IEP process; and

    c.    Failing to offer appropriate behavior intervention services to allow J.B. to access his education in the least restrictive environment.

For remedies, J.B. sought an order requiring LEAs to (i) fund placement in a residential treatment center or appropriate nonpublic 24/7 therapeutic placement; (ii) fund creation of IEP goals in the areas of need by a non-District expert; (iii) fund a functional behavior assessment and

1  the creation of a behavior intervention plan and behavior goals by a non-District PhD-level

2  behaviorist; (iv) fund an assistive technology assessment by a non-District evaluator; (v) fund

3  training and counseling for parents in supporting J.B.; (vi) provide compensatory education;

4  (vii) reimburse Parents for the cost of all services provided by Dr. Paula Solomon; (viii)

5  reimburse Parents for assessments obtained by Parents; (ix) provide 50 to 100 hours of staff

6  training; and (x) pay J.B.'s attorney's fees.

7  **III.  SUMMARY OF THE ALJ's RESOLUTION OF THE ISSUES**

8       The ALJ issued her decision on May 10, 2019. (*See* AR 3860-3901.)

9       As to the relief sought by LEAs, the ALJ found that LEAs were entitled to perform a new

10  functional behavior assessment of J.B., but that they were not entitled to a release of information

11  to allow LEAs to speak with J.B.'s medical providers and Devereux.

12       As to the relief sought by J.B., the ALJ found that LEAs denied J.B. a FAPE from January

13  4, 2017, through the remainder of the 2016-17 school year by failing to offer J.B. clear and

14  measurable goals, failing to continue his occupational therapy goals, reducing his educationally

15  related mental health services, failing to timely conduct a functional behavioral assessment,

16  failing to offer appropriate behavioral intervention services, and failing to offer a behavior

17  intervention plan. The ALJ found LEAs denied J.B. a FAPE during the 2017-18 school year by

18  failing to conduct an assistive technology assessment, failing to offer clear and measurable goals,

19  failing to develop goals to meet J.B.'s need in executive functioning, failing to offer occupational

20  therapy goals and services, and failing to offer sufficient educationally related mental health

21  counseling. Finally, the ALJ found that beginning on May 10, 2018, LEAs denied J.B. a FAPE by

22  failing to offer a more restrictive placement based on J.B.'s history of frequent, intense, and

23  dangerous behavior.

24       As remedies for the denial of a FAPE, the ALJ ordered that LEAs were responsible for

25  contracting with Madison Oaks to pay J.B.'s daily fees of tuition, therapeutic services, and room

26  and board to attend Madison Oaks until the end of 2019-20 regular school year, and that within

27  fifteen days of the ALJ's decision, J.B. was to enroll and begin attending Madison Oaks. (AR

28  3900.) The ALJ also ordered LEAs to pay for two roundtrip airline tickets for Parents to escort

J.B. to and from Madison Oaks, and for two nights of hotel accommodations, one upon

enrollment and the other for the return home. (*Id.*) Finally, LEAs were ordered to reimburse

Parents $11,025 for the cost of Dr. Solomon's assessment. (*Id.*) The ALJ denied student all other

relief.

Both LEAs and J.B. appeal from the ALJ's decision.

## IV.    ISSUES RAISED ON APPEAL

**A.    LEAS' Issues**

LEAs raise the following issues on appeal:

1.    Whether the ALJ's decision is entitled to deference when adjudicating LEAs' cross-

appeal and first counterclaim because:

a.    The ALJ's decision improperly fails to analyze LEAs' proposed placement

at Devereux;

b.    The ALJ's decision improperly substitutes the ALJ's own judgment over

that of LEAs' educational professionals;

c.    The ALJ's decision contains consequential clear errors of fact; and

d.    The ALJ's decision improperly fails to analyze Parent's testimony or

evaluate her credibility.

2.    Whether a preponderance of the evidence fails to support J.B.'s residential

placement at Madison Oaks because:

a.    The preponderance of the evidence shows J.B. made progress after May 10,

2018, particularly in behavior;

b.    The order for residential placement of J.B. as of May 10, 2018, is

impermissibly based upon the ALJ's substituted judgment; and

c.    The ALJ's decision relies on an incorrect legal standard for ordering a

change in J.B.'s placement.

3.    Whether the ALJ erred in awarding J.B. reimbursement for the cost of Dr.

Solomon's psychoeducational assessment.

\\\

**B.     J.B.'s Issues**

J.B. raises the following issues on appeal:

1.   Whether LEAs denied J.B. a FAPE during the 2016-17 school year, beginning on January 4, 2017, by failing to offer a more restrictive placement based on J.B.'s history of frequent, intense, and dangerous behaviors.

2.   Whether J.B. is entitled to additional remedies beyond that awarded by the ALJ.

3.   Whether the ALJ made improper negative credibility findings against J.B.'s testifying expert witnesses.

## V.     LEGAL STANDARDS

**A.     IDEA's Overarching Statutory Framework**

The IDEA grants federal funds to state and local agencies to provide a special education to children with disabilities. 20 U.S.C. § 1412(a); *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1469 (9th Cir. 1993). The main purposes of the IDEA are

(A) To ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further employment and independent living; (B) to ensure that the rights of children with disabilities and parents of such children are protected; and (C) to assist States, localities, educational service agencies, and Federal agencies to provide for the education of all children with disabilities.

20 U.S.C. § 1400(d)(1)(A)-(C).

A free and appropriate public education ("FAPE") is defined by the IDEA as

special education and related services that—(A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate pre-school, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9).

"Special education" is in turn defined by the IDEA as "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including—(A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (B) instruction in physical education." 20 U.S.C. § 1401(29).

"Related services" are defined by the IDEA as

> transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.

20 U.S.C. § 1401(26)(A); *see id.* § 26(B) (excluding from definition of "related services" any "medical device that is surgically implanted, or the replacement of such device").

The goals of the IDEA are implemented through the development of an individualized education plan or "IEP," which is a "written statement for each child with a disability," that includes the student's present level of performance, annual goals, short and long term objectives, specific services to be provided, the extent to which the student may participate in regular education programs, and criteria for measuring the student's progress. 20 U.S.C. §§ 1401(14), 1414(d)(1)(A). The IEP, which is to be developed by a team that includes a student's parents and school personnel, is thus a "comprehensive statement of the educational needs of a handicapped child and the specially designed instruction and related services to be employed to meet those needs." *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 368 (1985).

> Every IEP begins by describing a child's present level of achievement, including explaining "how the child's disability affects the child's involvement and progress in the general education curriculum." It then sets out "a statement of measurable annual goals . . . designed to . . . enable the child to be involved in and make progress in the general education curriculum," along with a description of specialized instruction and services that the child will receive. The instruction and services must likewise be provided with an eye toward "progress in the general education curriculum."

*Endrew F. ex rel. Joseph F. v. Douglas County Sch. Dist. RE-1*, 137 S. Ct. 988, 1000 (2017).

It is important to keep in mind that the IDEA does not require a school to maximize the potential of each special needs child. Rather, "the 'basic floor of opportunity' provided by the [IDEA] consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Bd. of Educ. of Hendrick*

1    *Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 201 (1982). The obligation to

2    provide FAPE is met if "the education to which access is provided [is] sufficient to confer some

3    educational benefit upon the" disabled child. *Id.* at 200; *see J.L. v. Mercer Island Sch. Dist.*, 592

4    F.3d 938, 950-51 & n.10 (9th Cir. 2010) (recognizing that, despite post-*Rowley* changes to special

5    education laws, the *Rowley* "educational benefit" standard remains the proper standard for

6    determining whether a disabled child has received FAPE).

7         When a child is fully integrated into a regular classroom, a FAPE generally requires an IEP

8    "'reasonably calculated to enable the child to achieve passing marks and advance from grade to

9    grade.'" *Endrew F.*, 137 S. Ct. at 996 (quoting *Rowley*, 458 U.S. at 207).

10        For a child who is not fully integrated into a regular classroom, the IEP "need not aim for

11   grade-level advancement," but instead "must be appropriately ambitious in light of [the child's]

12   circumstances." *Id.* at 1000. However, an educational program that provides "merely more than

13   *de minimis* progress from year to year can hardly be said to have been offered an education at all.

14   For children with disabilities, receiving instruction that aims so low would be tantamount to

15   sitting idly . . . awaiting the time when they were old enough to drop out." *Id.* at 1001 (quoting

16   *Rowley*, 458 U.S. at 179) (internal quotation marks omitted). "The IDEA demands more. It

17   requires an educational program reasonably calculated to enable a child to make progress

18   appropriate in light of the child's circumstances." *Id.* "Any review of an IEP must appreciate that

19   the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.* at

20   999.

21        Whether an IEP offers a student a FAPE is not judged in hindsight but is instead assessed

22   in light of information available at the time the IEP is developed. *Adams v. State of Oregon*, 195

23   F.3d 1141, 1149 (9th Cir. 1999). An IEP "is a snapshot, not a retrospective. In striving for

24   'appropriateness,' an IEP must take into account what was, and was not, objectively reasonable

25   when the snapshot was taken, that is, at the time the IEP was drafted." *Id.* (citation omitted).

26        Moreover, the IDEA requires that "[d]isabled children, to the maximum extent appropriate,

27   should be educated with children who are not disabled, i.e., they should be mainstreamed." *Seattle*

28   *Sch. Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1500 (9th Cir. 1996) (citing 20 U.S.C. § 1412(5)),

*abrogated on other grounds by Schaffer v. Weast*, 546 U.S. 49, 56-58 (2005); *see Rowley*, 458 U.S. at 202-03 ("The [IDEA] requires participating States to educate handicapped children with nonhandicapped children whenever possible."). In other words, "[t]he education of a disabled child should take place in the least restrictive environment." *B.S.*, 82 F.3d at 1500. (citing 34 C.F.R. § 300.552(d)).

Residential placement is, however, appropriate for a disabled child if it is necessary for the child to receive benefit from his or her education. *B.S.*, 82 F.3d at 1500. "If placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child." *Id.* (citation omitted); *see M. S. v. Los Angeles Unified Sch. Dist.*, 2019 WL 334564, at \*9 (C.D. Cal. 2019), *aff'd sub nom. M. S. by & through R.H. v. Los Angeles Unified Sch. Dist.*, 913 F.3d 1119 (9th Cir. 2019) ("Where the level of services provided by a residential treatment center is needed for a student to access a FAPE—that is, when the residential placement is 'considered necessary for educational purposes' and not merely 'necessary quite apart from the learning process'—it is appropriate for the student's IEP to reflect the need for residential placement." (citation omitted)).

Finally, the IDEA does not require a student "to spend years in an educational environment likely to be inadequate and to impede her progress simply to permit the School District to try every option short of residential placement." *B.S.*, 82 F.3d at 1501; *see Sacramento City Unified Sch. Dist., Bd. of Educ. v. Rachel H. By & Through Holland*, 14 F.3d 1398, 1404 (9th Cir. 1994) (setting out, as factors to be considered in determining whether a placement offers education in the least restrictive environment: "(1) the educational benefits of placement full-time in a regular class; (2) the non-academic benefits of such placement; (3) the effect [of the special education student] on the teacher and children in the regular class; and (4) the costs of mainstreaming [the special education student]").

**B.   IDEA's Procedural Safeguards, Including Agency Review**

The IDEA provides certain procedural safeguards to children and their parents, including notification of any changes in identification, education, and placement of the student; parental

1  presence at IEP meetings; and a mechanism for parents or the public agency to obtain agency

2  review.

3        The parent or public agency may obtain agency review by bringing a due process

4  complaint raising issues related to the student's education and placement. The filing of a due

5  process complaint may result in a mediation or a due process hearing conducted by a local or state

6  educational agency hearing officer. 20 U.S.C. § 1415(b)-(i).

7        A due process complaint may be brought by a party "with respect to any matter relating to

8  the identification, evaluation, or educational placement of the child, or the provision of a free

9  appropriate public education to such child," and can be for an alleged violation that "occurred not

10  more than 2 years before the date the parent or public agency knew or should have known about

11  the alleged action that forms the basis of the complaint. . . ." 20 U.S.C. § 1415(b)(6)(A), (B). A

12  parent or local education agency may also request a hearing if the party "believes that maintaining

13  the current placement of the child is substantially likely to result in injury to the child or to

14  others." 20 U.S.C. § 1415(k)(3)(A).

15        When a due process complaint has been filed, "the parents or the local educational agency

16  involved in such complaint shall have an opportunity for an impartial due process hearing, which

17  shall be conducted by the State educational agency or by the local educational agency, as

18  determined by State law or by the State educational agency." 20 U.S.C. § 1415(f)(1)(A).[18]

19  Following the due process hearing, the hearing officer—here the administrative law judge

20  ("ALJ")—is to provide a written decision determining whether the child received a free

21  appropriate public education. 20 U.S.C. § 1415(f)(3)(E)(i).[19]

22  **C.   <u>Judicial Review</u>**

23        A party that is dissatisfied with the decision of an agency hearing officer may bring a civil

24        [18] If parents invoke the IDEA's "stay put" provision, the child is permitted to remain in the current

25  educational placement until the dispute is resolved. See 20 U.S.C. § 1415(j) ("[D]uring the pendency of any
proceedings conducted pursuant to this section, . . . the child shall remain in the then-current educational placement
of the child.").

26        [19] For alleged procedural violations, a hearing officer may find a child did not received a FAPE only if the

27  procedural inadequacies "impeded the child's right to a free appropriate public education"; "significantly impeded
the parents' opportunity to participate in the decision making process regarding the provision of a free appropriate
public education to the parents' child"; or "caused a deprivation of educational benefits." 20 U.S.C.

28  § 1415(f)(3)(E)(ii).

1   action in state or federal court seeking review of the agency's decision. 20 U.S.C. § 1415(i)(2).

2   The reviewing court "shall receive the records of the administrative proceedings"; "shall hear

3   additional evidence at the request of a party"; and, "basing its decision on the preponderance of

4   the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. §

5   1415(i)(2)(C); *see Ashland Sch. Dist. v. Parents of Student E.H.*, 587 F.3d 1175, 1183 (9th Cir.

6   2009) ("When a district court hears an appeal from a state hearing officer, it exercises broad

7   discretion to craft relief under 20 U.S.C. § 1415(i)(2)(C).") (citing *Sch. Comm. of Burlington*, 471

8   U.S. at 369-70 (1996)).

9         In reviewing an appeal under the IDEA, the reviewing court does not employ the highly

10   deferential standard of review that typically governs agency decisions. Instead, "due weight" is to

11   be given to the administrative proceedings. *See JG v. Douglas Cty. Sch. Dist.*, 552 F.3d 786, 793

12   (9th Cir. 2008); *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472, 1476 (9th Cir. 1993); *see

13   also Hendrick Hudson Dist. Bd. Of Ed. V. Rowley*, 458 U.S. 176, 206 (1982) (Judgments of

14   education policy under 20 U.S.C. § 1415(e) are to be given "due weight."). Under this standard,

15   the reviewing court must consider the ALJ's findings carefully and address the ALJ's resolution

16   of each material issue raised on appeal. *Cty. of San Diego v. Cal. Special Educ. Hearing Office*,

17   93 F.3d 1458, 1466 (9th Cir. 1996). After such consideration, the reviewing court may accept or

18   reject the ALJ's findings in part or in whole. *Id.* On the other hand, "courts should not substitute

19   their own notions of sound educational policy for those of the school authorities which they

20   review." *Wilson v. Marana Unified School Dist.*, 735 F.2d 1178, 1183 (9th Cir. 1984). Complete

21   *de novo* review is not appropriate. *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 887 (9th

22   Cir. 2001).

23         The amount of deference given to the decision of the ALJ is a matter for the discretion of

24   the reviewing court:

25           The traditional test of findings being binding on the court if supported by
        substantial evidence, or even a preponderance of the evidence, does not apply.

26           This does not mean, however, that the findings can be ignored. The court, in
        recognition of the expertise of the administrative agency, must consider the

27           findings carefully and endeavor to respond to the hearing officer's resolution of
        each material issue. After such consideration, the court is free to accept or reject

28           the findings in part or in whole.

1  *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987) (citations omitted).

2  A reviewing court is to give "particular deference where the [ALJ's] findings are 'thorough

3  and careful.'" *R.B., ex rel. F.B.v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 937 (9th Cir.

4  2007) (citing *Smith*, 15 F.3d at 1524). A reviewing court is to also give particular deference to the

5  ALJ's credibility determinations of live witnesses. *See Amanda J. ex rel. Annette J. v. Clark Cty.*

6  *Sch. Dist.*, 267 F.3d 877, 889 (9th Cir. 2001) (An ALJ "who receives live testimony is in the best

7  position to determine issues of credibility."); *Ms. S. ex rel. G. v. Vashon Island Sch. Dist.*, 337

8  F.3d 1115, 1127 (9th Cir. 2003) ("Normally, a finder of fact's determination of credibility

9  receives deference on appeal, because access to live testimony is important to the credibility

10  finding.").

11  "The burden of proof in the district court rest[s] with ... the party challenging the

12  administrative decision." *Hood v. Encinitas Union Sch. Dist.*, 486 F.3d 1099, 1104 (9th Cir.

13  2007).

14  **VI.   MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD**

15  J.B. seeks to supplement the administrative record with evidence of his status at Madison

16  Oaks. (ECF No. 32.) LEAs oppose the motion. (ECF Nos. 43, 52.)

17  On review of an administrative decision in an IDEA case, the court "shall hear additional

18  evidence at the request of a party." 20 U.S.C. § 1415(i)(2)(C)(ii). "Additional" evidence means

19  "supplemental." *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1473 (9th Cir. 1993).

20  The reasons for supplementation will vary; they might include gaps in the
administrative transcript owing to mechanical failure, unavailability of a witness,

21  an improper exclusion of evidence by the administrative agency, and evidence
concerning relevant events occurring subsequent to the administrative hearing.

22  The starting point for determining what additional evidence should be received,
however, is the record of the administrative proceeding.

23  The determination of what is "additional" evidence must be left to the discretion
of the trial court which must be careful not to allow such evidence to change the

24  character of the hearing from one of review to a trial de novo.

25  *Id.* (citation and ellipses omitted).

26  "[E]vidence that is non-cumulative, relevant, and otherwise admissible constitutes

27  'additional evidence' that the district court 'shall' consider pursuant to 20 U.S.C.

28  § 1415(i)(2)(C)(ii)." *E.M. ex rel. E.M. v. Pajaro Valley Unified Sch. Dist. Office of Admin.*

1    *Hearings*, 652 F.3d 999, 1005 (9th Cir. 2011).

2       Here, J.B. seeks to supplement the record with two declarations. The first declaration is

3 from Starlett Armstrong, clinical director of Madison Oaks. Ms. Armstrong has been responsible

4 for overseeing implementation of J.B.'s therapeutic programming. (*See* ECF No. 33.) The second

5 declaration is from Diane Carter, a teacher at Madison Oaks. Ms. Carter has been responsible for

6 providing direct academic instruction to J.B. (*See* ECF No. 33.)

7       J.B. contends that this supplemental evidence is relevant to the additional remedies he

8 seeks in order to address his significant deficits and the failure of LEAs to provides him a FAPE.

9 He also contends that the evidence underscores the need for one-to-one aide services to

10 adequately support his behavioral and academic intervention.

11       LEAs oppose the motion to supplement. They contend that the declarations are confusing

12 and would not assist the Court without further clarification; that the introduction of the

13 declarations would contravene the "Snapshot Rule"; and that the declarations, by their nature, call

14 for the Court to retry issues already heard and determined by the ALJ. (ECF No. 43.) Finally,

15 LEAs contend that the declarations are directly contradicted by emails exchanged between LEAs'

16 staff and declarants, casting doubt on the credibility of the declarants. (ECF No. 52.)

17       The Court disagrees with and rejects LEAs' contentions.[20]

18       First, the Court does not find the declarations to be confusing, in need of further

19 clarification, or in violation of the Snap Shot Rule, for the purpose for which J.B. is seeking to

20 introduce the evidence—to support the additional remedies that J.B. seeks to address his deficits

21 and LEAs' failure to provide him a FAPE, including the need for one-to-one aide and other

22 support so that he can access his education. In other words, J.B. does not seek to use the evidence

23 to evaluate in hindsight the actions of LEAs and the IEP team but instead seeks only to support

24 the remedies he seeks for denial of FAPE. Use of the evidence for this purpose does not violate

25 the Snap Shot Rule.

26  

---

27    [20] The Court has also reviewed the other specific objections LEAs raise in opposition to the declarations. (*See* ECF Nos. 50, 51.) The Court declines to address each of the objections individually but keeps the objections in mind

28 in reviewing the declarations and will consider only those portions of the declarations that the Court deems to be admissible.

1    The declarations also do not call for the Court to retry issues already heard and determined

2 by the ALJ. Rather, the declarations merely provide additional information on the status of J.B. in

3 the months following placement at Madison Oaks and the need for additional compensatory

4 remedies to allow J.B. to access his education.

5    Finally, the email exchange between LEAs' staff and the declarants does not impinge on

6 the declarants' credibility to such an extent as to render the declarations inadmissible. The email

7 exchange occurred in May and June 2019, shortly after J.B. was first enrolled in Madison Oaks.

8 (*See* ECF No. 52.) In contrast, the declarations were signed in October 2019, after J.B. had been

9 enrolled in Madison Oaks for approximately five months. (*See* ECF Nos. 34, 35.) That the emails

10 indicate that J.B. was in a different place behaviorally and academically in May-June 2019 than

11 the declarations indicate he was at as of October 2019 does not in any way impinge on the

12 declarants' credibility regarding J.B.'s status and needs.

13    The Court finds the proposed supplemental evidence to be non-cumulative, relevant, and

14 otherwise admissible. *See* 20 U.S.C. § 1415(i)(2)(C)(ii). The Court will thus grant the motion to

15 supplement

16    **VII.   ANALYSIS OF WHETHER LEAs DENIED J.B. A FAPE**

17    As summarized above, the ALJ found that LEAs denied J.B. a FAPE from January 4, 2017,

18 through the remainder of the 2016-17 school year, and during the 2017-18 school year, by failing

19 to offer J.B. adequate goals, assessments, plans, counseling, and other services. LEAs do not, for

20 the most part, challenge these findings on the merits.

21    Rather, LEAs focus their challenge on the ALJ's finding that beginning on May 10, 2018,

22 LEAs denied J.B. a FAPE by not offering a more restrictive placement based on his history of

23 frequent, intense, and dangerous behavior. As discussed below, the Court recommends that this

24 finding be affirmed.

25 **A.   Whether the ALJ's decision is entitled to deference on issues raised by LEAs.**

26    LEAs spend a significant portion of their opening brief on appeal arguing that portions of

27 the ALJ's decision with which LEAs disagree are not thorough and careful and are not, therefore,

28 entitled to deference.

1    The ALJ's decision is 42-pages long, single-spaced. The decision contains an in-depth

2  discussion of applicable law (AR 3880-82), a lengthy and detailed discussion of the factual

3  background of the case (AR 3863-80), and detailed explanations of the ALJ's findings on each of

4  the issues raised by the parties (AR 3883-96). The decision also includes a discussion of the

5  testimony of most of the witnesses that testified during the multiple-day hearing, an explanation

6  for most witnesses of whether the ALJ found the witness to be persuasive and, where applicable,

7  the specific portions of a particular witness's testimony that the ALJ did not find persuasive and

8  why. For example, the ALJ's discussion of Dr. Solomon's testimony and report continues for

9  more than three pages and includes an explanation of the specific portions of Dr. Solomon's

10  testimony that the ALJ found to be unpersuasive and why. (*See* AR 3875-78.) Similarly, the

11  ALJ's discussion of Ms. Tjenderson's testimony and the testing this witness conducted continues

12  for more than a page and includes an explanation as to why the ALJ found Ms. Tjenderson's

13  testimony to raise "signification questions about her objectiveness." (AR 3879-80.)

14    The Court has conducted an independent review of the entire record and finds that, with

15  exceptions discussed below, the ALJ's decision is thorough and careful and therefore entitled to

16  deference. *See R.B.*, 496 F.3d at 937; *Amanda J.*, 267 F.3d at 889.

17    **1.    *Whether the ALJ's decision improperly fails to analyze LEAs' proposed placement
        at Devereux.***

18

19    LEAs argue that the ALJ's decision is not thorough and careful because it does not include

20  an analysis of the District's offer of placement at Devereux on December 14, 2018, and at the

21  February 1, 2019 IEP meeting (ECF No. 37 at 18). LEAs also argue that the ALJ's placement at

22  Madison Oaks is inappropriate because the ALJ failed to analyze the District's offer of Devereux.

23    As LEAs point out, the ALJ's decision does not analyze the offer of placement at Devereux

24  and explicitly states that the appropriateness of the District's offer of residential placement was

25  not reached since LEAs "are no longer proposing Devereux as an appropriate placement." (AR

26  3896, 3898.) The record supports these statements by the ALJ. In LEAs' amended prehearing

27  conference statement, LEAs listed issue 1 as follows: "Does the District's IEP offer of placement

28  at Devereux offer J.B. a FAPE in his least restrictive environment ("LRE")?" (AR 642.)

1   Subsequently and prior to the hearing, LEAs filed a notice of withdrawal of LEAs' issue number

2   1, stating that they "hereby withdraw the LEAs Issue No. 1" without prejudice. (AR 756-57.) The

3   notice of withdrawal is dated March 18, 2019, the day before the hearing began. (*Id.*)

4   During a March 19, 2019, prehearing conference, the ALJ acknowledged the receipt of the

5   notice of withdrawal of LEAs' issue number 1 and confirmed with LEAs' counsel that they were

6   withdrawing that issue. (AR 3976.) After receiving confirmation from LEAs' counsel, the ALJ

7   deemed issue 1 to be withdrawn. (AR 3976-80.) After going over the remaining issues with

8   counsel and discussing other preliminary issues, the hearing began. (AR 3980-88.) LEAs again

9   confirmed that they had withdrawn issue 1 in their post-hearing closing brief, stating that they

10   "withdrew Issue 1 on March 18, 2019." (AR 775 n.1.)

11   On appeal, LEAs do not deny that they withdrew issue 1, the offer of Devereux, prior to the

12   hearing. LEAs also do not argue on appeal that the offer of Devereux was an offer of FAPE.

13   Instead, LEAs argue that, despite their withdrawal of Devereux, the ALJ was still required by

14   Ninth Circuit precedent to analyze placement at Devereux and that because the ALJ's decision

15   failed to do so, the decision is not thorough nor careful and is accordingly not entitled to

16   deference.

17   In support of their argument, LEAs cite *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307,

18   1314 (9th Cir. 1987). In *Gregory K.*, the Ninth Circuit stated that *de novo* review of the record

19   "must focus primarily on the District's proposed placement, not on the alternative that the family

20   preferred." 811 F.2d at 1314. However, there is no indication in *Gregory K.* that the school

21   district had abandoned the issue of whether its proposed placement was appropriate, or that the

22   proposed placement was made outside of the IEP process.[21] Further, the agency decision in

23   *Gregory K.* found the school district's proposed placement to be appropriate. The district court

24   reversed the agency's finding that the proposed placement was appropriate, and the Ninth Circuit

25   reversed the district court's decision and upheld the agency's decision on the issue of appropriate

26

27   _____

    [21] Here, as the ALJ found, LEAs' December 18, 2018 offer of placement at Devereux was made outside the
IEP process and that LEAs' failure to convene an IEP meeting after Parents declined to consent to placement at

28   Devereux resulted in the denial of a FAPE. (AR 3890, 3892.)

1   placement.[22] *Id.* at 1315.

2       In the present case, LEAs withdrew their offer of Devereux as an appropriate placement

3   prior to the hearing before the ALJ and do not argue on appeal that Devereux was an appropriate

4   placement. Thus, the only placements at issue before the ALJ, and on appeal, are the Nexus

5   Program and Madison Oaks. The ALJ was not required, under these circumstances, to discuss or

6   analyze whether Devereux was an appropriate placement, and the ALJ's failure to discuss this

7   non-issue does not indicate that the ALJ's decision was not careful or thorough.

8       Moreover, LEAs presented very little evidence to the ALJ regarding Devereux. The

9   evidence presented by LEAs indicates that the District's representative reached out to Devereux

10  on one to two occasions over several months, that the representative did not mention or discuss

11  J.B.'s elopement behaviors with Devereux, and that no one from the District visited Devereux or

12  otherwise explored whether Devereux would be an appropriate placement in light of J.B.'s

13  elopement issues. (*See* AR 4064-4105, 4133-36, 4888-4909, 4173-91.) In contrast, Parent testified

14  that she visited Devereux, took a thorough tour of the Devereux campus, and obtained extensive

15  information about Devereux from Devereux itself and from other sources such as online reviews

16  and discussions with other parents. Parent testified that her visit and tour, along with the

17  additional information she obtained, raised a lot of red flags, and demonstrated that Devereux was

18  not a safe placement for her child.

19      For example, Parent testified that there are significant elopement problems at Devereux;

20  that there is a large expanse of the Devereux campus that is not fenced and that this area is easily

21  accessible to students and also abuts on a wide and busy road; that numerous Devereux students

22  have eloped from the campus; and that a student had recently eloped from Devereux and was hit

23  by a car and killed. (*See* AR 5595-5602.) Parents' retained expert also visited Devereux and

24  testified regarding aspects of Devereux that would make it an inappropriate placement for J.B.,

25  including the risk of elopement. (AR 4586-93.)

26

27      _____

        [22] The Ninth Circuit also reversed the district court and upheld the agency's decision on other issues,
28  including the basis for the student's eligibility for special education and whether the student was receiving education
        under an IEP. *See Gregory K.*, 811 F.2d at 1312-14.

1    The evidence presented by Parents regarding Devereux was, for the most part,

2  uncontradicted by LEAs. This evidence, in combination with the extensive testimony and other

3  evidence in the record regarding J.B.'s elopement behavior, demonstrates that placement at

4  Devereux would not have been appropriate.

5        **2.    *Whether the ALJ improperly substituted her judgment for that of LEAs' witnesses.***

6    LEAs argue that the ALJ's placement and assessment reimbursement remedies directly

7  contradict the evidence in the record and the ALJ's own credibility findings and are, instead,

8  based on the ALJ's substituted judgment, destroying any deference due to the ALJ's decision. In

9  support of this argument, LEAs contend that there is no evidence that anyone recommended

10 residential placement to the IEP team or LEAs on or before May 10, 2018, and that there was thus

11 no basis on or before May 10, 2018, for LEAs to have reached a conclusion that residential

12 placement was needed. LEAs also argue that the ALJ's decision reaches conclusions inconsistent

13 with her credibility determinations.

14    LEAs' arguments are intertwined with their challenges to the ALJ's finding that residential

15 placement was required beginning on May 10, 2018, and the ALJ's requirement that LEAs

16 reimburse Parents for the cost of Dr. Solomon's psychoeducational assessment. The Court has

17 reviewed the testimony and other evidence in the record and rejects LEAs' contention that the

18 ALJ substituted her own judgment for that of the witnesses. To the contrary, as discussed below,

19 the Court finds the ALJ's decision on these issues to be based on and supported by the testimony

20 of the witnesses and the other evidence in the record.

21        **3.    *Whether the ALJ's decision contains consequential clear errors of fact.***

22    LEAs argue that the ALJ's decision contains consequential factual errors and thus was not

23 careful and thorough. In support, LEAs cite to two areas in which they believe the ALJ erred:

24 (1) the timespan between when LEAs offered Devereux in December 2018 and again in February

25 2019; and (2) the relevant dates of Madison Oaks' certification. LEAs argue that both of these

26 mistakes are material to the ALJ's decision and that thus the ALJ's decision is not thorough and

27 careful and should not be granted deference. The Court disagrees.

28 ///

### a.    Timespan between initial offer of Devereux and February 2019 IEP team meeting

The ALJ's decision states that once Parents did not consent to LEAs' informal offer of Devereux in December 2018, LEAs "had an obligation to convene an IEP meeting to discuss and formally offer an appropriate placement," and that LEAs "failed to convene an IEP team meeting until February 2019, four months after the amendment [for placement at Devereux] was offered." (AR 3890.) The ALJ's statement that there was a four-month timespan between the offer of placement at Devereux and the IEP team meeting is an error.

The evidence in the record establishes that the informal offer of placement at Devereux was made on December 18, 2018, just before the winter holiday break; that Parents immediately notified LEAs that they would not consent to that placement; that LEAs' offices were closed during the break; that when the break was over, the first week of January 2019, Parents attempted to get an IEP team meeting on the schedule as soon as possible; and that the IEP team meeting did not occur until February 1, 2019.[23] (AR 5603-04.)

The ALJ's decision states the correct dates of December 18, 2018, for LEAs' informal offer of Devereux, and February 1, 2019, for the IEP team meeting. (AR 3875, 3876, 3890, 3892.) Yet, the ALJ's decision incorrectly states that the timespan between the December 18, 2018, offer and the February 1, 2019 IEP team meeting was four months, rather than less than two months. This error appears to be a typographical error but could possibly be a calculation error. Either way, the Court does not find that this error is material to the ALJ's conclusions or affects the deference to be given to the ALJ's decision.

### b.    Date of Madison Oak's certification

The ALJ's decision states that Madison Oaks received California Department of Education ("CDE") certification in December 2018. (AR 3875.) This is an error because the evidence in the record establishes, and the parties agree, that Madison Oaks was not certified in December 2018,

---

[23] Parents contend that the February 1, 2019 IEP team meeting, and offer of Devereux at that meeting, also violated the IDEA because a member of the IEP team, whose attendance is mandatory, was not present at the meeting, and that member's absence was not waived. (ECF No. 44 (citing 34 C.F.R. § 300.321).) Because LEAs withdrew the offer of Devereux as an appropriate placement, the ALJ did not reach the issue of whether the February 1, 2019, offer violated the IDEA.

1   but instead received its certification on March 18, 2019. (*See* ECF No. 8 at 5; ECF No. 20 at 38;

2   ECF No. 26 at 3.)

3          LEAs argue that this error is material because J.B. is claiming that LEAs should have

4   offered placement at Madison Oaks, and that the date of certification is central to whether LEAs

5   could or should have offered placement at Madison Oaks. LEAs contend that the ALJ's error on

6   the certification date is thus a clear, material, and consequential error of fact that reduces or

7   eliminates any deference owed to the ALJ's decision. The Court disagrees.

8          The evidence in the record demonstrates that as of December 2018, Madison Oaks already

9   had students from California who had been placed there through IEPs; that Madison Oaks was

10  working through the certification process with the CDE; and that Madison Oaks was expected to

11  be certified by CDE any day. (AR 5615-16.) There is also evidence that the District was aware

12  that Madison Oaks had certification pending with the CDE. Specifically, Kylee Luchetti, a

13  District employee and a witness for LEAs, testified that that she contacted Madison Oaks and

14  learned that Madison Oaks was not currently CDE certified but that they were in the process of

15  gaining CDE certification and expected to have it any day. (AR 4091-92, 4095, 4124-25.) This

16  evidence is significant because, under California law, an out-of-state non-public school ("NPS"),

17  such as Madison Oaks, can apply for certification from the CDE once a California student has

18  been placed there through the IEP process. *See* Cal. Ed. Code § 56365(i). The CDE then has 120

19  days from the date of the NPS's application to decide certification, and if the NPS is approved,

20  and meets all requirements, certification is retroactively effective *to the application date*. Cal. Ed.

21  Code § 56366.1(e), (f).

22         Here, as noted, the evidence demonstrates that as of December 2018, Madison Oaks had

23  California students who had been placed there through the IEP process, that Madison Oaks had

24  applied for CDE certification, and CDE certification was expected to be approved any day. In

25  light of this evidence, and state law providing for retroactive certification, it was reasonable to

26  conclude that Madison Oaks' certification would be effective retroactively to December 2018.

27         Further, the ALJ recognized in her decision that she had authority to reimburse, as

28  compensatory education, a student's ongoing placement at a noncertified school. (AR 3898

40

1  (citing *Ravenswood City Sch. Dist. v. J.S.*, 2012 WL 2510844, *7 (N.D. Cal. 2012).) This

2  recognition confirms that the ALJ understood that Madison Oaks was not yet certified in

3  December 2018.

4       Under these circumstances, the Court does not find the ALJ's statement that Madison Oaks

5  *received* certification in December 2018, rather than stating that Madison Oaks was *retroactively*

6  *certified* to December 2018, to be a consequential error, and thus does not find that this error

7  affects the deference to be given to the ALJ's decision.[24]

8       **4.  *Whether the ALJ's decision improperly fails to analyze the Parent's testimony or evaluate her credibility.***

9       LEAs argue that the ALJ's decision is not thorough and careful, and thus not entitled to

10  deference, because it fails to analyze Parent's testimony or evaluate her credibility. In support of

11  their argument, LEAs cite to *J.G. ex rel. Jimenez v. Baldwin Park Unified Sch. Dist.*, 78 F. Supp.

12  3d 1268, 1282 (C.D. Cal. 2015). In *J.G.*, the court found that, "rather than consider [the parent's]

13  unique perspective, the ALJ improperly discounted her testimony. In fact, the ALJ discussed, and

14  summarily dismissed, only one small portion of Ms. Jimenez's testimony, stating that 'her

15  testimony that she wanted to try something different was not enough to credibly challenge the

16  Districts' witnesses' opinions regarding J.G.'s progress." *Id.* (internal quotation marks omitted).

17  Further, the small portion of the parent's testimony the ALJ did discuss was "largely irrelevant"

18  to the issue of whether the school district had complied with its obligation to provide a FAPE. *Id.*

19

20      [24] LEAs also argue that they could not place J.B. at Madison Oaks through the IEP process prior to the date the certification was received by the school. This argument is inconsistent with the California Education Code,

21  which provides that a nonpublic, nonsectarian school located outside the state is eligible for certification by CDE "only if a pupil is enrolled in a program operated by that school or agency pursuant to the recommendation of an

22  individualized education program team in California, and if that pupil's parents or guardians reside in California." Cal. Educ. Code § 56365(i). Thus, an NPS such as Madison Oaks cannot even apply for certification with CDE until

23  and unless a California student, such as J.B., has been placed there through an IEP.

    LEAs cite several OAH decisions for the proposition that an IEP team cannot place a student at a non-

24  certified non-public school. (See ECF No. 37 at 22.) These decisions are inapposite because they deal with *in-state* non-public schools and thus do not fall within the retroactive certification provisions for *out-of-state* non-public

25  schools. *See Parent v. Capistrano Unified Sch. Dist.*, 119 LRP 32339, *48 (OAH July 15, 2019) (The IEP team could not fund or place a student at Halstrom, a non-certified private school located in California, because

26  "[f]unding a non-certified private school is prohibited at the IEP team level as part of an offer of FAPE."); *Parents v. Carlsbad Unified Sch. Dist.*, 117 LRP 14170, *9 ("Although Parents also requested placement at New Vista

27  [located in Orange County, California], District was not required to, and could not place Student there because New Vista was not a certified non-public school."); *Parents v. Manhattan Beach Unified Sch. Dist.*, 74 IDELR 150, *12

28  (OAH Oct. 10, 2018) ("As Pacific Point Academy [located in Santa Monica, California] was not certified by the state of California as a non-public school, the team could not place Student there.").

1    Here, in contrast to *J.G.*, although the ALJ did not explicitly discuss or analyze Parent's

2 testimony or her credibility, there is no indication that the ALJ found Parent to be not credible or

3 otherwise discounted Parent's testimony. Indeed, the ALJ's decision is consistent with a finding

4 that the Parent's testimony was deemed to be credible, and LEAs have not cited to any evidence

5 in the record indicating otherwise.

6    A review of Parent's testimony demonstrates her extensive knowledge, familiarity, and

7 unique perspective regarding J.B.'s special needs. *See Amanda J. ex rel. Annette J. v. Clark*

8 *County Sch. Dist.*, 267 F.3d 877, 891 (9th Cir. 2001) ("[B]ecause [parents] observe their children

9 in a multitude of different situations, they have a unique perspective of their child's special

10 needs."). Other witnesses also testified regarding Parent's extensive knowledge of and familiarity

11 with J.B.'s needs, and the reliance of witnesses on Parent for information needed to conduct

12 assessments of J.B., and for assistance in handling J.B. when he engaged in maladaptive

13 behaviors.

14    Moreover, there is an extensive record here, consisting of a 6,859-page administrative

15 record that includes testimony from at least fourteen witnesses. "In cases, like this one, where

16 there is an extensive record and testimony, the ALJ is not required to mention every detail when

17 discussing the record. . . ." *Mary Struble v. Fallbrook Union High Sch. Dist.*, 2011 WL 291217,

18 *4 (S.D. Cal. 2011). This is especially the case where there were multiple experts with more

19 expertise and relevant opinions than Parent on the critical issues presented.

20    Finally, the Court has reviewed the testimony of Parent and finds it to be consistent with

21 the ALJ's conclusions regarding FAPE.

22    Under these circumstance, the ALJ did not err by failing to include an explicit discussion of

23 Parent's testimony or a credibility finding regarding that testimony.

24 **B.   Whether the ALJ's finding that residential placement was required as of May 10, 2018, is supported by a preponderance of the evidence.**

25    The ALJ determined that J.B. required residential placement as of May 10, 2018,

26 explaining as follows:

27    55. The Nexus program, while at first an appropriate program for Student, began
28    to no longer meet his needs. Following Student's October 18, 2017 IEP team

meeting where the team implemented his behavior program, his behavior spiraled. He was suspended for punching other students, striking a teacher with a fire extinguisher, and bringing a pocket knife to school. Student's on-going mental health was "slippery" as he would cycle through positive periods and extraordinarily dark periods. Student's behaviors, while difficult, were being managed by the behavior classroom at the Nexus program. Even Student's expert witnesses did not believe a more restrictive placement was necessary in the 2017-2018 school year. Ms. Knopf, Student's trusted behaviorist and key member of his outside of school support system never addressed residential treatment for Student until his manifestation determination review meeting on September 11, 2018. Ms. Swaffer, his counselor during the 2017-2018 school year also testified residential treatment was not a desired outcome as the family wanted to maintain the family unit.

56. Despite efforts to support Student's behaviors, they continued to decline. On May 10, 2018, the team agreed to an IEP amendment to initiate a twice daily pocket and sock check to ensure Student was not carrying any contraband he could turn into a weapon. Student was searched prior to coming to school and once he arrived at school out of fear he transported a weapon to harm himself or others. This intrusive form of behavior management, similar to what a criminal suspect endures rather than a fourth grade boy, was sufficient notice to Tuolumne County and Curtis Creek of Student's declining behaviors and increasing volatility. His active fantasy life took on a darker, more foreboding presence and was reflected in the violent and fantastical drawings he produced at school. Despite this knowledge, the adjustments the IEP team made to Student's IEP were insufficient to meet his needs. Tuolumne County and Curtis Creek's placement at the Nexus program was not sufficiently structured or restrictive to meet Student's behavior and learning needs beginning May 10, 2018. By May 10, 2018, the evidence showed that Student required a more restrictive placement than the Nexus program.

57. Further, Tuolumne County and Curtis Creek's December 18, 2018 IEP amendment that offered Student placement at Devereux outside the IEP process is a tacit admission that at least by that date, a more restrictive placement was also intended by Tuolumne County and Curtis Creek.

58. As to Issue 3(h), Student did not meet his burden of proof that he required a more restrictive placement during 2017-2018 school year. Student met his burden that he required a more restrictive placement from May 10, 2018, through the date of filing of Student's due process complaint, thus prevailing on Issues 4(i) and 5(c). The failure to offer a more restrictive placement severely impacted Student's ability to access his education. This failure denied Student a FAPE from May 10, 2018, through the time the case was filed.

(AR 3891-92.)

Both LEAs and J.B. challenge the ALJ's determination that residential placement was required as of May 10, 2018. LEAs argue that residential placement was not required until LEAs made the offer of Devereux in December 2018; J.B. argues that residential placement was required on or before January 4, 2017.

///

1

***1.  Whether the preponderance of the evidence supports the ALJ's finding that residential placement was required on and after May 10, 2018.***

2

3

LEAs argue that the preponderance of the evidence does not support J.B.'s residential

4

placement at Madison Oaks. LEAs do not dispute that J.B. needs residential placement and admit

5

that residential placement was required by the time of the hearing in March 2019. LEAs also

6

acknowledge that they offered residential placement on December 18, 2018. Further, LEAs do not

7

challenge the underlying facts cited by the ALJ in her opinion, which are set forth above.

8

Nevertheless, LEAs dispute the ALJ's determination that residential placement was required as of

9

May 10, 2018.[25] In support of their position, they contend that J.B. made progress after May 10,

10

2018; that the ALJ's finding that residential placement was required as of May 10, 2018, is based

11

on the ALJ's substituted judgment; and that the ALJ used the wrong legal standard in ordering a

12

change in placement.

13

  a.  Whether a finding of progress after May 10, 2018, particularly in behavior, is supported by a preponderance of the evidence.

14

LEAs argue that the preponderance of the evidence demonstrates that J.B. made

15

educational progress in the 2018-19 school year, as well as behavioral progress, and that this

16

progress fully supports LEAs' continued offer of placement in the Nexus program and not a more

17

restrictive residential placement:

18

> Plaintiff made particular progress in his primary area of need, behavior: his rate of suspension in 2018-19 was less than half of the previous year's. His behaviorist, Ms. Simon, saw "behavior of concern" in only 3% of her classroom visits in the 2018-19 school year, and staff reported no aggression for two consecutive months. Ms. Simon further reported Plaintiff "[has] done really well with us," except for one day, during the initial part of the 2018-19 school year and her data showed that from the start of the school year through September 11, 2018, Plaintiff earned maximum behavior points on all but one day. By comparison, in 2017-18, Plaintiff earned a perfect behavior score on 49% of days and an acceptable score 73.4% of days. Plaintiff's progress in the less restrictive Nexus after May 10, 2018, validates his continued placement there, until residential placement was offered on December 14, 2018.

19

20

21

22

23

24

(ECF No. 37 at 26 (citing ER 122, 123, 296, 298-99, 426, 428).)

25

LEAs thus rely on the testimony of Ms. Simon, a board-certified behavior analyst who was

26

---

27

[25] LEAs also dispute the ALJ's determination of residential placement at Madison Oaks as opposed to LEAs' offer of placement at Devereux. As discussed above, LEAs withdrew the offer of placement at Devereux prior to the start of the hearing and thus placement at Devereux was no longer at issue. Rather, the only offer on the table at the time of the hearing was Nexus.

28

1  working with Tuolumne County as an independent contractor during the 2018-19 school year, that

2  (1) the rate of suspension for the 2017-18 school year was 0.93 days per month, and that the rate

3  for the 2018-19 school year was 0.42; and (2) Ms. Simon had seen J.B. twice when he was

4  dysregulated, and that "staff have reported there's been no physical aggression since the end of

5  January [2019] when he was 5150." (AR 6167, 6181, 6170, 6181-82.) LEAs also cite to a

6  behavior chart prepared by Ms. Simon dated September 10, 2018. (AR 1203-04.) This behavior

7  chart states that from the start of the 2018-19 school year to September 11, 2018, J.B. earned

8  maximum behavior points on all but one day, compared to the 2017-18 school year when J.B. had

9  73.4 percent of days in the good behavior range. (AR 1203-04.)

10        However, as the ALJ noted, LEAs offered residential placement in December 2018. This

11  demonstrates that, by that date, LEAs believed residential placement was appropriate, despite the

12  lower rate of suspensions during the first part of the 2018-19 school year.[26] Further, Ms. Luchetti,

13  who was the special education coordinator for the District, testified that between September and

14  December 2018, J.B.'s "behavior pattern had continued with a 5150 and multiple behaviors at

15  school that were concerning, necessitating an offer of a change of placement" in December 2018,

16  and that this was a pattern of behaviors that had continued from the previous year. (AR 4908.)

17  She also testified that the September 2018 manifestation determination was conducted based on

18  J.B.'s suspensions and behaviors during the 2017-18 school year. (AR 4145.) Thus, even if J.B.'s

19  behavior for the first month or so of the 2018-19 school year may have slightly improved, there is

20  also evidence that J.B.'s maladaptive behaviors were continuing unabated. Moreover, the

21  evidence confirms the ALJ's factual findings, including that J.B.'s mental health and behaviors

22  are "slippery" as he cycles through positive periods and extraordinarily dark periods. LEAs'

23  selective, cherry-picking of evidence covering a short period of time when J.B.'s behavior

24  improved, while ignoring the extensive evidence that weighs against its position, is disingenuous.

25        The Court finds that the preponderance of the evidence demonstrates that J.B.'s behavior

26

27  [26] There is also evidence in the record indicating that LEAs' staff members may have been intentionally avoiding suspensions of J.B., perhaps in an attempt to avoid a manifestation determination review meeting, which is required if a student receives more than ten days of suspensions in a school year and those suspensions meet certain other criteria. *See* 34 C.F.R. § 300.536.

28

deteriorated, and his maladaptive behaviors escalated during the 2017-18 school year such that, by May 10, 2018, he needed a more restrictive placement and that this need continued during the 2018-19 school year up to the date J.B. filed his due process complaint.

     b. <u>Whether the ALJ's order for residential placement as of May 10, 2018, is impermissibly based on the ALJ's substituted judgment.</u>

  LEAs argue that because there is no record of residential placement being discussed or even requested on or before May 10, 2018, and because residential placement was not discussed or referenced with the IEP team or LEAs prior to June 25, 2018, the ALJ's determination that residential placement was required as of May 10, 2018, is based on the ALJ's substituted judgment. The Court disagrees.

  The IDEA requires a district to provide an education that meets a special education student's "academic, social, health, emotional, communicative, physical and vocational needs." *Ashland Sch. Dist. v. Parents of Student E.H.*, 587 F.3d 1175, 1185 (9th Cir. 2009) (citation omitted). In fulfilling this duty, a district has an independent obligation to "ensure that a continuum of alternative placements is available to meet the needs of [the student] for special education and related services." 34 C.F.R. § 300.115(a). The continuum of alternative placements may include "placement in a public or private residential program," in the event such a program "is necessary to provide special education and related services to" the student. 34 C.F.R. § 300.104. Further, a district has an obligation to assess the special education student in *all areas* of his suspected disability. *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 441 (9th Cir. 2010) (citing 20 U.S.C. § 1414(b)(3); Cal. Educ. Code § 56320(f)).

  Here, the preponderance of the evidence demonstrates that J.B.'s behavior was deteriorating, and his maladaptive behaviors were escalating during the 2017-18 school year such that, by May 10, 2018, he needed residential placement. LEAs had an *independent obligation* to ensure that they considered the continuum of alternative placements, including private residential placement, to meet J.B.'s needs. That the IEP team had not discussed residential treatment does not relieve LEAs of their independent obligation to consider whether residential placement was necessary to meet J.B.'s needs and provide J.B. with a FAPE.

     c.   <u>Whether the ALJ's decision relies on an incorrect legal standard for ordering a change in J.B.'s placement</u>.

LEAs argue that the ALJ relied on an incorrect legal standard for ordering a change in J.B.'s placement. LEAs contend that the ALJ should not have relied on the addition of the intervention of pocket checks at Nexus as a trigger for residential placement, contending that the "ALJ incorrectly seized on pocket checks as a measure of placement, but this intervention is not atypical for special education, and does not relate to whether more restrictive placement is warranted." (ECF No. 37 at 28.)

However, the ALJ did not merely rely on the twice-daily pocket (and sock) checks in finding that residential placement was required as of May 10, 2018. Rather, the ALJ determined that the addition of this measure, in light of J.B.'s unabated and escalating maladaptive behaviors, was sufficient to put LEAs on notice of J.B.'s escalating and unabated maladaptive behaviors and increasing volatility. Prior to this, J.B.'s behavior had spiraled. He had been suspended for punching other students, striking a teacher with a fire extinguisher, and bringing a pocket knife to school. His on-going mental health was "slippery," as he cycled through positive periods and extraordinarily dark periods. His "active fantasy life took on a darker, more foreboding presence and was reflected in the violent and fantastical drawings he produced at school." (AR 3891.) The ALJ's reliance on the addition of the twice-daily pocket and sock checks was not improper in light of the other evidence in the record indicating that J.B. required residential placement.

### 2.   *Whether the preponderance of the evidence supports a finding that residential placement was required as of January 4, 2017.*

J.B. argues that the failure of LEAs to offer him residential placement by January 4, 2017, denied him a FAPE. He contends that LEAs "had ample notice of J.B.'s behaviors across all settings upon his arrival" in the district, and that "J.B.'s dangerous behaviors and mental health issues continued unabated on and after January 4, 2017." (ECF No. 40-1 at 26-27.) He contends:

> By the end of the 2016-17 school year, while receiving both private and school-based services, J.B. was suspended twice and was documented to engage in maladaptive, violent, and aggressive behaviors at school which were apparently not documented on 10 different occasions, e.g.: assaulting District staff across settings; assaulting peers across settings; being obstinately noncompliant; eloping from class; cursing at District staff; and engaging in self-injurious behaviors, such as attempting to rip out his own tooth. For almost two school years, District staff

1  allowed J.B. [to] remain in psychosis and harm himself and others.

2  (ECF No. 40-1 at 27 (citing AR 2471-71, 5125-5126, 3842-46).) Thus, J.B. contends that he

3  required a more restrictive placement since at least January 4, 2017. He further contends that, in

4  ruling against him on this issue, the ALJ improperly placed the burden on him and his experts to

5  determine placement.

6        In finding that May 10, 2018, and not a date prior to that, was the date on which residential

7  placement was required, the ALJ cited the testimony of two of J.B.'s witnesses, Ms. Swaffar and

8  Ms. Knopf. The ALJ stated:

9        The Nexus program, while at first an appropriate program for Student, began to
10       no longer meet his needs. Following Student's October 18, 2017 IEP team
         meeting where the team implemented his behavior program, his behavior spiraled.
11       He was suspended for punching other students, striking a teacher with a fire
         extinguisher, and bringing a pocket knife to school. Student's on-going mental
12       health was "slippery" as he would cycle through positive periods and
         extraordinarily dark periods. Student's behaviors, while difficult, were being
13       managed by the behavior classroom at the Nexus program. Even Student's expert
         witnesses did not believe a more restrictive placement was necessary in the 2017-
14       2018 school year. Ms. Knopf, student's trusted behaviorist and key member of his
         outside of school support system never addressed residential treatment for Student
15       until his manifestation determination review meeting on September 11, 2018. Ms.
         Swaffer, his counselor during the 2017-2018 school year also testified residential
16       treatment was not a desired outcome as the family wanted to maintain the family
         unit.

17       . . . . .
         . . . Student did not meet his burden of proof that he required a more restrictive
18       placement during 2017-2018 school year. . . .

19  (AR 3891.)

20       The Court finds the ALJ's analysis and finding on this point to be careful and thorough and

21  therefore entitled to deference. The Court's independent review of the evidence confirms that J.B.

22  did not demonstrate by a preponderance of the evidence that he needed residential placement

23  beginning on January 4, 2017.

24       Ms. Swaffar testified that she was initially happy with the Nexus program for J.B, and that

25  what J.B. wanted—and what they all wanted—was for J.B. to stay in Nexus, "but J.B. is too sick.

26  He's too sick." (AR 5696-97.) Ms. Swaffar explained that despite J.B. having what she

27  characterized as Tuolumne County's "best" through the Nexus program, J.B. was not making

28  progress:

1

> I think that honestly, I think that he's had Tuolumne County's best, but I don't
> think it has helped. He has exactly the same behaviors and symptoms as when he
> came in. Because he has so much internally . . . going on and it takes so much of
> his energy, he's not able to access academics. He's not able to access social stuff.
> He's not able to do the things that people do in school.

(AR 5681-82.)

As to when she made a determination that Nexus was no longer working for J.B. and that J.B. needed residential placement, Ms. Swaffar testified:

> Well, you know, I wrote the – I had the phone call with Corrie in I think it was
> October of 2017, but we've actually had a conversation about it earlier saying you
> know, some kids – and I don't ever recommend, I only just put out information
> and say, you know, some children need a higher level of care in order to be
> successful. People are tired. The teacher is tired. The staff is tired.

> You know, when we talk about elopement, I mean this kid eloped from school,
> and one time he was gone for two and a half hours. . . .

> . . . .

> Probably 2016 we had the initial conversation, maybe even 2015, end of 2015.
> But it was just casual conversation. It's not something that I did a note about, but
> it was just basically sometimes if things are too hard at school, if he's not able to
> access his academics at school, and so Mom and Dad were not for residential
> treatment at that time at all. They wanted to – we all wanted J.B. to stay home. It
> wasn't about taking him and removing him at all, and I think that's why parents
> hung on so long, but that's what I think.

(AR 5697-98.)

Thus, Ms. Swaffar testified that they all wanted J.B. to stay at Nexus and not go into residential placement because they wanted J.B. to stay home. Ms. Swaffar also did not clearly testify as to a specific date on which she believed residential treatment was required. Although she testified that she had been discussing residential treatment with the Parents since 2016, she did not testify that she believed residential treatment was required in 2016 or 2017.

Ms. Knopf, J.B.'s trusted behaviorist and a key member of J.B.'s outside of school support system, testified as follows when asked when she thought J.B. needed residential placement:

> That's a tough call. Let me think back, if I may, for a second. When I look at
> some of the behaviors that I experienced with J.B. and I know of J.B., I would say
> no later than 2016, easily.

> He demonstrated some of the most dangerous behaviors that you can't turn
> around that well. And after three and a half years of working with him and very
> little progress, he cannot sustain when he needs to sustain it.

> And that's the bigger piece – is that when I teach these skills to the kids, they
> sustain it. They're be – they're able to get through that being ruminating and stop
> – and distorted thinking because they have the nonverbal skills.

1   J.B. can't do that when he becomes psychotic. And I believe from my – from my
2   experience – that J.B. is on the verge of psychosis most of the time. But I can't
    diagnose that. I'm not – I can't diagnose that. But that's my experience.

3   (AR 4480-81.)

4       Ms. Knopf attended IEP meetings held on March 9, 2016; February 24, 2017; February 9,
5   2018; and September 11, 2018. Despite attending all of these IEP meetings, she first
6   recommended residential placement at the September 11, 2018 IEP meeting. As to why she did
7   not recommend it earlier, she explained that she never recommends residential treatment and does
8   not believe that is her job; that she will talk about residential placement with parents and will
9   educate them about residential placement but will not recommend it because her job is not to
10  advocate but is instead to educate. (AR 4481.)

11      As to why she recommended residential treatment in this instance at the September 11,
12  2018 IEP meeting, Ms. Knopf explained that she and the Parents had a long and extensive
13  conversation about residential and she provided them information about the various residential
14  programs she was aware of because she knew that the Parents were seeking residential and she
15  supported them in that decision. But, again, she was not advocating because "that's not my job."
16  (AR 4482.) "At the County, we were always taught you are not an advocator, you are a provider.
17  That was my job. When you advocate, you start losing focus of objectivity and you become
18  subjective." (*Id.*)

19      Thus, even Ms. Knopf admitted it was a "tough call" as to when J.B. needed residential
20  placement. Although she testified that she believed it was no later than 2016, she admits that she
21  did not address residential placement with the IEP team prior to the September 11, 2018,
22  manifestation determination review meeting, and did not really discuss residential placement in
23  depth previously. Further, the ALJ found Ms. Knopf's credibility to be negatively impacted, and,
24  as discussed below, the Court grants deference to that credibility finding. In light of this, and the
25  information noted above, the Court gives no weight to Ms. Knopf's testimony that she believed
26  J.B. needed residential treatment no later than 2016.

27      Finally, Dr. Solomon testified that it was her opinion that J.B. should have been in
28  residential treatment by the end of 2015:

50

1
2
3
4

> I think he should've been in residential treatment by the end of 2015 when he was placed. He moved from the charter school to the NeXus program, and then within – while in the NeXus program in the first three months, had more episodes, including a – a large dangerous one, and – and had just come out of a psychiatric hospital, so was clearly a child who was very fragile and vulnerable. To me, that would've been the time to do it because he's fragile, he's vulnerable, but we also had the opportunity to really intervene.

5
(AR 5364.)

6
Although Dr. Solomon's testimony supports finding that residential placement was needed

7
no later than January 4, 2017, the ALJ found Dr. Solomon's testimony "unreliable as to when she

8
concluded a residential placement was warranted."(AR 3878.) As discussed in more detail below,

9
the Court finds the ALJ's determination on this point to be careful and thorough and will thus

10
defer to the ALJ's determination that Dr. Solomon's testimony was unreliable as to when

11
residential placement was needed.

12
The Court finds that the J.B. did not meet his burden of demonstrating that he

13
needed residential placement beginning on January 4, 2017. The Court finds that the

14
preponderance of the evidence demonstrates that J.B. required residential placement

15
beginning on May 10, 2018, and that the failure of LEAs to offer residential placement

16
beginning on May 10, 2018, denied J.B. a FAPE.

17
### VIII.   ANALYSIS OF REMEDIES

18
Under the IDEA, the reviewing court, "basing its decision on the preponderance of the

19
evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C.

20
§ 1415(i)(2)(C)(iii). "Under this provision, 'equitable considerations are relevant in fashioning

21
relief,' and the court enjoys 'broad discretion' in so doing." *Florence Cty. Sch. Dist. Four v.*

22
*Carter By & Through Carter*, 510 U.S. 7, 16 (1993) (citations omitted). "Courts fashioning

23
discretionary equitable relief under IDEA must consider all relevant factors, including the

24
appropriate and reasonable level of reimbursement that should be required." *Id.*; s*ee Sch. Comm.*

25
*of Town of Burlington, Mass. v. Dep't of Educ. of Mass*., 471 U.S. 359, 369-71 (1985) (parents of

26
a student denied a FAPE are entitled to reimbursement for the costs of "proper" placement or

27
other services that they have independently obtained for their child); *Ashland Sch. Dist. v.*

28
*Parents of Student E.H*., 587 F.3d 1175, 1183 (9th Cir. 2009) ("[W]here Parents seek

1   reimbursement for private school expenses, they 'are entitled to reimbursement *only* if a federal

2   court concludes both that the public placement violated IDEA and that the private school

3   placement was proper under the Act.'" (quoting *Carter By & Through Carter*, 510 U.S. at 15)).

4        Compensatory education is also an available remedy for the harm a student suffers while

5   denied a FAPE. *R.P. ex rel. C.P. v. Prescott Unified Sch. Dist.*, 631 F.3d 1117, 1125 (9th Cir.

6   2011) (citing *Parents of Student W. v. Puyallup Sch. Dist. No. 3*, 31 F.3d 1489, 1496-97 (9th Cir.

7   1994). "Compensatory education is an equitable remedy that seeks to make up for 'educational

8   services the child should have received in the first place,' and 'aim[s] to place disabled children

9   in the same position they would have occupied but for the school district's violations of IDEA.'"

10  *Id.* (citing *Reid ex rel. Reid v. Dist. of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005); 20 U.S.C. §

11  1415(i)(2)(C)(iii)).

12       Here, the ALJ granted, as the sole remedy for all of the violations and denial of FAPE

13  addressed in her decision, residential placement at Madison Oaks (or a comparable program if

14  Madison Oaks was unavailable), commencing no later than fifteen days following the decision,

15  and continuing through the 2018-19 regular and extended school year and the 2019-20 regular

16  school year. The ALJ explained:

17       86. Student required a more restrictive placement than what was offered from May
18       2018 through the time this case was filed. While the appropriateness of the subsequent
         offers is not reached in this decision, the evidence established by October 2018, there
19       was no dispute that Student required a residential placement to receive educational
         benefit. To remedy these denials, it is determined that Student is entitled to placement
20       that addresses his mental health, behavior, and educational needs in order to receive an
         educational benefit. Student requires a program of residential treatment that provides
21       mental health services by licensed clinicians experienced in treating individuals with
         emotional disturbance, specialized academic instruction by properly credentialed special
22       education teachers, and delivered in a facility prepared to handle his elopement issues.
         Therefore, to compensate for Tuolumne County and Curtis Creek's failure to provide
23       Student a FAPE including appropriate goals, executive functioning needs, occupational
         therapy needs, mental health counseling service, a timely functional behavior assessment,
24       appropriate behavior supports, for failing to provide a more restrictive placement, and as
         prospective relief based on Student's current needs, Student requires residential
25       placement commencing no later than fifteen days following this decision, during the
         2018-2019 regular and extended school year through the remainder of the 2019-2020
26       regular school year.

27       87. Student established that Madison Oaks is an appropriate program that is
         certified by the California Department of Education. It is being ordered prospectively to
28       remedy the FAPE denials. Nothing in this decision alleviates Tuolumne County or
         County Creek from meeting its prospective obligation to offer Student a FAPE.

1   (AR 3898.).

2       The ALJ also ordered LEAs to reimburse Parents for Dr. Solomon's psychoeducational

3   assessment in the amount of $11,025. (*Id.*) Finally, the ALJ ordered LEAs to provide one round

4   trip airline ticket for J.B. to go to and from Madison Oaks, two round trip airline tickets for

5   Parents to escort J.B. to and from Madison Oaks, and one night of hotel accommodations upon

6   enrollment and return home for a total of two hotel nights. (AR 3900.)

7       Both LEAs and J.B. appeal from the ALJ's award of these remedies. The parties'

8   challenges regarding residential placement at Madison Oaks through the 2019-20 school year are

9   focused on the timing of when J.B. required residential placement and whether the ALJ should

10  have considered the appropriateness of placement at Devereux. Those challenges have been

11  discussed above. The additional challenges raised by the parties are to the appropriateness of the

12  ALJ's compensatory remedy of requiring LEAs to reimburse Parents for the cost of Dr.

13  Solomon's psychoeducational assessment and the denial by the ALJ of additional remedies

14  requested by J.B.

15  **A.**     **Reimbursement for Dr. Solomon's psychoeducational assessment**

16      LEAs argue that the ALJ erred in ordering them to reimburse Parents $11,025 for the cost

17  of the Dr. Solomon's psychoeducational assessment of J.B.[27]

18      First, LEAs contend that reimbursement is not an appropriate remedy because the ALJ did

19  not identify how the assessment relates to FAPE or educational benefit for J.B. The Court

20  disagrees.

21      In her decision, the ALJ discussed at length Dr. Solomon's assessment and testimony. (AR

22  3875-78.) The assessment provides a detailed psychological evaluation of J.B. and makes

23  recommendations regarding J.B.'s educational needs. The assessment also includes details

24  regarding J.B.'s school and medical history and his history of maladaptive behavior, the tests

25   

26      [27] J.B. argues that the ALJ erred in failing to require full reimbursement of the non-testimonial fees paid to Dr. Solomon. However, the ALJ awarded J.B. reimbursement for the cost of the psychoeducational assessment

27  conducted by Dr. Solomon in the amount of $11,025. The invoice from Dr. Solomon demonstrates that the other costs incurred by J.B. in relation to Dr. Solomon were for time Dr. Solomon spent preparing for testimony, traveling for testimony, and giving testimony. (AR 3852.) As these additional costs are testimonial-related costs, it appears

28  that J.B. has already obtained the relief of full reimbursement for the non-testimonial fees paid to Dr. Solomon.

conducted by Dr. Solomon, the records she reviewed and the interviews she conducted, and her observations of J.B., both inside and outside the classroom. Although the ALJ did not agree with the date put forward by Dr. Solomon regarding when J.B. needed residential placement and did not agree with and adopt all of the remedies recommended by Dr. Solomon, it is clear that the ALJ relied extensively on information provided by Dr. Solomon in finding that J.B. required residential treatment by May 10, 2018, and in granting the remedy of residential placement at Madison Oaks.[28]

Second, LEAs contend that Dr. Solomon's assessment could not have provided benefit to J.B. because it contained no recommendations and was not provided to the IEP team. Again, the Court disagrees. Dr. Solomon's assessment concludes that J.B. is not able to utilize the educational opportunities provided to him, that he "is barely stable much of the time and is too mentally unstable to use his cognitive capacity to its fullest"; that he "requires a residential program that specializes in children with serious mood disorders and significant learning disorders"; and that "[n]o less restrictive environment will allow him to become stable and to then benefit from an education." (AR 3785; *see* 5362-63 (expressing opinion that J.B. needs residential placement and explaining why); AR 5373-76 (testimony that to achieve remediation for the denial of FAPE, J.B. will need placement in a very high-level locked residential treatment program as discussed in her assessment and, among other things, sufficient medical management in order to stabilize him and allow him to access his education, as well as individual therapy and regular family contact).) Further, Dr. Solomon attended the IEP team meeting held prior to the hearing

---

[28] LEAs also argue that the ALJ found that Dr. Solomon's testimony lacked credibility. (ECF No. 37 at 29-31.) The Court disagrees. At no point did the ALJ indicate that she found Dr. Solomon lacked credibility. Rather, the ALJ specified which portions of Dr. Solomon's conclusions and recommendations that she found unpersuasive. For example, the ALJ stated: "Dr. Solomon concluded Student required a residential treatment facility as of late 2015. Dr. Solomon first met Student in February 2019. This recommendation was unreliable as to when she concluded a residential placement was warranted. However, the totality of the evidence in this case established that Student required a more restrictive placement by May 10, 2018." (AR 3878.) Another specific recommendation that the ALJ disagreed with regarded family counseling. The ALJ stated: "Despite only meeting Student's family in February 2019 and his younger brother for only 20 minutes, [Dr. Solomon] also recommended the family receive two years of family therapy and individual therapy for each of the family members. Her recommendation was unpersuasive given the expansiveness of her recommendation versus the limited knowledge she had of the family's needs." (*Id.*) Thus, the ALJ was careful to delineate which specific aspects of Dr. Solomon's opinion and recommendations that the ALJ found unpersuasive and why. The ALJ never indicated that she found Dr. Solomon to lack overall credibility.

1   and was thus available to answer questions from or make recommendations to the IEP team.

2   Despite this availability, there is no indication that anyone on the IEP team sought to obtain any

3   information from Dr. Solomon or asked to review her assessment of J.B.

4          Finally, LEAs argue that reimbursement was not appropriate because J.B. did not put

5   psychoeducational assessment at issue during the hearing and did not request an independent

6   assessment. Again, the Court disagrees. The parents of a student denied a FAPE are entitled to

7   reimbursement for the costs of "proper" related services that they have independently obtained for

8   their child. *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359,

9   369-71 (1985). Those related services include mental health services "required to assist a child

10  with a disability to benefit from special education." 34 C.F.R. § 300.34(a).[29] Without appropriate

11  evaluative information about a student, it is not possible for an IEP team to develop a plan

12  reasonably calculated to provide the student with a meaningful educational benefit. *N.B. v.*

13  *Hellgate Elementary Sch. Dist., ex rel. Bd. of Directors, Missoula Cty., Mont.*, 541 F.3d 1202,

14  1210 (9th Cir. 2008). Here, Dr. Solomon's assessment provided evaluative information about J.B.

15  and recommendations for what was required to allow him to access his education. This

16  assessment was a proper related service, and the ALJ's order requiring LEAs to reimburse J.B. for

17  the cost of the assessment was accordingly appropriate. *See id.*

18  **B.     Additional remedies sought by J.B.** [30]

19         J.B. argues that he is entitled to additional remedies beyond that ordered by the ALJ. He

20   argues that, in light of the FAPE denials during the two-year statutory period, he is, at minimum,

21  _____

22        [29] Section 300.34(a) provides:

23        Related services means transportation and such developmental, corrective, and other supportive
          services as are required to assist a child with a disability to benefit from special education, and
          includes speech-language pathology and audiology services, interpreting services, psychological

24        services, physical and occupational therapy, recreation, including therapeutic recreation, early
          identification and assessment of disabilities in children, counseling services, including

25        rehabilitation counseling, orientation and mobility services, and medical services for diagnostic or
          evaluation purposes. Related services also include school health services and school nurse

26        services, social work services in schools, and parent counseling and training.

27  34 C.F.R. 300.34(a).
          [30] At a hearing held on June 11, 2020, LEAs indicated that they have already provided some of the additional
          remedies sought by J.B. To the extent J.B. agrees that LEAs have already adequately provided a particular additional

28  remedy, LEAs need not provide that remedy again.

entitled to the following additional compensatory remedies: (1) completion of an FBA and BIP

by a Ph.D.-level behaviorist with demonstrable experience working with children similarly

situated to J.B.; (2) annual IEP goals drafted by Education Specialist Priya Tjenderson or a

similarly qualified educational specialist; (3) educational therapy/specialized academic

instruction in the form of instructional IEP services in Math and Language Arts; (4) an AT

assessment; (5) an OT assessment, as well as corresponding goals and direct and/or consult

services; (6) full reimbursement of non-testimonial fees paid to Ms. Wilkinson, Ms. Tjenderson,

Ms. Swaffar, and Ms. Knopf; (7) individual and family counseling; (8) 100 hours of staff training

in managing students with comorbid behavioral and mental health issues; and (9) one-to-one aide

support.[31]

### 1.   *Completion of an FBA and BIP*

Before the ALJ, LEAs contended that they had a right to conduct a new FBA pursuant to a

February 6, 2019, assessment plan. The ALJ agreed, finding as follows:

> 64. Curtis Creek's request to assess Student is warranted. Student is currently
> eligible for special education and related services. Student's behavior has
> significantly changed since his 2017 functional behavior assessment was
> completed. Curtis Creek's members of Student's IEP team established that
> changes may be necessary to Student's IEP. The evidence further established that
> to propose changes, Student's IEP team requires current assessment information
> to determine his educational and related service needs.

> 65. Curtis Creek provided parents a copy of the proposed assessment plan on
> February 6, 2019. The proposed assessment plan outlined the areas to be
> evaluated and identified the titles of the examiner: a board certified behavior
> analyst. The plan described that the assessment proposed was a functional
> behavior assessment. The plan was written clearly in English and in terms
> understandable by the general public. The plan was clear in that it stated no
> special education services would be provided to Student without Parents' written
> consent. All statutory requirements of notice were met, and the assessment plan
> itself complied with the applicable statutes.

> 66. Curtis Creek proved they had qualified school personnel who met the state
> licensing, training and experiential requirements to assess Student. Specifically,
> Judy Simon is a BCBA with more than 18 years' experience; she was the
> designated assessor and qualified to assess Student.

> 67. Curtis Creek proved that the February 6, 2019, assessment plan complied with
> all applicable statutory requirements regarding form, function, and notice. They
> met their burden of proof that they may assess Student without parental consent

---

[31] The Court declines to address additional remedies and arguments that J.B. raised in his reply brief that were not included in his opening brief. *See Lane v. Dept. of Interior*, 523 F.3d 1128, 1140 (9th Cir. 2008) (the court can, in its discretion, decline to consider arguments raised for the first time in a reply brief).

1   based upon the proposed assessment plan. Tuolumne County and Curtis Creek
    prevailed on Issue 2.

2   . . . .

3   101. Curtis Creek is entitled to conduct a functional behavior assessment of
    Student. The assessment may be conducted while Student is attending Madison

4   Oaks.

5   (AR 3893, 3900.)[32]

6   J.B. takes the position that the ALJ ordered LEAs to conduct an FBA at Madison Oaks

7   and that LEAs have failed to comply with this requirement as no FBA has been conducted.

8   However, as the language above demonstrates, the ALJ stated that the LEAs "*may* assess Student

9   without parental consent based upon the proposed assessment plan"; that LEAs are "*entitled* to

10  conduct a functional behavior assessment of Student"; and that the "assessment may be conducted

11  while Student is attending Madison Oaks." (*Id.*) The ALJ did not *require* LEAs to conduct the

12  assessment.

13  Nonetheless, the Court finds that requiring LEAs to conduct a new FBA and BIP is an

14  appropriate compensatory remedy. There is extensive evidence in the record regarding the impact

15  of J.B.'s maladaptive behaviors on his ability to access his education, and the need for an

16  effective FBA and BIP to address those behaviors. LEAs' own witness, Ms. Simon, who is a

17  board-certified behavior analyst for the District, reviewed the initial FBA by Ms. Murphy and

18  recommended that it be redone. Ms. Wilkinson, who testified for J.B., is also a board-certified

19  behavior analyst. Ms. Wilkinson similarly reviewed the FBA by Ms. Murphy and recommended

20  that it be redone.

21  The Court finds that the preponderance of the evidence demonstrates that a new FBA and

22  BIP are needed, and that both an FBA and BIP are crucial steps in ensuring that J.B. is able to

23  access his education. The Court accordingly recommends that LEAs be required to conduct a new

24  FBA and to develop a new BIP based on that FBA as a compensatory remedial remedy for LEAs'

25  denial of FAPE.

26  _____

    [32] The ALJ also acknowledged J.B.'s request that the FBA be conducted by a PhD-level behaviorist with

27  specialized relevant experience, but did not specifically address that request, instead allowing LEAs to conduct an
    FBA based on the February 6, 2019 assessment plan, which states that the assessment is to be performed by a board-
    certified behavior analyst, and finding that LEAs have demonstrated that they have a qualified person to conduct that

28  assessment, Ms. Simon. (AR 3893, 3900.)

1   J.B. contends that he is entitled to have the new FBA conducted by a PhD-level

2   behaviorist with demonstrable experience working with children similarly situated to J.B. In

3   support of this contention, J.B. points out that Ms. Murphy, who conducted the initial FBA, was a

4   board-certified behavior analyst who, on paper, was an experienced behaviorist, yet completely

5   failed in conducting the FBA such that her work needs to be redone. (ER 40-1 at 25.) J.B. also

6   relies on Ms. Wilkinson's testimony that J.B. needs a FBA after he is placed in residential

7   treatment, and that the FBA needs to be conducted by a PhD-level board-certified behavior

8   analyst or PhD-level psychologist who has experience in behavior analysis and specializes in

9   working with children similarly situated to J.B.[33] (AR 5890-91.)

10   In light of the failure of LEAs' previous board-certified behavioral analyst to conduct an

11   adequate FBA, and the complex nature of J.B. and his mental health issues, the Court is

12   concerned that a subsequent FBA may also be inadequate unless conducted by a highly qualified

13   PhD-level behaviorist with experience working with children similarly situated to J.B., as

14   recommended by Ms. Wilkinson. The importance and urgency of an adequate FBA and effective

15   BIP cannot be overstated in light of J.B.'s maladaptive behaviors that have, for the most part,

16   remained unaddressed and escalated over many years, and have continued to prevent J.B. from

17   accessing his education.

18   The Court therefore recommends that LEAs be required to fund a new FBA using an

19   independent PhD-level behaviorist with experience working with children similarly situated to

20   J.B., and to have this behaviorist also develop an appropriate BIP based on the results of the FBA.

21   **2.    *Annual IEP goals drafted by Priya Tjenderson or a similarly qualified education***
22   ***specialist***

23   J.B. contends that he is entitled to annual IEP goals drafted by Educational Specialist Priya

24   Tjenderson or a similarly qualified educational specialist.

25   The ALJ found as follows regarding the annual IEP goals set for J.B. during the two-year

26   _____

27   [33] The Court recognizes that the ALJ found Ms. Wilkinson's credibility to be negatively impacted and, as discussed below, will in general defer to that negative credibility finding. However, both Ms. Wilkinson and LEAs' witness, Ms. Simon, reviewed Ms. Murphy's FBA and testified that the FBA needed to be redone. The Court thus finds Ms. Wilkinson's testimony on this specific issue to be credible, and similarly gives some weight to Ms. Wilkinson's opinion that the new FBA should be conducted by a PhD-level behaviorist.

statutory period:

15. In the January 31, 2017 IEP, 12 goals were identified for Student to work on over the next 12 months. Four of Student's goals were measurable. For example, Student's numbers sense goal called for Student to add and subtract double digit numbers up to 50 with 80 percent accuracy. To measure progress toward this goal, staff could identify the number of times Student was asked to calculate double-digit numbers and his accuracy at each attempt. Student's spelling goal is similarly measurable as it called for Student to spell at an 80 percent accuracy words from the fourth grade sight list.

16. The remaining goals of Student's January 31, 2017 IEP were not measurable. For example, Student had a behavior goal that asked him in a counseling setting to demonstrate positive peer interactions. The goal fails in its measurability and it is difficult to monitor or track. The goal is subjective to the mental health clinician evaluating Student in a counseling setting. Further, the goal requires Student to demonstrate appropriate interactions with peers, but is not evaluated in a classroom setting, but his individual counseling setting. Thus, this goal was never measurable.

17. Another unmeasurable goal was Student's behavior goal that asked him, in a counseling setting, to identify five strategies for managing his own anger, stress, frustration, and anxiety 70 percent of the time in two out of three trials as measured by the mental health clinician. The evidence in this case established Student was aware of positive and negative behaviors when not dysregulated. Simply asking Student to identify strategies without any further guidance renders the goal unmeasurable. Student could easily accomplish this goal by identifying five maladaptive strategies for his anger. Student could also by rote identify strategies and be successful in this goal. Thus, this goal is a memorization goal rather than a behavior goal because Student could identify strategies but not deploy them as a behavior modification. Thus, as a behavior goal it is not measurable.

18. In Student's October 18, 2017 IEP team amendment, four new behavior goals were presented. Two of Student's behavior goals were measurable. One goal asked Student to move to a safe area away from conflict four out of five situations. Student's emotional control goal required him not to engage in threats and negative comments towards other students, and avoid aggression towards adults as defined by making physical contact with them through hitting, kicking, and pushing on 85 percent of the school days he attended. However, the remaining two goals were not measurable. For example, one goal addressed seeking help, called for him to independently seek help when engaged in difficult or nonpreferred tasks. This goal fails as it is unclear what difficult or non-preferred tasks Student is expected to independently seek assistance on. His emotional control goal fails for similar reasons. It called for student to calmly and effectively communicate his emotions and needs in four out of five trials. The goal is not measurable as it is subjective to the causative behavior and the desired result.

19. When the team met again on January 29, 2018, the team introduced new goals in multiplication, subtraction, reading fluency, a counseling setting-behavior goal, and two new behavior goals to address negative peer interaction and aggression. Some of Student's goals from his 2017 IEP that he did not meet were continued without revision. None of the goals introduced at Student's October 18, 2017 IEP amendment meeting were met; however, Student's needs

increased. Student's aggressive behavior goal was measurable as it required him to not engage in pushing, kicking or hitting staff 100 percent of the school days he was present.

20. Student failed to meet their burden that Student's baselines were incorrect. Student's expert's wholesale discounting of Student's goals was given little weight and Student provided no other evidence that the baselines were incorrect. While[] Student did not meet their burden that the baselines were incorrect, Student did establish several goals from the January 31, 2017 IEP were unmeasurable and were never remediated in his January 29, 2018 IEP. That several goals were not measurable was a procedural flaw in the two IEP's.

21. As noted above, a procedural violation only results in a denial of FAPE if it impeded the child's right to a FAPE, significantly impeded the parents' opportunity to participate in the decision-making process, or caused a deprivation of educational benefits for the child. (20 U.S.C. § 1415(f)(3)(E); 34 C.F.R. § 300.513(a)(2); Ed. Code, § 56505, subd. (f)(2); see also, Target Range, supra, 960 F.2d at pp. 1483-1484.)

22. That Student's goals remained unmeasurable and un-remediated over two annual IEPs resulted in a substantive denial of FAPE because the failure to develop clear and measurable goals impeded Student's ability to access his education. Thus, Tuolumne County and Curtis Creek denied Student a FAPE.

(AR 3883-85.)

Thus, the ALJ found numerous goals in the IEP were not measurable and were un-remediated over two annual IEPs, and that this resulted in a substantive denial of FAPE. The ALJ also acknowledged that J.B. was requesting that LEAs be ordered to fund Ms. Tjenderson to draft all of J.B.'s IEP goals. (AR 3899.) However, the ALJ did not grant this requested relief and did not explain why she declined to do so.

In light of the past failures of the IEP team to provide measurable and adequate goals and the resulting denial of FAPE over the entire two-year statutory period, the Court finds that review of current IEP goals by a qualified educational specialist with experience working with children similarly situated to J.B. and drafting of future IEP goals during the 2020-21 school year by this specialist is an appropriate remedy.

The Court therefore recommends that, as a compensatory remedy for the previous denials of FAPE related to unmeasurable and unremediated goals, LEAs be ordered to fund an independent, qualified educational specialist, with experience working with children similarly situated to J.B., and approved by Parents, to review the goals included in J.B.'s current IEP and draft goals for IEPs through the 2020-21 school year.

1          ### 3.     *Educational therapy/specialized academic instruction*

2          J.B. contends that he is entitled to educational therapy/specialized academic instruction in

3    Math and Language Arts.

4          Throughout her decision, the ALJ cited evidence demonstrating that Math and Language

5    Arts are areas in which J.B. has deficits. Specifically, the ALJ noted that during the January 31,

6    2017 IEP meeting, J.B.'s academic assessment was discussed. This assessment "revealed math

7    deficits in calculations," and the IEP team identified in writing that Math was an area of need for

8    J.B. (AR 3865.) During the January 29, 2018 IEP meeting, the IEP team identified J.B.'s areas of

9    need as including Language Arts and Math. (AR 3871.) On the Woodcock-Johnson test, J.B.

10   performed below average in areas of spelling, sentence writing fluency, writing samples, and

11   broad language, and his math scores indicated that J.B. had "significant weakness in calculation,

12   math facts fluency, applied problems, and broad mathematics." (AR 3879.)

13         In light of the documented deficiencies in Math and Language Arts, the Court recommends,

14   as a compensatory remedy for past denials of FAPE, that LEAs be required to fund educational

15   therapy/specialized academic instruction in the form of instructional IEP services in Math and

16   Language Arts through the 2020-21 school year.

17         ### 4.     *Assistive technology assessment*

18         J.B. contends that he is entitled to an assistive technology ("AT") assessment as a

19   compensatory remedy for the denial of FAPE.

20         The ALJ found as follows regarding assistive technology:

21         Student's needs rose to the level that Tuolumne County and Curtis Creek
           provided Student with electronic technology in an effort to contain his behaviors.
22         Tuolumne County and Curtis Creek team members indicated at the January 31,
           2017 IEP team meeting that they did not believe Student required any assistive
23         technology. Yet, when the IEP team reconvened on February 24, 2017, the team
           agreed Parent would provide Student a leapfrog tablet for school use. Tuolumne
24         County and Curtis Creek also agreed Student required an iPad and headphones to
           allow him to navigate his bus rides to and from school. The IEP team offered
25         these services to address Student's behavior without the benefit of an assistive
           technology assessment to determine Student's unique needs in this area.
26         Tuolumne County and Curtis Creek were on notice from at least February 24,
           2017, of Student's needs in the area of assistive technology. Tuolumne County
27         and Curtis Creek's failure to assess Student in that area of need denied him a
           FAPE from February 24, 2017.
28

(AR 3889.)

Despite finding LEAs denied J.B. a FAPE by failing to assess J.B. in AT, the ALJ did not order any AT related compensatory remedy, nor did the ALJ address why she was not doing so.

The Court finds that an AT assessment is an appropriate and necessary compensatory remedy for the denial of a FAPE in the area of assistive technology. Moreover, given the ongoing denial of FAPE over the two-year period in this area, the Court finds that such assessment should be conducted by a qualified independent assessor.

Accordingly, the Court recommends that LEAs be ordered to fund a qualified, independent assessor to conduct an AT assessment.

### 5. *Occupational therapy assessment*

J.B. contends that he is entitled to an occupational therapy ("OT") assessment and corresponding goals and direct and/or consult services.

The ALJ found as follows regarding OT:

> 29. . . . . Student's January 2017 IEP identified Student's bilateral coordination as an area of need. Student met two of his three occupational goals at the time of this IEP. Tuolumne County and Curtis Creek discontinued Student's occupational therapy services despite evidence that occupational therapy[is] an area of need with no explanation o[r] justification. No assessment report supported Tuolumne County and Curtis Creek's withdrawal of Student's occupational therapy service or contained goals. Ongoing services for Student in occupational therapy would have assisted him in further developing [his] fine motor and gross motor skills. The evidence established Tuolumne County and Curtis Creek should not have discontinued Student's occupational therapy goals or services when he continued to have occupational therapy needs.
>
> 30. Tuolumne County and Curtis Creek denied Student a FAPE from January 31, 2017, through the date of filing regarding occupational therapy.

(AR 3886.)

Despite finding that LEAs denied J.B. a FAPE regarding occupational therapy for the entire two-year statutory period, the ALJ did not order any OT related compensatory remedy, nor did the ALJ address why she declined to do so.

The Court finds that an OT assessment and corresponding goals and services are an appropriate and necessary compensatory remedy for the LEAs' denial of FAPE in the area of occupational therapy. The Court further finds that this OT assessment and development of appropriate goals should be conducted by a qualified independent assessor.

Accordingly, the Court recommends that LEAs be ordered to fund a qualified, independent assessor to conduct an OT assessment and develop appropriate goals based on that assessment; and to provide appropriate OT services based on that assessment and goals developed therefrom.

### 6. Reimbursement of non-testimonial fees paid to Ms. Wilkinson, Ms. Tjenderson, Ms. Swaffar, and Ms. Knopf and the ALJ's credibility findings[34]

The ALJ found that J.B. was not entitled to reimbursement of the costs incurred by Parents for the services of Ms. Wilkinson, Ms. Tjenderson, Ms. Swaffar, and Ms. Knopf:

> 93. Student presented no authority under which to order Tuolumne County and Curtis Creek to reimburse Parent's out-of-pocket medical expenses and private placement consultant fees. Further, at least two of the invoices for out-of-pocket medical expenses lack sufficient detail. Ms. Swaffer's is simply a list of years with dates listed. Ms. Knopf's invoice was handwritten, lacking an adequate explanation of the time duration of the services provided or even the year the services were provided. Parties were advised in the Order Following Prehearing Conference dated March 12, 2019, any party seeking reimbursement was to "present admissible evidence of these expenditures…as part of its case in chief." Thus, in the interest of justice, the nature of the other remedies provided, and Student's lack of authority supporting such a remedy, Student's request for out-of-pocket medical expenses, assessments, and private placement consulting fees is denied.
>
> 94. Ms. Wilkinson's testimony was deemed less than credible. Reimbursement for her services would not be appropriate and is denied.

(AR 3899.)

J.B. challenges both the ALJ's denial of reimbursement for the services of Ms. Wilkinson, Ms. Tjenderson, Ms. Swaffar, and Ms. Knopf and the ALJ's credibility determinations regarding Ms. Wilkinson, Ms. Tjenderson, and Ms. Knopf.

#### a. Ms. Tjenderson

Ms. Tjenderson is an Educational Specialist Consultant hired by Parents. The ALJ denied Parents' request for reimbursement of the cost of Ms. Tjenderson's services because the ALJ found Ms. Tjenderson to be not credible. The ALJ noted that Ms. Tjenderson found all of J.B.'s IEP goals to be inadequate. (AR 3879.) The ALJ found this "wholesale discounting of Student's goals was conclusory," and further noted that Tjenderson never observed J.B. at school or spoke to his teachers. The ALJ concluded, "Ms. Tjenderson's testimony raised significant questions

---

[34] J.B. also contends he is owed full reimbursement for the non-testimonial fees paid to Dr. Solomon. However, as discussed previously, the ALJ ordered LEAs to reimburse J.B. for the cost of the psychoeducational assessment conducted by Dr. Solomon and, based on the invoice in the record, this reimbursement covers all of Dr. Solomon's non-testimonial fees.

about her objectiveness." (AR 3880.) This reasoning is supported by the evidence in the record. That the ALJ also made some findings that were consistent with the testimony of Ms. Tjenderson does not otherwise refute the ALJ's negative credibility finding. Accordingly, the Court defers to the ALJ's credibility finding regarding Ms. Tjenderson, and also defers to the ALJ's denial of reimbursement for the costs of Ms. Tjenderson's services.

### b. Ms. Wilkinson

Ms. Wilkinson is a board-certified behavior analyst hired by Parents. The ALJ found:

> Ms. Wilkinson's opinions on the quality of the [initial FBA] and behavior plan were impacted by straying from her area of expertise in behavior. Ms. Wilkinson consistently testified about Student's psychosis issues. Student has a diagnosis of Bi-Polar disorder; no medical provider was called to testify to any "psychosis." Further, Ms. Wilkinson's credibility was impacted by her refusal to answer the questions she was asked and instead insisted on providing the answers she wanted to give.

(AR 3873.) Although there was evidence in the record that J.B. had been diagnosed as having Bipolar Disorder with psychotic features (*see* AR 3786 (Dr. Solomon's report listing a current diagnosis of "Bipolar Disorder, early onset, with psychotic features")), the ALJ correctly noted that no medical provider was called to testify regarding any psychosis. This and other evidence in the record supports the ALJ's finding regarding Ms. Wilkinson's credibility, and the Court defers to that finding and to the ALJ's denial of reimbursement of the cost of Ms. Wilkinson's services.

### c. Ms. Swaffar

Ms. Swaffar is a licensed marriage and family therapist hired by Parents to work with J.B. Ms. Swaffar began working with J.B. in 2015 when J.B. was seven years old and continued to work with him through at least February 13, 2019. The ALJ denied Parents reimbursement for Ms. Swaffar's services based on the ALJ's finding that Ms. Swaffar's invoice for those services lacked sufficient detail, specifically noting that the invoice is simply a list of years with dates listed.

The Court finds that the ALJ's decision to deny reimbursement of the cost of Ms. Swaffar's services is neither thorough nor careful, and accordingly does not grant deference to this portion of the ALJ's decision.

Although Ms. Swaffar's invoice is, as the ALJ noted, simply a list of years with dates (*see*

1  AR 3218), the invoice is supported by Ms. Swaffar's extensive treatment notes, which provide

2  details of the services she provided to J.B. over the years she saw him (*see* AR 3154-3217). The

3  invoice, combined with the treatment notes, demonstrate that Ms. Swaffar provided proper related

4  services that were required to assist J.B. in accessing his education and that reimbursement for the

5  cost of Ms. Swaffar's services is therefore appropriate.

6      The primary reasons J.B. was unable to access his education were his emotional

7  dysregulation and maladaptive behaviors. During counseling sessions, Ms. Swaffar worked with

8  J.B. on skills to assist him in, among other things, emotional regulation; recognizing,

9  understanding, and appropriately responding to social cues; and controlling his impulsive

10 behaviors. (*See* AR 1873-1894, 5679-83.) These are all skills that J.B. requires in order to access

11 his education. Thus, Ms. Swaffar's services were "proper" related services that were required to

12 assist J.B. in accessing his education, and Parents are entitled to reimbursement for the cost of

13 those services. *See Sch. Comm. of Town of Burlington, Mass.*, 471 U.S. at 369-71 (1985) (parents

14 of a student denied a FAPE are entitled to reimbursement for the costs of "proper" related services

15 that they have independently obtained for their child); 34 C.F.R. 300.34(a) (related services

16 include mental health services "required to assist a child with a disability to benefit from special

17 education").

18     Ms. Swaffar's invoice demonstrates that she provided services of twenty-one appointments

19 in 2017, five appointments in 2018, and two appointments in 2019, for a total of twenty-eight

20 appointments since January 4, 2017. Parents were billed a $20 copay for each of twenty-seven

21 appointments, and a $40 copay for the remaining appointment. Thus, the total amount paid by

22 Parents for Ms. Swaffar's services since January 4, 2017, is $580.[35]

23     The Court recommends that LEAs be required to reimburse Parents for the cost of Ms.

24 Swaffar's services in the amount of $580.

25 ///

26

27     [35] The invoice submitted by J.B. shows that Parents paid a total of $1,400 in copayments for Ms. Swaffar's
   services covering the period of May 4, 2015, through February 13, 2019. (AR 3218.) The $580 recommended
28 reimbursement is for the copayments Parents paid for services since January 4, 2017.

1

       d.  <u>Ms. Knopf</u>

2

Ms. Knopf is a private behavior modification practitioner hired by Parents to work with

3

J.B. beginning in 2015. The ALJ found:

4

> Ms. Knopf became a member of Student's emergency phone tree when his
> behaviors became unsuitable to remain at school. Ms. Knopf would pick Student up

5

> from school if Mother was unable. She would also meet the family at the
> emergency room when necessary. Ms. Knopf is a trusted member of Student's

6

> private support team. Ms. Knopf expressed her belief Student was intellectually
> disabled during testimony. She did this without any evidence to support her claim.

7

> Ms. Knopf's credibility was impacted by this unsupported statement.

8

(AR 3870.) The evidence in the record supports the ALJ's reasoning for making this credibility

9

finding, and the finding is thus entitled to deference. This negative credibility finding also

10

supports the denial of reimbursement for the costs of Ms. Knopf's services.

11

**7.**    ***Individual and Family Counseling***

12

J.B. contends that he is entitled to the compensatory remedy of individual and family

13

counseling. The Court assumes that J.B. is referring to the recommendation by Dr. Solomon that

14

J.B.'s family receive two years of family therapy and individual therapy for each family member.

15

(AR 3878, 5373-74.)

16

The ALJ found this recommendation by Dr. Solomon to be unpersuasive:

17

> Despite also only meeting Student's family in February 2019 and his younger
> brother for only 20 minutes, [Dr. Solomon] also recommended the family receive

18

> two years of family therapy and individual therapy for each of the family members.
> Her recommendation was unpersuasive given the expansiveness of her

19

> recommendation versus the limited knowledge she had of the family's needs.

20

(AR 3878.)

21

The Court finds the ALJ's rejection of the additional remedy of family therapy to be

22

supported by the record and entitled to deference. Accordingly, the Court recommends that the

23

ALJ's denial of J.B.'s request for individual and family counseling for his family members be

24

affirmed.

25

**8.**    ***100 hours of staff training***

26

J.B. contends that he is entitled to an order requiring LEAs provide, and LEAs' staff attend,

27

100 hours of training in managing students with comorbid behavioral and mental health issues.

28

J.B. contends that the District repeatedly admitted at the hearing that its staff has never had

1  appropriate training or qualifications to provide J.B. a FAPE during the relevant statutory period.

2    As LEAs point out, there is no indication that LEAs' staff lacked the credentials and

3  certifications required to work with J.B. Further, the reasons set forth by J.B. for contending that

4  the staff was not appropriately trained or qualified are unpersuasive. For example, J.B. notes that

5  Shea Morgan, J.B.'s teacher for three years at Nexus, had little special education experience as of

6  January 2017, and that "J.B. attacked Mr. Morgan with sticks, rocks, and fire extinguishers

7  between October 18, 2017 and January 29, 2018." J.B. also contends that there is no evidence

8  showing that Mr. Morgan's training or qualifications were sufficient to meet J.B.'s needs. J.B.

9  also notes that the FBA created by Ms. Murphy, the District-contracted behaviorist, needed to be

10  redone and discusses errors made by Ms. Murphy. Finally, J.B. discusses issues he has with the

11  testimony of Ms. Reiser and Ms. Simon, and apparently seeks to also impinge on the ALJ's

12  positive credibility finding regarding Ms. Simon. (*See* ECF No. 40-1 at 25-26.)

13    The Court does not find the information cited by J.B., or the other evidence in the record,

14  sufficient to demonstrate that LEAs should be ordered to provide, and staff to attend, 100 hours of

15  training. The Court therefore recommends that J.B.'s request for training as a compensatory

16  remedy be denied.

17    **9.**    ***One-to-one aide support***

18    J.B. contends that he should receive one-to-one aide support as a compensatory remedy for

19  the denial of FAPE. The ALJ acknowledged that Dr. Solomon recommended that J.B. receive

20  one-to-one aide support. (AR 3878.) The ALJ found, however, that J.B. "did not prove he

21  required a one-to-one aide, in fact, the evidence was contrary as Student's dislike of authority

22  figures and even an aide at arm's length could trigger a behavior incident in Student." (AR 3888.)

23    Based on the record, including the supplemental declarations submitted by J.B., the Court

24  finds that one-to-one aide support is an appropriate compensatory remedy for J.B.

25    During the hearing, Dr. Solomon recommended that, in addition to residential placement,

26  J.B. required a one-to-one aide. Dr. Solomon opined that J.B. is "not going to be able to get

27  academic benefit without the one-to-one attention," and that although this may not be true once he

28  becomes more regulated; "it's certainly true that any academics happen because someone, an

aide, was sitting in one-to-one." (AR 5372.) Dr. Solomon also noted that J.B. might need a one-to-one aide for other behavioral issues: "He's also a child who's, at this point, so acute that he might require one-to-one when he enters a program. For a while he was given one-to-one in the last psychiatric hospitalization because he was so inappropriate in groups, mostly just blurting out sexually inappropriate things. But he couldn't contain it even when they let him know that it would take him out of the group." (AR 5369.)

As the ALJ recognized, there is evidence in the record that J.B. is resistant to and dislikes authority figures, and that the close presence of authority figures may trigger a behavior incident. However, the evidence also demonstrates that unless there is one-to-one aide support, J.B. is unable to stay on task with and complete his school work. The evidence further demonstrates that despite having an arms-length requirement, J.B. continued to engage in elopement behavior and other maladaptive and dangerous behavior at Nexus.

The Court finds that the evidence in the record demonstrates by a preponderance of the evidence a strong need for one-to-one aide support to remedy past denials of FAPE and allow J.B. to access his education.

The supplemental evidence submitted by J.B.—declarations from Starlett Armstrong and Dianne Carr—also supports the need for one-to-one aide support.

Ms. Armstrong has a Master of Social Work and is a doctoral candidate in social work. (ECF No. 34.) She is a licensed advanced professional social worker with the State of Tennessee and has over 20 years of mental health and social services experience, including the last approximately 10 years as Clinical Director of Madison Oaks. (*Id.*) Ms. Armstrong declared as follows regarding J.B.:

> 6. Since J.B.'s enrollment at Madison, I have observed him in group therapy settings purposefully self-isolating; exhibiting extreme withdrawal behavior; using sexualized language that is wholly inappropriate to his setting; and making inappropriate statements regarding use of alcohol and recreational drugs. Additionally, I am aware that J.B. continues to perseverate on suicidal ideations, including hanging himself with a noose, as recently as the week of September 23, 2019. J.B. also continues to engage in physically aggressive acts towards peers.

> 7. J.B. requires, but currently does not have, 1:1 support from a behaviorally trained aide throughout the day because I am aware that J.B. has attempted to elope from Madison's campus on at least one occasion and that he attempts to pick or break locks to escape from locked areas. I am also aware from

staff reports that J.B. has attempted to goad peers into attempting to elope with him. Madison staff and I remain concerned that J.B. will attempt to elope and may injure himself or others in the process.

8. Given J.B.'s severe and intensive behaviors that interfere with his access to his academics daily, it is critical to J.B.'s learning to have a dedicated 1:1 adult who is highly trained and supervised by a behaviorist who is highly trained in addressing behaviors and mental health issues in students with profiles similar to that of J.B. . . .

9. J.B. also continues to engage in self-harming behaviors across all settings, including punching his own chest and head. As a result, J.B. cannot be left alone in his room, as compared to his fellow students, and must [be] kept in "line of sight" supervision by Madison staff at all times. Naturally, this becomes very taxing on Madison's staff and frequently distracts from the ability to support other students.

10. Through both firsthand observations and staff reports, I am aware that J.B. engages in bizarre and manic behaviors at Madison, including making strange "vampire" sounds, incessant talk of blood and gore, drawing gruesome pictures, and engaging in psychosis-related symptomology (e.g., his eyes roll in the back of his head when dysregulated).

11. At Madison, J.B. has been frequently disciplined, including being sent to the "quiet room," as a result of regularly occurring dysregulated, explosive, and disruptive behaviors highlighted by the use of profane and inappropriate language. I am aware that while present in the quiet room, he continues to engage in dangerous, aggressive, and self-harming behaviors, including punching himself in the chest and banging his head against the walls, as well as kicking a hole in the wall.

12. I am aware that Madison requires staff working with J.B. to remain constantly on guard when working with J.B. because he has the observed ability to weaponize virtually any object(s) he encounters, including throwing rocks at peers and fashioning impromptu weapons from screws, metal pieces, and shoestrings. As a result, I am aware that Madison currently requires staff to conduct frequent visual and physical searches of J.B.

13. As part of my job responsibilities, it is my duty to meet with J.B.'s psychiatrist at Madison, who has reported to me during those sessions that J.B. exhibits severely impaired concentration; deceitful behavior; irrational thoughts; active self-harming behaviors; suicidal and homicidal ideation; persecutory delusions; erratic behaviors; and auditory hallucinations (e.g., command hallucinations to kill himself).

. . . .

16. As described above, J.B.'s behavioral needs are substantial and represent a level of need typically accommodated by 1:1 aide support services. He currently requires full-time 1:1 support [from an aide] who is or can be specially trained in advanced behavioral intervention techniques to protect himself and others from harm.

(ECF No. 34 at 2-5.)

Ms. Carr has a Master of Arts in Education and has over 30 years of experience teaching students ages 3-13. (ECF No. 35.) Ms. Carr has been responsible for providing direct academic

1   instruction in all academic subjects to J.B. since his enrollment in Madison Oaks in May 2019.

2   Ms. Carr declares as follows regarding J.B.:

3          13. . . . .[B]ehavioral manifestations of J.B.'s mental health and attentional challenges have caused him to struggle with remaining on task for more than five

4   minutes at a time and significantly impact his ability to access his education. He rarely completes assigned tasks due to extreme and interfering behaviors and is

5   more distractible compared to his classroom peers.

6          14. J.B.'s impeding behaviors in my classroom include disruptive and eloping behaviors; frequent self-talk that is both audible and distracting to others in

7   his vicinity; and inappropriate comments concerning sex, recreational drugs, and alcohol.

8          15. J.B.'s academic deficits and behaviors demand 1:1 intensive individual support to a greater degree than any of his peers, and at the level which a student is

9   typically assigned dedicated 1:1 aide services to adequately support behavioral and academic intervention. . . .

10         16. Moreover, given J.B.'s severe and intensive behaviors that interfere with his access to his academics daily, it is critical to J.B.'s learning to have a dedicated

11  1:1 adult who is highly trained and supervised by a behaviorist who is highly trained in addressing behaviors and mental health issues in students with profiles

12  similar to that of J.B. . . . .

13  (ECF No. 35 at 2-4.)

14       The supplemental declarations thus provide further support of the need for one-to-one aide

15  support to remedy past denials of FAPE and allow J.B. to access his education. Further, the

16  Court does not find the ALJ's determination on this issue to be entitled to deference.

17       The Court recommends that LEAs be ordered to provide the compensatory remedy of one-

18  to-one aide support through the 2020-21 school year.

19       ***10.    An additional year of placement at Madison Oaks***

20       As noted above, the ALJ awarded, as the sole remedy for denial of FAPE, placement at

21  Madison Oaks through the 2019-20 regular school year. The Court finds that an additional year

22  of residential placement at Madison Oaks, through the 2020-21 regular school year is

23  appropriate. This will allow J.B. to remain in his current residential placement while other

24  additional remedies are provided to him in an attempt to compensate for the denial of FAPE

25  during the entire two-year statutory period that began on January 4, 2017. Further, the Court

26  finds that  J.B. is entitled to have his Parents and his brother visit him at Madison Oaks two times

27  during the 2020-21 school year.

28       The Court accordingly recommends that LEAs be ordered to (1) contract with Madison

1  Oaks to pay J.B.'s daily fees of tuition, therapeutic services, and room and board to attend

2  Madison Oaks through the end of the 2020-21 regular school year; and (2) pay for six roundtrip

3  airline tickets for Parents and J.B.'s brother to visit J.B. twice during the 2020-21 school year,

4  and two-nights' hotel accommodations for each of those trips for a total of four nights of hotel

5  accommodations.

6  **IX.     ORDER AND RECOMMENDATIONS**

7  IT IS ORDERED:

8  1.     LEAs' unopposed requests for judicial notice of OAH decisions (ECF Nos. 38, 42)

9         are GRANTED; and

10  2.     J.B.'s motion to supplement the record (ECF No. 32) is GRANTED.

11  IT IS RECOMMENDED that the decision of the Administrative Law Judge ("ALJ") be

12  affirmed in part and reversed in part as follows:

13  1.     The ALJ's determination that LEAs denied J.B. a FAPE from January 4, 2017,

14         through the remainder of the 2016-17 school year by failing to offer J.B. clear and

15         measurable annual goals, failing to continue his occupational therapy goals,

16         reducing his educationally related mental health services, failing to timely conduct a

17         functional behavioral assessment, failing to offer appropriate behavioral

18         intervention services, and failing to offer a behavior intervention plan be

19         AFFIRMED.

20  2.     The ALJ's determination that LEAs denied J.B. a FAPE during the 2017-18 school

21         year by failing to conduct an assistive technology assessment, failing to offer clear

22         and measurable goals, failing to develop goals to meet his need in executive

23         functioning, failing to offer occupational therapy goals and services, and failing to

24         offer sufficient educationally related mental health counseling be AFFIRMED.

25  3.     The ALJ's determination that from May 10, 2018, LEAs denied J.B. a FAPE by not

26         offering a more restrictive placement based on his history of frequent, intense, and

27         dangerous behavior be AFFIRMED.

28  4.     The ALJ's grant of compensatory remedies for denial of a FAPE be AFFIRMED.

5.    The following additional compensatory remedies for denial of FAPE be awarded:

    a.    LEAs be directed to reimburse Parents for the cost of Ms. Swaffar's services in the amount of $580.

    b.    LEAs be directed to:

        i.    Contract with Madison Oaks to pay J.B.'s daily fees of tuition, therapeutic services, and room and board to attend Madison Oaks through the end of the 2020-21 regular school year; and

        ii.    Pay for roundtrip airline tickets for Parents and J.B.'s brother to visit J.B. two times during the 2020-21 regular school year, and a two-night hotel stay for each of those visits, for a total of six roundtrip airline tickets and four nights of hotel accommodations.

    c.    LEAs be directed to provide J.B. with one-to-one aide support through the end of the 2020-21 regular school year.

    d.    LEAs be directed to fund a PhD-level behaviorist with experience working with children similarly situated to J.B. to:

        i.    Conduct a new functional behavior assessment, with such assessment to be conducted within sixty (60) days of entry of the district court's order; and

        ii.    Develop an appropriate behavior intervention plan based on the results of the functional behavior assessment.

    e.    LEAs be directed to fund educational therapy or specialized academic instruction in Math and Language Arts through the end of the 2020-21 regular school year.

    f.    LEAs be directed to fund a qualified independent assessor to conduct an assistive technology assessment within sixty (60) days of entry of the district court's order, and to provide appropriate assistive technology services based on that assessment.

    g.    LEAs be directed to fund a qualified independent assessor to conduct a new

occupational therapy assessment and develop appropriate goals based on that assessment within sixty (60) days of entry of the district court's order, and for LEAs to provide appropriate occupational therapy services based on that assessment.

h.   LEAs be directed to fund a qualified independent educational specialist, with experience working with children similarly situated to J.B., and approved by Parents, to:

i.   Review the goals included in J.B.'s current individualized education plan, with such review to be conducted within sixty (60) days of entry of the district court's order; and

ii.   Draft goals for individualized education plan(s) through the 2020-21 school year.

6.   The ALJ's decision be otherwise AFFIRMED.

These findings and recommendations are submitted to the district judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within **fourteen (14) days** after being served with these findings and recommendations, the parties may file written objections with the court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Written replies to any objections may be filed within **seven (7) days** after being served with said objections.

The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (quoting *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **June 18, 2020**          /s/ Erica P. Grosjean

UNITED STATES MAGISTRATE JUDGE