1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  | J.B., by and through his guardians ad litem,       | No. 1:19-cv-0858-NONE-EPG
    | Adam Billiet and Corrie Billiet,                   |
12  |                                                    |
    |        Plaintiff and Counter-Defendant,            |
13  |                                                    | ORDER ADOPTING FINDINGS AND
    |   v.                                               | RECOMMENDATIONS IN PART;
14  |                                                    | AFFIRMING ALJ'S DECISION IN PART;
    | TUOLUMNE COUNTY                                    | AND ORDERING ADDITIONAL
15  | SUPERINTENDENT OF SCHOOLS, *et al.*,               | REMEDIES
16  |        Defendants and Counter-Claimants.           | (Doc. No. 72)
17
18

19          This action is brought by J.B., a minor, by and through his guardians, Adam Billiet and

20  Corrie Billiet (collectively, "Parents"), under the Individuals with Disabilities in Education Act

21  ("IDEA"), 20 U.S.C. § 1400 *et seq*., concerning the educational placement of and services

22  provided to J.B. by the Tuolumne County Superintendent of Schools ("TCSS") and Curtis Creek

23  Elementary School District ("District") (collectively, local educational agencies or "LEAs").

24  Disputes between the parties arose concerning J.B.'s placement and services beginning in the

25  2016-17 school year.  (*See* Administrative Record ("AR") 3861–62.)  J.B. filed a request for a

26  due process hearing before the Office of Administrative Hearings ("OAH"), and a hearing was

27  convened before Administrative Law Judge ("ALJ") Tiffany Gilmartin over several days in late

28  March and early April 2019.  (AR 3860.)  On May 10, 2019, the ALJ issued a lengthy decision

                                         1

1   containing a thorough discussion of the factual background and the law, as well as detailed

2   explanations of the ALJ's findings as to each of the issues raised by the parties in the due process

3   hearing.  (AR 3860–901.)

4     J.B. then sought review of certain aspects of the ALJ's decision in this court, arguing that

5   the ALJ erred in several ways and that the decision should be overturned in part.  (*See generally*

6   Doc. No. 40-1.)  The LEAs also sought review of the ALJ's decision, arguing that the ALJ's

7   decision should be overturned in part.  (*See generally* Doc. No. 41.)  In addition, before the court

8   are LEAs' unopposed requests for judicial notice (Doc. Nos. 38, 42) and J.B.'s motion to

9   supplement the record (Doc. No. 32).  On June 18, 2020, the assigned magistrate judge issued

10   findings and recommendations recommending that the ALJ's decision be affirmed in part and

11   reversed in part.  (Doc. No. 72.)  The parties filed objections (Doc Nos. 73, 74) and responses

12   thereto (Doc. Nos. 76, 77).  J.B. attached to his response two declarations.  (Doc. Nos. 77-1, 77-

13   2.)  The LEAs filed objections to those declarations along with an application to further

14   supplement the record with material responsive to J.B.'s offered supplemental information, (Doc.

15   Nos. 78, 79), to which J.B. responded (Doc. No. 80) and the LEAs replied (Doc. No. 81).

16     The court has carefully reviewed the ALJ's decision, the merits briefs, the evidentiary

17   requests, the pending thorough and well-reasoned findings and recommendations, the objections

18   thereto, and all responses.

19                 **BACKGROUND**

20     The IDEA's primary purpose is "to assure that all children with disabilities have available

21   to them a free appropriate public education [('FAPE')] which emphasizes special education and

22   related services designed to meet their unique needs[.]"  20 U.S.C. § 1400(c).  This purpose is

23   implemented through a mandate that requires development of an individualized education

24   program ("IEP") for each child with a disability.  20 U.S.C. §§ 1401(14), 1414(d).  An IEP is

25   crafted annually by a team that includes at least one representative of LEAs, the child's teacher

26   and parents, and, if appropriate, the child.  20 U.S.C. § 1414(d)(1)(b); 34 C.F.R. § 300.321.  The

27   IEP document must contain:  information regarding the child's present levels of performance; a

28   statement of annual goals and short-term instructional objectives; a statement of the specific

1   educational services to be provided and the extent to which the child can participate in regular

2   educational programs; and objective criteria for measuring the student's progress.  20 U.S.C.

3   § 1414(c)(1)(B); 34 C.F.R. § 300.320(a).

4         The court hereby adopts the magistrate judge's detailed description of the factual

5   background of this case and incorporates by reference that section of the findings and

6   recommendations.  (Doc. No. 72 at 2–21.)  In sum, J.B. is a student with serious emotional and

7   behavioral issues that manifested from an early age, including extreme and sudden, violent and

8   self-harming behaviors, delusions, and numerous other maladaptive behaviors that interfere with

9   his ability to take advantage of his educational opportunities.  For some time, Parents and LEAs

10  appear to have been roughly in agreement regarding J.B.'s educational placement and services,

11  including his initial placement in the non-residential "Nexus" program within his home school

12  district.  However, in 2017 and 2018, J.B.'s behavior deteriorated further, leading to a series of

13  disagreements between the parties concerning J.B.'s placement and other issues for the 2016-17,

14  2017-18, and 2018-19 school years.  By October 2018, both the LEAs and the Parents agreed that

15  J.B. required some form of residential placement.  At the administrative hearing, J.B. contended

16  that the LEAs denied J.B. a FAPE[1] by, among other things, not offering J.B. a "more restrictive

17  placement"—in this case, residential treatment—at an earlier date; failing to properly set goals

18  reasonably calculated to meet J.B.'s unique needs in various arenas; and failing to offer J.B. other

19  /////

20  /////

21  /////

22

23  [1]  Free, appropriate public education ("FAPE") is defined by the IDEA as "special education and
    related services that—(A) have been provided at public expense, under public supervision and
24  direction, and without charge; (B) meet the standards of the State educational agency; (C) include
    an appropriate pre-school, elementary school, or secondary school education in the State
25  involved; and (D) are provided in conformity with the individualized education program required
    under section 1414(d) of this title."  20 U.S.C. § 1401(9).  "Special education" is in turn defined
26  by the IDEA as "specially designed instruction, at no cost to parents, to meet the unique needs of
    a child with a disability, including—(A) instruction conducted in the classroom, in the home, in
27  hospitals and institutions, and in other settings; and (B) instruction in physical education."  20
28  U.S.C. § 1401(29).

3

1    related services[2] to allow J.B. to access his education.  (*See* Doc. No. 72 at 22–23.)  The LEAs

2    sought an order requiring Parents to:  sign a release authorizing the LEAs to communicate with

3    one particular residential treatment program, Devereux Advanced Behavioral Care ("Devereux") ,

4    even though it was no longer Parents' choice for residential treatment; and allow LEAs to conduct

5    a Functional Behavioral Assessment ("FBA") of J.B.  (*Id.* at 22.)

6          The ALJ found that LEAs were entitled to perform a new FBA of J.B., but that they were

7    not entitled to a release of information to allow LEAs to speak with J.B.'s medical providers and

8    Devereux.  (*See id.* at 24.)  As to the relief sought by J.B., the ALJ found that LEAs denied J.B. a

9    FAPE

10      • From January 4, 2017 through the remainder of the school year by failing to offer J.B.

11         clear and measurable goals, failing to continue his occupational therapy ("OT") goals,

12         reducing his educationally related mental health services, failing to timely conduct an

13         FBA, and failing to offer appropriate behavioral intervention services or a behavior

14         intervention plan.  (*See id.*)

15      • During the 2017-18 school year by failing to conduct an assistive technology assessment,

16         failing to offer clear and measurable goals, failing to develop goals to meet J.B.'s need in

17         executive functioning, failing to offer OT goals and services, and failing to offer sufficient

18         educationally related mental health counseling.  (*See id.*)

19      • Beginning on May 10, 2018 by failing to offer a more restrictive placement based on

20         J.B.'s history of frequent, intense, and dangerous behavior.  (*See id.*)

21    */////*

22

23    [2] "Related services" are defined by the IDEA as "transportation, and such developmental,
corrective, and other supportive services (including speech-language pathology and audiology

24    services, interpreting services, psychological services, physical and occupational therapy,
recreation, including therapeutic recreation, social work services, school nurse services designed

25    to enable a child with a disability to receive a free appropriate public education as described in the
individualized education program of the child, counseling services, including rehabilitation

26    counseling, orientation and mobility services, and medical services, except that such medical
services shall be for diagnostic and evaluation purposes only) as may be required to assist a child

27    with a disability to benefit from special education, and includes the early identification and

28    assessment of disabling conditions in children."  20 U.S.C. § 1401(26)(A).

As remedies awarded to J.B. for the denial of a FAPE, the ALJ ordered LEAs to contract with Madison Oaks, a residential program to which Parents were amenable.  (*See id*.)  LEAs were ordered to pay J.B.'s daily fees of tuition, therapeutic services, and room and board to attend Madison Oaks through the end of 2019-20 regular school year.  (*See id*.)  The ALJ also ordered LEAs to pay for two roundtrip airline tickets and other travel expenses to enable Parents to escort J.B. to and from Madison Oaks.  (*See id*. at 24–25.)  Finally, the ALJ ordered LEAs to reimburse Parents $11,025 for the cost of an assessment performed by Dr. Paula Solomon in early 2019.  (*See id*. at 25.)

In seeking review from this court, LEAs challenged the ALJ's analysis in numerous ways.  In particular, LEAs objections focused on the ALJ's conclusions that J.B. required residential placement as of May 10, 2018 and that Parents were entitled to reimbursement for Dr. Solomon's assessment.  (*Id*.)  On the other hand, J.B. argued that the ALJ should have found that J.B. required residential placement at an even earlier date:  January 4, 2017.  (*Id*. at 26.)  J.B. also requested additional remedies beyond those awarded by the ALJ.  (*Id*.)

The pending findings and recommendations recommend that this court reject the LEAs' arguments in almost all material respects, reasoning that the ALJ did not improperly:  (1) fail to consider and analyze the LEAs' proposed placement at Devereux (*id*. at 35–38); (2) substitute her judgment for that of the LESs' witnesses (*id*. at 38); (3) make material errors of fact with respect to the LEAs' offer of placement at Devereaux and the certification of Madison Oaks by the California Department of Education (*id*. at 38–41); or (4) fail to include an explicit discussion of the one Parent's testimony or a credibility finding regarding that testimony (*id*. at 41–42).  As to the ALJ's finding that residential placement was required as of May 10, 2018, the magistrate judge concluded that such a finding was supported by a preponderance of the evidence.  (*Id*. at 44–47.)  Furthermore, the pending findings and recommendations recommend that J.B.'s contention that he required residential placement as early as January 4, 2017 be rejected.  (*Id*. at 47–51.)

The findings and recommendations also evaluated the parties' disputes with respect to the remedies awarded or not awarded by the ALJ.  As mentioned, the ALJ had granted placement at

Madison Oaks through the 2018-19 and 2019-20 school years as the sole remedy for all the FAPE violations identified in her decision.  (AR 3900.)  The ALJ also ordered reimbursement for Dr. Solomon's assessment.  (*Id*.)  The findings and recommendations recommend affirming the ALJ as to both those remedies.  (Doc. No. 72 at 53–55.)  The magistrate judge also recommended that the court order a number of additional remedies not ordered by the ALJ, namely that the LEAs be ordered to fund:

> (1) the completion by a PhD-level behaviorist of a new FBA and behavior intervention plan (*id*. at 56–58);

> (2) an independent, qualified educational specialist, with experience working with children similarly situated to J.B., and approved by Parents, to review the goals included in J.B.'s current IEP and draft goals for any IEPs created through the 2020-21 school year (*id*. at 58–60);

> (3) educational therapy/specialized academic instruction in math and language arts through the 2020-21 school year (*id*. at 61);

> (4) a qualified, independent assessor to conduct an assistive technology assessment (*id*. at 61–62);

> (5) a qualified, independent assessor to conduct an OT assessment and develop appropriate goals based on that assessment; and,

> (6) relatedly, to provide appropriate OT services based on that assessment and goals developed therefrom (*id*. at 62–63).

In addition, the findings and recommendations recommend:

> (7) that LEAs be required to reimburse Parents for the cost of services provided by licensed marriage and family therapist Susan Swaffar's in the amount of $580 (*id*. at 65); and

> (8) that LEAs be required to provide J.B. with one to-one aide support through the 2020-21 school year (*id*. at 67–70).

J.B.'s objections to the pending findings and recommendations are narrow in this regard. J.B. raises one objection based on his concern that the magistrate judge's reasoning in connection

1 with the determination of the date on which J.B. required residential placement could

2 "inadvertently create precedent excusing LEAs from otherwise unwarranted delays in offering

3 residential placement." (Doc. No. 73 at 4–8.).  More straightforwardly, J.B. also requests that the

4 court modify the recommended remedies by "further specif[ying] the qualifications of the 1:1

5 aide awarded." (*Id*. at 8–9.)  Finally, J.B. request that the court add flexibility to the award of

6 Madison Oaks as a compensatory placement to permit placement at a mutually-agreeable

7 alternative institution. (*Id*. at 10.)

8  The LEAs' objections are more extensive.  They argue generally that the findings and

9 recommendations are not based on the correct standard of review, which they assert requires this

10 court to defer to the ALJ's findings of fact and ordered remedies in the absence of clear error.

11 (Doc. No. 74 at 5–6.)  Many of the LEAs' more specific objections are grounded at least in part

12 upon their understanding of the applicable standard of review.

13  The court will address all of these objections below.  First, however, the court will address

14 threshold matters regarding the scope of the record before the court.

15     **MOTIONS TO AUGMENT THE ADMINISTRATIVE RECORD**

16  J.B. sought to supplement the AR with two declarations from employees at Madison

17 Oaks:  one from Starlett Armstrong, the clinical director at that facility; the other from Diane

18 Carter, a teacher who has been providing direct academic instruction to J.B. (Doc. No. 32.)

19 LEAs opposed the motion. (Doc. Nos. 43, 52.)  The magistrate judge granted J.B.'s motion to

20 supplement, finding that the information contained in the declarations was not confusing and did

21 not violate the "Snap Shot" rule[3] insofar as it would be considered only to support the *remedies*

---

[3]  As the magistrate correctly explained (Doc. No. 72 at 28), whether an IEP offers a student FAPE is not judged in hindsight but is instead assessed in light of the information available at the time the IEP is developed.  *Adams v. State or Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999).  An IEP is therefore a "snapshot, not a retrospective." *Id*. (internal citation and quotation omitted).  In determining whether an IEP is appropriate, a court must consider "what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was drafted." *Id*. Thus, while the snapshot rule "does not bar a court from considering evidence acquired after the hearing," it does require "that the hearing officer's judgment not be second-guessed based on hindsight." *W.H. ex rel. B.H. v. Clovis Unified Sch. Dist*., No. CVF08-0374LJO DLB, 2008 WL 5069711, at *6 (E.D. Cal. Nov. 25, 2008).  Here, the magistrate judge avoided this potential pitfall.  Having found the LEAs denied J.B. a FAPE on numerous grounds based upon the

1    J.B. requested for denial of FAPE.  (Doc. No. 72 at 33–34.)

2         In their objections to the findings and recommendations LEAs sought to further

3    supplement the record with a declaration sworn to by Kylee Luchetti, to which LEAs attached

4    four hundred pages of additional information related to J.B.'s time at Madison Oaks.  (Doc. Nos.

5    74-1, 78.)  According to the LEAs, the court should consider this information largely because it

6    "directly contradict[s]" information contained within the Declarations of Carter and Armstrong

7    that were the subject of J.B.'s motion to supplement.  (Doc. No. 78 at 2.)  LEAs assert the

8    information submitted by them was not available to them "until after the close of briefing in this

9    matter."  (*Id*.)

10        In response, J.B. not only objected to the motion to supplement on numerous grounds, but

11   submitted additional declarations (from Dr. Jennifer Hammond and Plaintiff's mother, Corrie

12   Billiet) designed to rebut the Luchetti Declaration.  (Doc. Nos. 77; 80 (indicating that these

13   declarations were specifically aimed at pointing out the questionable reliability of the Luchetti

14   Declaration).)  LEAs in turn submitted objections to the Hammond and Billiet Declarations.

15   (Doc. Nos. 79, 81.)

16        "[J]udicial review in IDEA cases differs substantially from judicial review of other agency

17   actions, in which courts generally are confined to the administrative record and are held to a

18   highly deferential standard of review."  *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th

19   Cir. 1993).  In the course of reviewing an administrative decision in an IDEA case, a reviewing

20   court "shall" consider "non-cumulative, relevant, and otherwise admissible" evidence.  *E.M. ex*

21   *rel. E.M. v. Pajaro Valley Unified Sch. Dist. Office of Admin. Hearings*, 652 F.3d 999, 1004–

22   1005 (9th Cir. 2011) (citing 20 U.S.C. § 1415(i)(2)(c)(ii)).  Although relying on J.B.'s initial

23   supplemental evidence in considering only one remedy issue, the magistrate judge also reasoned

24   /////

25   /////

26   /////

27   _____

28   existing administrative record, the magistrate judge concluded the more recent evidence could be
     considered to evaluate the remedies to be awarded to compensate for those past denials of FAPE.

8

1  that the issue could be resolved in J.B.'s favor even without the supplemental evidence.[4]

2  Accordingly, the undersigned concludes that the evidence is cumulative of evidence in the record

3  and/or only tangentially relevant to the issue for which it was considered.  *See id.* at 1004 ("[A]

4  district court need not consider evidence that simply repeats or embellishes evidence taken at the

5  administrative hearing.").  The court will therefore not consider the supplemental evidence.[5]

6  Because the court has declined to consider the supplemental evidence submitted by J.B., the

7  additional evidence submitted by LEAs to rebut J.B.'s supplemental evidence, as well as J.B.'s

8  "sur-rebuttal" evidence will likewise not be considered by the court.  The court declines to

9  consider this mountain of additional evidence for another reason:  admitting any of it arguably

10  requires consideration of all of it and this runs the serious risk of turning this review into a "trial

11  de novo."  *See Ojai*, 4 F.3d at 1473 ("The determination of what is 'additional' evidence must be

12  left to the discretion of the trial court which must be careful not to allow such evidence to change

13  the character of the [proceeding] from one of review to a trial de novo. . . . a court should weigh

14  heavily the important concerns of not allowing a party to undercut the statutory role of

15  administrative expertise . . . and the conservation of judicial resources.") (quoting with approval

16  *Town of Burlington v. Dep't of Educ. for Com. of Mass.*, 736 F.2d 773, 791 (1st Cir. 1984), *aff'd*

17  *sub nom. Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 105

18  (1985)).[6]

19  /////

20  /////

---

21  [4] The supplemental information was directly considered in only one section of the findings and
22  recommendations—a discussion of the remedy of a one-to-one aide, but only after independently
concluding that the existing AR (i.e., without supplementation) supported a finding that a one-to-
23  one aid was an appropriate remedy.  (Doc. No. 72 at 67–70.)

24  [5] It is unclear whether a district judge should accord any deference to a magistrate judge's order
allowing supplementation of the record under these circumstances.  In any event, the undersigned
25  declines to consider any of the supplemental evidence for the reasons explained above.

26  [6] This ruling also renders moot the LEAs' second objection to the findings and
27  recommendations, namely, that the court should not adopt the findings and recommendations
without allowing the LEAs to supplement the AR with evidence to rebut the supplemental
28  evidence presented by J.B.  (*See* Doc. No. 74 at 6–9.)

1

**J.B.'S OBJECTIONS**

2          Plaintiff agrees in substantial part with the findings and recommendations, with a few

3     exceptions.  First, plaintiff objects to the magistrate judge's recommended affirmance of the

4     ALJ's finding that J.B. required residential placement no sooner than May 10, 2018, not so much

5     because they disagree with that date, but because they are concerned about the reasoning

6     employed by the findings and recommendations.  (*See* Doc. No. 73 at 2.)  Specifically, the

7     findings and recommendations relied on the testimony of two outside mental health professionals,

8     Susan Knopf and Sharon Swaffar, to support the recommendation that the ALJ's finding that J.B.

9     required residential placement no sooner than May 10, 2018 be affirmed.  (*See* Doc. No. 72 at 48–

10    50.)  It is plaintiffs' position that Ms. Knopf's and Ms. Swaffar's "unique professional

11    perspectives and ethical responsibilities cannot supplant the multifactorial analysis required to

12    determine what constitutes a Free and Appropriate Education ('FAPE') in the least restrictive

13    environment."  (*Id.*)  Plaintiff is correct that under IDEA, a team of LEA employees tasked with

14    developing a student's IEP alone bears the responsibility of identifying when residential

15    placement is required to meet a student's unique needs.  *See* 34 C.F.R. § 300.23.  Plaintiff

16    expresses concern that the findings and recommendation in addressing this issue may

17
18
19
20

> inadvertently incentivize" LEAs to "exonerate otherwise
> unwarranted delays in offering residential placement by claiming
> reliance on outside persons whose professional opinions may not
> encompass all aspects of the holistic FAPE analysis.  At worst,
> allowing LEAs to abdicate [their] FAPE obligation to outside
> professionals through willful ignorance is contrary to the letter and
> spirit of the IDEA.

21    (Doc. 73 at 2.)  The court does not agree.  As explained below, the findings and recommendations

22    are based on the specific facts of this case and are supported by the entire record.  Moreover, the

23    court believes the reasoning set forth in the findings and recommendations is unlikely to create

24    the incentives about which plaintiff has expressed concern.

25          The ALJ determined, and the magistrate judge concurred, that the record generally

26    supports a finding that J.B.'s pre-dispute placement in the non-residential "Nexus" program

27    within his home school district was initially an appropriate program to meet his needs.  (*See* Doc.

28    72 at 43.)  Although J.B. displayed certain maladaptive behaviors (e.g., making threatening and

10

1   negative comments to peers, and showing aggression to adults and peers, including hitting,

2   kicking and pushing), throughout 2017, the IEP team developed plans aimed at addressing these

3   issues, culminating in an October 2017 IEP amendment that incorporated a behavior intervention

4   plan.  (*Id*. at 4–9.)  It was not until after October 2017 that J.B.'s behavior took a considerable

5   turn for the worse.  Between October 18, 2017 and January 29, 2018, J.B. engaged in three

6   behavior incidents, including eloping from campus, striking a teacher with a fire extinguisher, and

7   striking staff with rocks.  (*Id*. at 9.)  Other incidents that occurred after January 2018 included

8   punching other students, yelling obscenities at a teacher, and bringing a pocket knife to school.

9   As the magistrate judge indicated, "J.B.'s teachers and support staff tried to navigate J.B.'s

10  changing behaviors" in various ways.  (*Id*.)  Critically, nothing in the record suggests that the

11  LEAs should have known in early 2018 that these efforts would likely be futile.  The court

12  particularly notes that the record indicates that all involved were generally inclined to try to keep

13  J.B. at home (as opposed to at a residential institution).  (*See id*. at 49.)

14          Although difficult for the parties to do so, the ALJ and the magistrate judge were both

15  able to recognize that May 2018 represented a tipping point for J.B.  The court agrees with their

16  assessments of the factual situation.  By May 2018, J.B.'s behavior had deteriorated to such an

17  extent that the IEP team met to impose upon J.B. daily searches of his pockets and socks.  (*Id*. at

18  12.)  This was designed to prevent J.B. from hiding contraband that could be used as weapons.

19  (*Id*. at 12–13.)  The ALJ found that by this point, the school was on notice that residential

20  placement was necessary for J.B.  The ALJ made this determination based in part on the

21  testimony of professionals who were not part of the IEP.  But, critically, the ALJ also found that

22  the *LEAs* denied J.B. FAPE by waiting until December 2018 to acknowledge the need for

23  residential treatment.  The ALJ's determination on this issue is entirely reasonable and is

24  supported by the entire record, not just the testimony of Ms. Knopf and Ms. Swaffar.  In light of

25  this finding, the court fails to see how the ALJ's ruling or the pending findings and

26  recommendation are in any way an endorsement of what the LEAs did between May 2018 and

27  December 2018.

28  /////

11

1    Plaintiff next requests clarification of one aspect of the awarded remedy.  Specifically, the

2    magistrate judge recommended, over and beyond the remedies awarded by the ALJ, that J.B. be

3    provided one-on-one aid support throughout the end of the 2020-21 regular school year.  (*See*

4    Doc. No. 72 at 72 (order); Doc. No. 73 at 9 (request for clarification).)  Plaintiff requests that the

5    court order J.B. be provided with a "behaviorally trained" aide throughout the day who is

6    supervised by a behaviorist who is highly trained in addressing behavioral and mental health

7    issues.  (Doc. 73 at 8–9.)  Plaintiff argues that there is "little reason to expect behavioral

8    progress" if the assigned aide lacks these specific qualifications.  (*Id.* at 9.)  Because this

9    objection is closely related to the LEAs' counter objection, both will be addressed below.

10    Finally, plaintiff requests that the court's final order reflect flexibility in the actual

11    residential placement such that J.B. could be placed at Madison Oaks or "another mutually-agreed

12    upon residential program."  (Doc. No. 73 at 11.)  Facially, this seems reasonable.  Yet, LEAs

13    object.  (Doc. No. 76 at 8–9.)  LEAs objections on this issue merit little discussion.  LEAs seem

14    to be arguing that this language should not be added to the order because they anticipate plaintiff

15    will request placement elsewhere (other than at Madison Oaks) once he is stabilized.  (*Id*. at 9.)

16    Such stabilization, LEAs insist, would not be grounds to remove him from Madison Oaks but

17    rather would be grounds to continue such placement.  (*Id*.)  Even if the court accepted this

18    assertion as true, this would simply mean that LEAs would refuse to agree to an alternative

19    placement and that the "another mutually-agreed upon residential program" language in the

20    court's order would not be triggered.  If the parties cannot communicate well enough to work

21    through that kind of logic together, the court is helpless to assist them.  In an abundance of hope

22    that the parties will finally attempt to work together, the court will grant plaintiff's request to

23    leave open the possibility of a mutually agreed-upon alternative placement.

24                                    **LEAS' OBJECTIONS**

25    LEAs object to the findings and recommendations on numerous grounds, some generic

26    and some specific to individual findings and remedies ordered.

27    /////

28    /////

12

1    **A.     Does a Clear Error Standard Apply?**

2          First, LEAs contend that the magistrate judge failed to apply the "applicable clear error

3    standard." (Doc. No. 74 at 5–6.)  LEAs admit that this court must apply a "modified de novo"

4    standard of review that requires the court to give "due weight to the administrative due process

5    hearing decisions of the ALJ." (Doc. No. 74 at 5.)  But LEAs also insist that "findings of fact are

6    reviewed for clear error" while "mixed questions of law and fact which are primarily factual are

7    also reviewed under the clear error standard." (*Id*.)  In support of this latter assertion, they cite

8    *Timothy O. v. Paso Robles Unified School District*, 822 F.3d 1105, 1118 (9th Cir. 2001).

9    However, in the quoted passages regarding the application of a clear error, the Ninth Circuit was

10   discussing the standard(s) applicable to *its review of the district court's* decision, not the standard

11   the district court must apply in reviewing the ALJ's ruling.  *Id*.; *see also Anchorage Sch. Dist. v.*

12   *M.P*., 689 F.3d 1047, 1053 (9th Cir. 2012).

13          Under the "modified de novo" standard—the standard that actually applies to this court's

14   review of the ALJ's decision—this court must accord "due weight" to the ALJ's findings and

15   must, at least, "consider the findings carefully." *Anchorage*, 689 F.3d. at 1053.  An ALJ's

16   "thorough and careful" findings receive particular deference.  *Id*.  A court should "treat a hearing

17   officer's findings as thorough and careful when the officer participates in the questioning of

18   witnesses and writes a decision containing a complete factual background as well as a discrete

19   analysis supporting the ultimate conclusions." *R.B. v. Napa Valley Unified Sch. Dist*., 496 F.3d

20   932, 942–43 (9th Cir. 2007) (internal citations and quotations omitted).  Within this framework,

21   IDEA empowers the reviewing court to "grant such relief as the court determines is appropriate,"

22   based upon a preponderance of the evidence.  20 U.S.C. § 1415(i)(2)(C).  Accordingly, the LEAs'

23   suggested "clear error" standard for this court's review (through the magistrate judge's findings

24   and recommendations) of the ALJ's ruling is without support in the law.

25   **B.     Are the Findings and Recommendations Internally Inconsistent?**

26          LEAs also to argue that the findings and recommendations should be disregarded as

27   internally inconsistent because, on the one hand the findings and recommendations generally

28   conclude that overall the ALJ's decision is thorough and careful, yet also find that the ALJ's

1  decision failed to specifically analyze certain remedies issues.  (Doc. No. 74 at 10.)  The court

2  again does not see it this way.  Rather, the undersigned agrees with magistrate judge's conclusion

3  that, overall, the ALJ's ruling was thorough and careful, yet failed to delve into certain issues,

4  particularly certain rulings regarding the appropriate remedies with sufficient depth.  (*See* Doc. 72

5  at 35 (noting that the ALJ's decision was generally thorough with certain exceptions); 60 (noting

6  that the ALJ declined to grant the requested remedy of having goals drafted by a specialist but did

7  not explain why she declined to do so); 62 (noting that the ALJ found that the LEAs denied J.B.

8  FAPE by discontinuing J.B.'s OT goals and services when he continued to have needs for OT, yet

9  the ALJ declined to explain why she did not order any OT-related remedy).)

10  **C.      Specific Objections**

11        1.      Least Restrictive Environment Analysis

12        LEAs argue that the ALJ's conclusion is not thorough and careful because it does not

13  contain a proper analysis of the kind of placement that would have constituted the "least

14  restrictive environment."  (*See* Doc. No. 74 at 11.)[7]  Specifically, the LEAs argue that the ALJ

15  should have explicitly discussed the factors set forth in *Sacramento City Unified School District,*

16  *Board of Education v. Rachel H. By & Through Holland*, 14 F.3d 1398, 1404 (9th Cir. 1994),

17  namely (1) the educational benefits of placement full-time in a regular class; (2) the non-

18  academic benefits of such placement; (3) the effect the student had on the teacher and children in

19  the regular class; and (4) the costs of mainstreaming the student.  LEAs acknowledge that the ALJ

20  "recognize[d]" the *Rachel H.* factors but did not "properly analyze" those factors.  (Doc. No. 74

21  at 11.)  But this objection puts form before substance.  No party has cited and the court has not

22  identified any authority that requires *explicit* discussion of the *Rachel H.* factors by the ALJ so

23  long as the record ultimately supports findings under those factors.  *See Bend LaPine Sch. Dist. v.*

24  *K.H.*, No. CIV. 04-1468-AA, 2005 WL 1587241, at *14 (D. Or. June 2, 2005), *aff'd*, 234 F.

---

25  [7]  From a practical perspective, although the LEAs challenge the ALJ's ruling generally on this

26  ground, in reality they only challenge the absence of this analysis with regard to a specific time
    period: from May 10, 2018 (the date after which the ALJ and the magistrate judge conclude

27  residential placement was necessary) to December 18, 2018 (the date on which LEAs offered
    residential placement, thereby conceding that such a placement was the "least restrictive" as of

28  that date).

App'x 508 (9th Cir. 2007) (discussing how the record supported specific factual findings made by the ALJ which in turn supported the necessary findings by the court under *Rachel H.*).  More significantly, LEAs fail to explain why the ALJ's findings in this case do not support residential placement in light of consideration of the *Rachel H.* factors.  The court is certainly not required to divine the parties' arguments out of thin air.

That said, the record before the court generally supports a finding under *Rachel H.* that residential placement was appropriate as of May 2018.  The decision in *Bend LaPine* again provides guidance.  There, the district judge examined the record and simply found "that residential placement, rather than a return to [a regular classroom], was appropriate" for the minor plaintiff because the plaintiff "was receiving gradually less academic benefits from her placement at [an] alternative program," "that her behavioral issues were continuing," and the defendant school district was "on the verge of expelling [the minor plaintiff] after she had severely disrupted the classroom."  *Id.*

Here, the ALJ's decision contained far more explicit reasoning immediately after citing to *Rachel H.*:

> 54. When determining whether a placement is the least restrictive environment for a child with a disability, four factors must be evaluated and balanced: the educational benefits of full-time placement in a regular classroom; the non-academic benefits of fulltime placement in a regular classroom; the effect the presence of the child with a disability has on the teacher and children in a regular classroom; and the cost of placing the child with a disability full-time in a regular classroom.  (*Ms. S. v. Vashon Island School District* (9th Cir. 2003) 337 F.3d 1115, 1136–1137; *Sacramento City Unified School District v. Rachel H.* (9th Cir. 1994) 14 F.3d 1398, 1404.)

> 55. The Nexus program, while at first an appropriate program for Student, begun to no longer meet his needs.  Following Student's October 18, 2017 IEP team meeting where the team implemented his behavior program, his behavior spiraled.  He was suspended for punching other students, striking a teacher with a fire extinguisher, and bringing a pocket knife to school.  Student's on-going mental health was "slippery" as he would cycle through positive periods and extraordinarily dark periods.  Student's behaviors, while difficult, were being managed by the behavior classroom at the Nexus program.  Even Student's expert witnesses did not believe a more restrictive placement was necessary in the 2017-2018 school year.  Ms. Knopf, Student's trusted behaviorist and key member of his outside of school support system never addressed residential

15

treatment for Student until his manifestation determination review meeting on September 11, 2018. Ms. Swaffer, his counselor during the 2017-2018 school year also testified residential treatment was not a desired outcome as the family wanted to maintain the family unit.

56. Despite efforts to support Student's behaviors, they continued to decline. On May 10, 2018, the team agreed to an IEP amendment to initiate a twice daily pocket and sock check to ensure Student was not carrying any contraband he could turn into a weapon. Student was searched prior to coming to school and once he arrived at school out of fear he transported a weapon to harm himself or others. This intrusive form of behavior management, similar to what a criminal suspect endures rather than a fourth grade boy, was sufficient notice to Tuolumne County and Curtis Creek of Student's declining behaviors and increasing volatility. His active fantasy life took on a darker, more foreboding presence and was reflected in the violent and fantastical drawings he produced at school. Despite this knowledge, the adjustments the IEP team made to Student's IEP were insufficient to meet his needs. Tuolumne County and Curtis Creek's placement at the Nexus program was not sufficiently structured or restrictive to meet Student's behavior and learning needs beginning May 10, 2018. By May 10, 2018, the evidence showed that Student required a more restrictive placement than the Nexus program.

57. Further, Tuolumne County and Curtis Creek's December 18, 2018 IEP amendment that offered Student placement at Devereux outside the IEP process is a tacit admission that at least by that date, a more restrictive placement was also intended by Tuolumne County and Curtis Creek.

(AR 3891–92.) LEAs fail to explain, or even suggest, how the record and the ALJ's reasoning fails to support residential placement under the *Rachel H.* analysis. As was the case with the student at issue in *Bend LaPine*, here, J.B.'s behavior issues were severe, ongoing, and deteriorating over time such that non-residential placement was "no longer meeting his needs." LEA's formalistic objection based on a "failure" to explicitly apply *Rachel H.* is therefore without merit.

     2.    Remedy of Behavioral Assessment by a PhD-level Behaviorist

      LEAs next object to the magistrate judge's recommendation that J.B. is entitled to have a new FBA conducted by a PhD-level behaviorist. (Doc. No. 74 at 11–12.) As the findings and recommendations explain, and LEAs do not dispute, J.B. requires an updated behavioral assessment because his previous FBA was inadequate. (Doc. No. 72 at 58.) Notably, the initial (inadequate) FBA was conducted by a board-certified behavior analyst without a doctoral degree,

16

Ms. Murphy, who "completely failed in conducting an FBA such that her work needs to be redone." (*Id*.) Again, LEAs do not dispute or undermine this conclusion in any way. They argue instead that the fact that Ms. Murphy failed to perform an appropriate FBA should not rule out the possibility that another person of her level of training would be suited to the task. (Doc. No. 74 at 12.) LEAs also take issue with the magistrate judge's allegedly selective reliance on the testimony of Jeanine Wilkinson whose credibility the ALJ found to be "negatively impacted." (*Id*.) LEAs are again viewing the record myopically. The magistrate judge agreed with the ALJ that Ms. Wilkinson lacked credibility with regard to certain unrelated issues discussed by the ALJ. (Doc. No. 72 at 14 n.11, 58 n. 33). However, the magistrate judge found credible Ms. Wilkinson's testimony on the specific issue of the level of training necessary to provide an appropriate FBA in part because Ms. Wilkinson's testimony on that subject was backed up by LEAs' own witness. (Doc. No. 72 at 58 n. 33). The court finds this parsing of the record to be reasonable.

The findings and recommendations expressed concern that "[i]n light of the failure of LEAs' previous board-certified analyst to conduct an adequate FBA, and the complex nature of J.B. and his mental health issues . . . a subsequent FBA may also be inadequate unless conducted by a highly qualified PhD-level behaviorist with experience working with children similarly situated to J.B." (*Id*. at 58.) There is ample support for this conclusion in the record. However, as the LEAs point out, the ALJ also concluded that one particular non-PhD-level behaviorist who testified at the due process hearing, Judy Simon, was "thoughtful" and qualified to assess J.B. (AR 3873, 3893.) The magistrate judge in fact acknowledged this finding. (Doc. No. 72 at 57 n.32.) Accordingly, the court will modify the ordered remedy in one respect: the FBA shall be conducted by a qualified PhD-level behaviorist <u>or</u> by Ms. Simon.

3.   Remedy of Goals Drafted by An Educational Specialist

The findings and recommendations recommend that "as a compensatory remedy for the LEAs' previous denials of FAPE related to unmeasurable and unremediated goals, LEAs be ordered to fund an independent, qualified educational specialist with experience working with children similarly situated to J.B., and approved by Parents, to review goals included in J.B.'s

17

1   current IEP and draft goals for IEPs through the 2020-21 school year." (*Id*. at 60.)  LEAs take

2   issue with this proposed remedy primarily because it is generally accepted that goals should be

3   drafted by individuals familiar with the student's needs and educational setting.  (Doc. No. 74 at

4   13 (citing 34 C.F.R. § 300.321).)  LEAs likewise point out that the ALJ's findings indicate that

5   some witness testimony was not credible specifically because the witness in question had limited

6   familiarity with J.B.  (*See* AR 3880 (finding witness Tjendersen not credible because she never

7   observed J.B. at school and never spoke to J.B.'s teachers), 3878 (finding Dr. Solomon's opinion

8   as to one time period unreliable because she had no direct knowledge of J.B.'s needs during that

9   period).)  This is a legitimate objection, but so too is the magistrate judge's finding that an

10  independent educational specialist's involvement in goal-setting is reasonably calculated to

11  remedy past denials of FAPE that directly flowed from failures related to goal-setting.

12  Accordingly, the court will require LEAs to fund an independent, qualified educational specialist

13  with experience working with children similarly situated to J.B., and approved by Parents, to

14  *review* (rather than draft) goals included in J.B.'s current IEP and any IEP's drafted through the

15  remainder of the 2020-21 school year.  The independent specialist shall be given reasonable

16  opportunity to review and comment upon these goals before they are finalized and implemented.

17          4.      Remedy of a One-to-One Aide

18          The ALJ declined to grant J.B.'s request for one-to-one aid support as a compensatory

19  remedy for the denial of FAPE, reasoning that, although J.B.'s "most profound issue was [his]

20  maladaptive behaviors[,] Student argued at length that Madison Oaks was a program capable of

21  meeting all of Student's academic and psychiatric needs."  (AR 3897.)  The findings and

22  recommendations nonetheless recommend that a one-to-one aide be ordered as an additional

23  remedy.  (Doc. No. 72 at 67.)  In making this recommendation, the magistrate judge relied on

24  both evidence from the original administrative record and evidence from J.B.'s first supplemental

25  evidentiary submission.  As noted above, the supplemental evidence will not be considered by the

26  undersigned.  Nonetheless, even excluding J.B.'s supplemental evidence, the magistrate judge's

27  conclusion is supported by the remainder of the record before the court.

28  /////

18

1    The magistrate judge focused on the testimony of Dr. Solomon, who opined that, at least

2   as of the date of the due process hearing, J.B. was "so acute that he might require one-to-one

3   when he enters a program."  (AR 5369.)  Dr. Solomon noted that "[f]or a while [J.B.] was given

4   one-to-one in the last psychiatric hospitalization because he was so inappropriate in groups,

5   mostly just blurting out sexually inappropriate things.  But he couldn't contain it even when they

6   let him know that it would take him out of the group."  (*Id*.)  Dr. Solomon specifically opined that

7   J.B. was at that point where he was "not going to be able to get academic benefit without the one-

8   to-one attention."  She admitted that the situation might improve "as he gets more regulated . . .

9   but right now, it's certainly true that any academics happen because someone, an aide, was sitting

10  in one-to-one."  (AR 5372.)

11    The court notes that the ALJ reviewed Dr. Solomon's assessment of J.B. in detail and

12  relied on much of it without reservation.  (AR 3875–78.)  The ALJ did find a small number of Dr.

13  Solomon's recommendations and conclusions to be unreliable, but did not directly question Dr.

14  Solomon's credibility generally or specifically on the issue of providing one-to-one aide.  (AR

15  3878.)  Yet, the ALJ did not recommend a one-to-one aide.  Instead, the ALJ concluded:

16  "Student did not prove he required a one-to-one aide, in fact, the evidence was contrary as

17  Student's dislike of authority figures and even an aide at arm's length could trigger a behavior

18  incident in Student."  (*Id*. at 3888.)  As the magistrate judge acknowledged, there is evidence in

19  the record before this court indicating that J.B. is resistant to authority.  Nonetheless, the court

20  agrees with the magistrate judge (*see* Doc. No. 72 at 68) that, despite this, the evidence also

21  demonstrates that unless there is one-to-one aide support, J.B. is unable to access his education.

22  The ALJ even acknowledged this in passing by concluding that LEAs denied J.B. FAPE from

23  January 31, 2017 through the date of the filing of the due process hearing request.  (AR 3865

24  ("Student continued to engage in aggressive behavior, required frequent redirection and

25  prompting from his classroom aide to remain engaged in his school work.").)

26    LEAs' objections fail to address head on Dr. Solomon's opinions or the logic of the

27  magistrate judge's findings and recommendations.  Rather, LEAs again focus on the wrong legal

28  standard, arguing that the magistrate judge's recommendations should be rejected because the

19

1   findings and recommendations fail to find that the ALJ committed clear error.[8]  As mentioned

2   above, that is not the governing standard of review.  This court has discretion to fashion remedies

3   (including to add remedies above and beyond those awarded by the ALJ) to meet the unique

4   circumstances of a case.  *See Sch. Comm. of Town of Burlington Mass. v. Dep't of Educ. Of Mass*,

5   471 U.S. 359, 369 (1985).  Any awarded remedy must be fact-specific and be "reasonably

6   calculated to provide the educational benefits that likely would have accrued from special

7   education services the school district should have supplied in the first place."  *Reid ex rel. Reid v.*

8   *District of Columbia*, 401 F.3d 516, 524 (D.D.C. Cir. 2005); *Fresno Unified Sch. Dist. v. K.U. ex*

9   *rel. A.D.U*., 980 F. Supp. 2d 1160, 1171 (E.D. Cal. 2013).  The court finds that the findings and

10  recommendations recommended remedy of a one-to-one aide is supported by a preponderance of

11  the evidence of record and is reasonable under the circumstances of this case.

12          In light of this ruling, the court returns to J.B.'s request that the court specifically order

13  that any one-on-one aide be "behaviorally trained" and be supervised by a "behaviorist."  (Doc.

14  73 at 8–9.)  Plaintiff's primary support for this request comes from the declaration of Madison

15  Oak's Clinical Director, Starlett Armstrong, which was part of plaintiff's supplemental evidence

16  submission.  (*Id*. at 8.)  As explained above, the undersigned has concluded that it is not

17  appropriate to consider this supplemental evidence.[9]  Moreover, the court also agrees with LEAs

18  that "behavioral training" is not a well-defined term of art in the field and therefore that plaintiff's

19  ────────────

20  [8]  LEAs other objections to this remedy focus on J.B.'s supplemental evidence.  (*See* Doc. No. 74 at 16–18).  Because the court does not consider that supplemental evidence, those objections are overruled as moot.

21

22  [9]  J.B.'s reliance on the supplemental information to support his request for clarification of the remedies request does not warrant a different outcome on the record supplementation motions.

23  Opening the record to consider plaintiff's evidence regarding the necessary level of training for a one-to-one aid would likely require the court to consider a vast swath of extra-record evidence in

24  order to determine whether that training is truly necessary in light of J.B.'s needs.  The parties clearly have many factual disputes about J.B.'s current situation, and the court will not allow this

25  relatively minor issue to metastasize into an entire trial *de novo*.  *See Ojai*, 4 F.3d at 1473 ("The determination of what is 'additional' evidence must be left to the discretion of the trial court

26  which must be careful not to allow such evidence to change the character of the [proceeding] from one of review to a trial de novo. . . . a court should weigh heavily the important concerns of

27  not allowing a party to undercut the statutory role of administrative expertise . . . and the conservation of judicial resources.").

28

20

1   specific request, ostensibly designed to clarify the magistrate judge's order, will not necessarily

2   clarify anything.  (*See* Doc. 76 at 7 (citing cases).)  Accordingly, J.B.'s request for greater

3   specificity as to the training of the provided one-to-one aide will be denied.  That said, the

4   primary remedial purpose of the aide is to address J.B.'s behavioral needs and LEAs should take

5   that into consideration when making arrangements pursuant to this order.

6         5.    <u>Specialized Instruction</u>

7       J.B. has also requested as a remedy educational therapy and specialized academic

8   instruction in math and language arts.  (*See* Doc. No. 40-1 at 18–19.)  As the findings and

9   recommendations indicate, the ALJ cited evidence demonstrating that math and language arts are

10   areas in which J.B. has deficits.  (AR 3865 (academic assessment reviewed at January 31, 2017

11   IEP meeting "revealed math deficits in calculations," and the IEP team identified that math was

12   an area of need for J.B.); AR 3871 (similar findings reached in January 29, 2018 IEP meeting);

13   AR 3879 (indicating J.B. had "significant weakness in calculation, math facts fluency, applied

14   problems, and broad mathematics.").  The ALJ, in ordering that J.B. be placed at Madison Oaks,

15   specifically indicated that this placement remedy would provide J.B. with "specialized academic

16   instruction by properly credentialed special education teachers" and would compensate him for

17   past denials of FAPE.  (AR 3898.)

18       Nonetheless, the pending findings and recommendations recommend that "[i]n light of the

19   documented deficiencies in Math and Language Arts," the court should order "as a compensatory

20   remedy for past denials of FAPE, that LEAs be required to fund educational therapy/specialized

21   academic instruction in the form of instructional IEP services in Math and Language Arts through

22   the 2020-21 school year."  (Doc. No. 72 at 61.)  In other words, as with the one-on-one aide, the

23   magistrate judge recommended additional specialized academic instruction as part of a package

24   of *compensatory remedies* above and beyond that ordered by the ALJ.

25       As was the case with the LEAs' attack on the one-on-one aide remedy, they argue that the

26   magistrate judge did not find that the ALJ committed clear error in fashioning the remedy.  (Doc.

27   No. 74 at 19.)  Because LEAs again advance the wrong standard of review to be employed by the

28   court, this generic objection is without merit.  LEAs also argue that the recommended remedy

1    cannot be justified simply based upon evidence of record that notes J.B.'s deficits in these areas,

2    because a deficit alone is not a denial of FAPE.  (*Id*.)  In advancing this and other objections,

3    LEAs seem incapable of internalizing that the ALJ *found a denial of FAPE* over an extended

4    period of time and that numerous failures by the LEAs rendered J.B. unable to access his

5    education.  The ALJ repeatedly noted that the LEAs identified math and language as areas of

6    need and failed to set appropriate goals to address those needs.  (*E.g.,* AR 3865, 3871.)  That the

7    ALJ concluded the residential placement was a sufficient remedy for past denials of FAPE is not

8    dispositive; this court has discretion to impose remedies beyond that remedy fashioned by the

9    ALJ.  The court sees no reason to depart from the magistrate judge's recommendation that

10   additional instruction in math and language arts be awarded to remedy past denials of FAPE.  In

11   making that recommendation, the magistrate judge considered the entire record and extensive oral

12   argument on the merits.  (*See* Doc. No. 56).  The court has likewise reviewed extensive portions

13   of the transcripts from the hearing before the ALJ.  Of particular note, the ALJ relied on the

14   testimony of Barbara Radebaugh, the assistant administrator and director of clinical services at

15   Madison Oaks, to support the conclusion that Madison Oaks could meet J.B.'s educational needs.

16   (AR 3897.)  The court's own review of Ms. Radebaugh's testimony reveals little to no specific

17   discussion of how Madison Oaks might remediate J.B.'s past denials of FAPE, including the

18   harm caused by the LEAs' previous failures to set appropriate goals for J.B. in relation to math

19   and language arts.  (*See* AR 4785-4846.)  Accordingly, the court will adopt the findings and

20   recommendations as to this remedy.

21        However, the court notes that the recommended remedy is not specific as to the number of

22   hours per week or whether any of the "specialized academic instruction" awarded could be

23   encompassed within the normal programming offered by Madison Oaks.  Therefore, as to this

24   remedy, the court will require plaintiff to file a supplemental brief no longer than five pages in

25   length explaining: (1) how much specialized academic instruction in math and language arts is

26   normally provided each week to J.B. at Madison Oaks; (2) how many additional hours of

27   specialized instruction (weekly) plaintiff is requesting and why plaintiff believes that amount of

28   /////

1    additional instruction is appropriate in light of J.B.'s current circumstances and schedule. [10]

2    LEAs will then be given an opportunity to file a response, also no longer than five pages in

3    length.  Alternatively and preferably, the parties may submit a stipulation as to how they intend to

4    arrange provision of this remedy.[11]

5              6.    Remedy of Occupational Therapy Assessment

6              J.B.'s January 2017 IEP identified "bilateral coordination" as an area of need.  (AR 3886.)

7    The ALJ found that the LEAs denied J.B. FAPE regarding OT for the entire two-year statutory

8    period.  (*Id.*)  The magistrate judge ordered an OT assessment and development of appropriate

9    goals as a remedy.  (Doc. No. 72 at 62.)  LEAs argue in their objections that this remedy is

10   inappropriate because J.B. never requested it in his due process complaint, or in the final order

11   following the pre-hearing conference.  (*See* Doc. No. 74 at 19–20 (citing AR 60–61, 721–22).)

12   Plaintiff disagrees.

13            The court agrees with plaintiff that his complaint contained a remedy request that

14   encompasses the remedy of an OT assessment.  (AR 60 (requesting "[f]unding for the creation of

15   IEP goals in [J.B.'s] documented areas of academic need (e.g., behavior, math, reading fluency,

16   spelling, *OT*, executive functioning, short-term memory, and attention) by a non-District expert

17   with demonstrable experience working with students similarly situated to [J.B.] who have

18   frequent, intense, and dangerous behaviors") (emphasis added).)  With this request, plaintiff

19   demanded that OT goals be set for J.B.  Because an OT assessment is a pre-requisite to the setting

20   of OT goals, the court finds that plaintiff's request effectively demanded an OT assessment.  (*See*

21   Doc. 77 at 14.)  LEAs' hyper-technical objection as to this issue will also be rejected.

22   /////

23   /////

24   _____

25   [10]  The court is aware that the current public health crisis has significantly impacted the provision
     of educational services.  If the parties believe that the real-world circumstances have significantly

26   changed the footing of this case, they should have made efforts to inform the court of those
     changed circumstances.  They did not do so.

27
     [11]  In any such stipulation, the LEAs are welcome to reserve their right to challenge the court's

28   provision of this remedy.

1          7.       Assistive Technology

2          Finally, LEAs object to the magistrate judge's recommendation that the LEAs be ordered

3   to ensure that an assistive technology ("AT") assessment be provided to J.B.  (Doc. No. 74 at 20.)

4   The ALJ found that the LEAs denied J.B. a FAPE in part because they failed to perform an AT

5   assessment, which the LEAs do not dispute.  (AR 3863.)  For example, the ALJ reasoned:

6               47. Student's needs rose to the level that Tuolumne County and
               Curtis Creek provided Student with electronic technology in an effort
7               to contain his behaviors. Tuolumne County and Curtis Creek team
               members indicated at the January 31, 2017 IEP team meeting that
8               they did not believe Student required any assistive technology. Yet,
               when the IEP team reconvened on February 24, 2017, the team
9               agreed Parent would provide Student a leapfrog tablet for school use.
               Tuolumne County and Curtis Creek also agreed Student required an
10              iPad and headphones to allow him to navigate his bus rides to and
               from school. The IEP team offered these services to address
11              Student's behavior without the benefit of an assistive technology
               assessment to determine Student's unique needs in this area.
12              Tuolumne County and Curtis Creek were on notice from at least
               February 24, 2017, of Student's needs in the area of assistive
13              technology.  Tuolumne County and Curtis Creek's failure to assess
               Student in that area of need denied him a FAPE from February 24,
14              2017.

15   (AR 3889.)  LEAs place great emphasis on the fact that the ALJ appears to focus on J.B.'s need

16   for assistive technology in his previous, particular (but no longer prevailing) educational setting,

17   namely the use of a tablet and headphones on the school bus.  (*See* Doc. No. 74 at 20.)  While it is

18   true that J.B. would no longer need that specific adaptation while in residential treatment because

19   he would no longer be riding the bus, that does not necessarily mean J.B. is not entitled to an AT

20   assessment.  Again, LEAs fail to address head on the relevant question of whether ordering an AT

21   assessment is a reasonable compensatory remedy for a residentially-placed student who was

22   denied FAPE while in a non-residential setting.  The evidence in the record before the court

23   indicates that there are various assistive technologies that may help J.B. overcome issues related

24   his various needs, academic and behavioral.  (AR 3800.)  This makes assistive technology an

25   appropriate remedy under the circumstances.

26   /////

27   /////

28   /////

                                          24

1          **CONCLUSION**

2     For the reasons set forth above:

3     A.  Construing the magistrate judge's ruling on J.B.'s motion to supplement the record

4          (Doc. No. 32) as findings and recommendations, the court declines to adopt those

5          recommendations and DENIES that motion to supplement.

6     B.  Because LEAs' motion to supplement the record (Doc. Nos. 74-1, 78) is offered to

7          rebut J.B.'s supplemental evidence, and J.B.'s subsequent evidentiary submissions are

8          framed as sur-rebuttals to the LEAs' rebuttal evidence, the court DENIES AS MOOT

9          any requests to supplement the record with that rebuttal or sur-rebuttal evidence.

10    C.  The decision of the ALJ is affirmed in part and reversed in part as follows:

11          1.  The ALJ's determination that LEAs denied J.B. a FAPE from January 4, 2017,

12              through the remainder of the 2016-17 school year by failing to offer J.B. clear and

13              measurable annual goals, failing to continue his OT goals, reducing his

14              educationally related mental health services, failing to timely conduct a functional

15              behavioral assessment, failing to offer appropriate behavioral intervention

16              services, and failing to offer a behavior intervention plan is AFFIRMED.

17          2.  The ALJ's determination that LEAs denied J.B. a FAPE during the 2017-18 school

18              year by failing to conduct an assistive technology assessment, failing to offer clear

19              and measurable goals, failing to develop goals to meet his need in executive

20              functioning, failing to offer OT goals and services, and failing to offer sufficient

21              educationally related mental health counseling is AFFIRMED.

22          3.  The ALJ's determination that beginning on May 10, 2018, LEAs denied J.B. a

23              FAPE by not offering a more restrictive placement based on his history of

24              frequent, intense, and dangerous behavior is AFFIRMED.

25          4.  The ALJ's grant of compensatory remedies for denial of a FAPE is AFFIRMED.

26          5.  The following additional compensatory remedies for denial of FAPE are awarded:

27              a.  LEAs are directed to reimburse Parents for the cost of Ms. Swaffar's

28                  services in the amount of $580.

                                25

b. LEAs are directed to:

    i. Contract with Madison Oaks, or another mutually-agreed upon residential program, to pay J.B.'s daily fees of tuition, therapeutic services, and room and board through the end of the 2020-21 regular school year; and

    ii. Pay for roundtrip airline tickets for Parents and J.B.'s brother to visit J.B. two times during the 2020-21 regular school year, and a two-night hotel stay for each of those visits, for a total of six roundtrip airline tickets and four nights of hotel accommodations.

    iii. Provide J.B. with one-to-one aide support through the end of the 2020-21 regular school year.

    iv. Fund the completion of a new FBA according to the following parameters:

        1. The FBA should be conducted within sixty (60) days of entry of the district court's order, or pursuant to any alternative schedule mutually agreeable to all parties;

        2. The FBA shall either be conducted by a PhD-level behaviorist or by Judy Simon;

        3. The professional who conduct the FBA shall develop an appropriate behavior intervention plan based on the results of the functional behavior assessment;

    v. LEAs are directed to fund educational therapy or specialized academic instruction in math and language arts through the end of the 2020-21 regular school year;

    vi. LEAs are directed to fund a qualified independent assessor to conduct an assistive technology assessment within sixty (60) days of entry of the district court's order, or pursuant to any alternative schedule mutually agreeable to all parties, and to provide

26

appropriate assistive technology services based on that assessment;

the independent specialist shall be given reasonable opportunity to

review and comment upon these goals before they are finalized and

implemented.

    vii.   LEAs are directed to fund a qualified independent assessor to

conduct a new OT assessment and develop appropriate goals based

on that assessment within sixty (60) days of entry of the district

court's order, and for LEAs to provide appropriate OT services

based on that assessment.

   viii.   LEAs are directed to fund a qualified independent educational

specialist, with experience working with children similarly situated

to J.B., and approved by parents, to review the goals included in

J.B.'s current IEP, with such review to be conducted within sixty

(60) days of entry of the district court's order or pursuant to any

alternative schedule mutually agreeable to all parties.

    ix.   LEAs are directed to fund educational therapy or specialized

academic instruction in math and language arts through the end of

the 2020-21 regular school year, with the number of hours of such

remedial therapy or instruction to be set by the court in a separate

order.  To aid the court's decision-making in that regard, within

fourteen (14) days of the date of this order, plaintiff shall file a

supplemental brief no longer than five pages in length explaining:

(1) how much specialized academic instruction in math and

language arts is normally provided each week to J.B. at Madison

Oaks; (2) how many additional hours of specialized instruction

(weekly) plaintiff is requesting and why plaintiff believes that

amount of additional instruction is appropriate in light of J.B.'s

circumstances and schedule.  Within fourteen (14) days of the filing

of plaintiff's supplemental brief, LEAs will then be given an
opportunity to file a response, also no longer than five pages in
length.  Alternatively and preferably, the parties may submit a
stipulation as to how they intend to arrange provision of this
remedy.

6.  The ALJ's decision is otherwise AFFIRMED.

IT IS SO ORDERED.

Dated:   **March 31, 2021**

UNITED STATES DISTRICT JUDGE

28